207UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMAL SALAAM BEY,

                              Plaintiff,

                                                      9:14-CV-00836
v.                                                    (GLS/TWD)

CHRISTOPHER MILLER, et al.
                              Defendants.
_____

APPEARANCES:                          OF COUNSEL:

JAMAL SALAAM BEY
   a/k/a Raymond Davis
Plaintiff pro se
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821


HON. ERIC T. SCHNEIDERMAN              COLLEEN D. GALLIGAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT AND RECOMMENDATION**</u>

## I.    INTRODUCTION

Pro se Plaintiff Jamal Salaam Bey, a/k/a Raymond Davis, an inmate in the custody of the

New York Department of Corrections and Community Supervision ("DOCCS") and housed at

Great Meadow Correctional Facility ("Great Meadow"), commenced this civil rights action

pursuant 42 U.S.C. § 1983 on July 11, 2014.  (Dkt. No. 1.)  Plaintiff originally brought suit only

against DOCCS, claiming that because he is Moorish, neither the United States nor New York State have jurisdiction over him, and that he had been unlawfully stolen and was illegally confined by DOCCS and forced into slavery. *Id.* Plaintiff's original complaint was construed as alleging a claim under the First Amendment Free Exercise Clause for failing to allow Plaintiff to freely practice his Muslim faith. *Id.* Plaintiff's claims were all dismissed upon initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A, and Plaintiff was granted leave to serve an amended complaint with regard to the claims dismissed without prejudice. (Dkt. No. 7 at 15.)

On January 15, 2015, Plaintiff filed an amended complaint, which is the operative pleading in the action. (Dkt. No. 11.) Upon initial review, two newly named defendants and all of the claims in Plaintiff's amended complaint were dismissed except for Plaintiff's First Amendment retaliation claims against newly named Defendants Ms. Karen Johns ("Johns") and Ms. Murphy ("Murphy"), teachers at Great Meadow, and a Fourteenth Amendment claim against newly named Defendant Christopher Miller ("Miller"), Superintendent at Great Meadow. (Dkt. No. 13 at 8-9.[1])

 Remaining Defendants Johns, Murphy, and Miller have now moved for summary judgment. (Dkt. No. 27.) Plaintiff has opposed the motion, and Defendants have filed a reply. (Dkt. Nos. 35[2] and 36.) For the reasons that follow, the Court recommends that Defendants'

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2] In response to Defendants' motion, Plaintiff filed papers consisting of a series of statements, each labeled as an "amended complaint." (Dkt. No. 35-1.) The "amended complaints" address specific claims made by Plaintiff. *Id.* With the exception of an attachment to one of Plaintiff's "amended complaints," none of his opposition papers are verified or sworn to under penalty of perjury. *Id.* at 16-17. Plaintiff's submission is treated as his response to Defendants' motion for summary judgment. *See* Text Order, dated August 2, 2016.

motion for summary judgment (Dkt. No. 27) be granted in its entirety.

## II.     FACTUAL BACKGROUND

### A.     Johns Misbehavior Report

Plaintiff was housed at Great Meadow during the January 2014 through December 2014 time period relevant to his claims.  (Dkt. No. 11 at 2, 4.)  According to Johns, a teacher at Great Meadow during the summer of 2014, Plaintiff was assigned to her classroom in July 2014 as a part of his mandatory program assignment and failed to attend class on July 17, 2014.  (Dkt. No. 27-8 at ¶¶ 1, 4-5.)  Green Meadow security personnel located Plaintiff in the law library and directed him to class.  *Id*. at ¶ 6; Dkt. No. 27-3 at 22.

Plaintiff claims that he did not have a program card assigning him to school at the time, and he had been in the law library working on an appeal.  (Dkt. No. 27-3 at 22.)  Plaintiff does not believe he was ever properly assigned to a school program.  *Id*. at 19.  Plaintiff testified at his deposition that he had never been to class prior to July 17, 2014, and had not previously met Johns.  *Id*. at 23, 35.)

When Plaintiff entered Johns' classroom, she directed him to take a seat.  (Dkt. No. 27-8 at ¶ 7.)  According to Johns, Plaintiff turned and faced her and yelled "I won't do anything" at her in front of the inmates in class, causing a disturbance among the students.  *Id*. at ¶ 8.  Johns ordered Plaintiff to go sit on the bench outside of the classroom with Officer Nitche ("Nitche") and told Nitche that Plaintiff had yelled and disrupted her class.  *Id*. at ¶¶ 9-10.  Plaintiff claims that Johns was belligerent and acted "real hostile" towards him.  (Dkt. No. 27-3 at 23.)

Johns issued a misbehavior report on Plaintiff regarding the July 17, 2014, incident charging him with 102.10    threats; 109.10    out of place; 104.13    creating a disturbance;

106.10    refusing a direct order; and 107.10    interference with employees *Id*. at ¶ 11; Dkt. No. 26-6 at 7.  Bey was put in keeplock.  (Dkt. No. 26-6 at 8.)  Plaintiff plead not guilty to the charges at his Tier II hearing.  *Id*. at 10.  Following the hearing, Plaintiff was found guilty of 104.13    creating a disturbance and 107.10    interference with employee.  He was found not guilty on the remaining charges in the misbehavior report.  *Id*. at 14.  The penalty imposed by the hearing officer included thirty days in keeplock and corresponding loss of various privileges.  *Id*.

**B.       Murphy Misbehavior Report**

Murphy is a teacher at Great Meadow.  (Dkt. No. 27-9 at ¶ 1.)  According to Murphy, Plaintiff was enrolled in her class at Great Meadow on September 29, 2014, as a part of his mandatory program assignment.  *Id*. at ¶ 4.  Plaintiff did not attend class on September 29, 2014, and was reported to be "in cell/AWOL."  *Id*. at ¶ 5.  Plaintiff did not attend class on September 30, 2014, October 1, 2014, and October 3, 2014, and was reported to be in the law library.  *Id*. at ¶ 6.  On October 6, 2014, Plaintiff again failed to attend class and was reported to be "in cell/AWOL."  *Id*. at ¶ 7.  Murphy wrote a misbehavior report on Plaintiff on October 6, 2014, for 109.10    being out of place.  *Id*. at ¶ 9; Dkt. No. 27-7 at 10.  Murphy had never met Plaintiff at the time she wrote the misbehavior report.  (Dkt. No. 27-9 at ¶ 9.)  Plaintiff was found guilty of the charge at his Tier II hearing, and a penalty of thirty days in keeplock and corresponding loss of various privileges was imposed.  (Dkt. No. 27-7 at 17.)

**C.       Miller's Lack of Involvement in the Affirmance of the Guilty Findings in Plaintiff's Two Tier II Hearings**

Plaintiff has sued Great Meadow Superintendent Miller for failing to overturn the determinations of guilt on the Tier II hearings held on the misbehavior reports issued by Johns

and Murphy. (Dkt. Nos. 11 at 7; 27-3 at 51-52; 35-1 at 7-9.) Miller has stated in his Declaration that he did not review Plaintiff's appeal or participate in the review or affirmance of the hearing officers' determinations in either of the two Tier II hearings. (Dkt. No. 27-5 at ¶¶ 10, 17.) The appeals from the Tier II hearing determination on Johns' July 17, 2014, and Murphy's October 6, 2014, misbehavior reports were referred by Miller's office to Captain Zazistaski ("Zazistaski") for review and determination. (Dkt. Nos. 27-5 at 8, 15; 27-6 at 2; 27-7 at 12.) Zazistaski affirmed the hearing determinations on the two misbehavior reports. (Dkt. Nos. 27-5 at ¶¶ 9, 16; 27-6 at 1; 27-7 at 1.)

## III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[3] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790

---

[3] Although Plaintiff's amended complaint is described by him as a "verified complaint," there is no verification, nor was the amended complaint signed under penalty of perjury. (*See* Dkt. No. 11.)

(2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.    FAILURE TO RESPOND TO MOVANTS' STATEMENT OF MATERIAL FACTS

Plaintiff has failed to respond to Defendants' Statement Pursuant to L.R. 7.1(a)(3) setting forth the material facts as to which Defendants assert no genuine issue of fact exists. (*See generally* Dkt. Nos. 28, 34, 35-1.) L.R. 7.1(a)(3) provides that "<u>The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert</u>."

While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to pro se litigants . . . does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Liberati v. Gravelle*, No. 12-CV-00795 (MAD/DEP), 2013 WL 5372872, at * 7 (N.D.N.Y. Sept. 24, 2013) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *Latouche v. Tompkins*, No. 09-CV-0308 (NAM), 2011 WL 1103045, at * 1 (N.D.N.Y. Mar. 23, 2911) ("a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a summary judgment motion").

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be

---

[4] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (requirement that pro se be advised of possible consequences of failing to respond to summary judgment motion, including movant's statement of material facts pursuant to local rules); L.R. 56.2 ("Notice to Pro Se Litigants of the Consequences of Failing to Respond to a Summary Judgment Motion").[5]

Courts in this district have found it appropriate to enforce L.R. 7.1(a)(3) and its predecessor L.R. 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon the opposing party's failure to properly respond to the statement. *See, e.g., Borihane v. Outhouse*, No. 9:05-CV-1256 (NAM/DEP), 2007 WL 2071698, at * 3 (N.D.N.Y. July 18, 2007) (following L.R. 7.1(a)(3) and accepting statement of material facts as uncontroverted) (citing *Elgamil v. Syracuse Univ.*, No. 99-CV-611 (NPM/GLS), 2000 WL 1264122, at * 1 (N.D.N.Y. Aug. 22, 2000) (listing cases)). The Court recommends that notwithstanding Plaintiff's pro se status, the District Court follow the practice of enforcing L.R. 7.1(a)(3) and accept the facts set forth in Defendants' Material Statement of Facts as

---

[5] Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond properly to their summary judgment motion, including the failure to respond to Defendants Material Statement of Facts. (Dkt. No. 27 at 3.)

uncontroverted to the extent supported by record evidence.

## V.   ANALYSIS

### A.   Exhaustion

One of the grounds on which Defendants Johns and Murphy seek summary judgment is Plaintiff's failure to exhaust his administration remedies with regard to the retaliation claims he has asserted against them.  (Dkt. No. 27-1 at 9-11.)

#### 1.   Legal Standard

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined.  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).  In New York state prisons, DOCCS has a well-established three-step inmate grievance program.  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.  First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence.  *Id.* at § 701.5(a) (2010).  A

representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3)(ii). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of

the evidence).

A prisoner's failure to exhaust, however, does not end a court's exhaustion review. For more than ten years, courts in this district were guided by the Second Circuit's decision in *Hemphill v. New York*. 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill*, the Second Circuit established a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust available administrative remedies could nevertheless be justified by "special circumstances."[6] *Id*. However, on June 6, 2016, the Supreme Court rejected the "special circumstances" exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1862 (2016). In *Ross*, the question before the Court was whether there is a "special circumstances" exception under the PLRA when the inmate erroneously believed that he had satisfied the exhaustion requirement. *Id*. at 1855. In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

> the [PLRA] mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id*. at 1854-55. (internal citation omitted).

---

[6] Generally, the "special circumstances" exception was applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterpreted the statutory requirements of the appeals process. *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004), *abrogated by Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850 (2016).

The Supreme Court rejection of the "special circumstances" exception still, however, does not end a court's review "because the PLRA contains its own, textual exception to mandatory exhaustion." *Id*. at 1858. Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id*. Thus, courts are still tasked with determining whether or not a prisoner's administrative remedies are, in fact "available."

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available." *Id*. at 1853. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end    with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. at 1853-54. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*.

2. Analysis

Defendants assert that Plaintiff filed five grievances while incarcerated at Great Meadow. (Dkt. Nos. 28 at ¶ 42.) Defendants' record evidence shows that Plaintiff filed the following grievances in 2014: Grievance No. 57,344-14, dated February 19, 2014, complaining of tooth pain (Dkt. No. 27-4 at 15); Grievance No. 57,537-14, dated Match 17, 2014, complaining of medical indifference regarding his hearing, *id*. at 20; Grievance No. 57,546-14, dated March 29, 2014, complaining of being pat frisked while working in the mess hall, *id*. at 32; and Grievance

No. 57,895-14, dated June 15, 2014, complaining of unnecessary cell search and excessive cruel and unusual punishment. *Id.* at 57.

The grievance records submitted by Defendants show that Plaintiff's Grievance No. 58, 975-15, although dated January 8, 2014, was filed on January 9, 2015, and appears to refer to an incident that occurred on January 5, 2015, in which Plaintiff was taken from the law library to a class for which he had not been authorized. (Dkt. No. 27-4 at 2.) Plaintiff complained in the grievance that he had not had a program card for three weeks and an unidentified male had attempted to give him a program care without proper authority. *Id*. at 4. Plaintiff claimed not to need school and asked to go before the Program Committee. *Id.* Plaintiff's January 21, 2015, note signing off on the grievance states "I have a date to be seen by the Program Committee." *Id*. at 3.

In his opposition to Defendants' motion, Plaintiff submitted a grievance complaint form, dated July 17, 2014, in which he complains of retaliation by the same female school teacher against whom he had filed a grievance three weeks earlier. (Dkt. No. 34 at 1.) Plaintiff has not submitted evidence regarding the filling or resolution of the grievance, and there is no evidence in the record showing the filing by Plaintiff of a grievance against a school teacher three weeks earlier. According to Defendants, the grievance was not filed with the IGP at Great Meadow, and Plaintiff did not produce the grievance during the course of discovery. (Dkt. No. 36 at ¶ 8.)

Even if Plaintiff had filed the grievance submitted with his opposition papers, or any grievance at all, against Johns and Murphy, he did not exhaust his administrative remedies under the PLRA. Defendants have submitted the results of a record search by the Assistant Director of the Inmate Grievance Program for DOCCS which establishes that Plaintiff has not appealed any

facility level grievances to CORC.  (Dkt. No. 27-10 at ¶¶ 1, 8-12.)  Based upon the foregoing, the

Court finds that Plaintiff has failed to exhaust his administrative remedies with regard to his

retaliation claims against Johns and Murphy.  *See Woodford*, 548 U.S. at 93 (in order to exhaust

his administrative remedies, a prisoner must properly follow each of the applicable steps of the

DOCCS IGP, including an appeal to CORC, prior to commencing litigation).

Furthermore, the summary judgment record is devoid of evidence raising a genuine issue

of fact with regard to whether the administrative remedies under the IGP were "available" to

Plaintiff.  *See Ross*, 136 Sup. Ct.  at 1858.  There is no evidence that the DOCCS IGP operates as

a "simple dead end," *id.*; no evidence that the provisions of the IGP relevant to the grievance

process to be followed by Plaintiff were "so opaque" as to be practically speaking incapable of

use, *id*. at 1853-54; and no evidence that prison administrators thwarted Plaintiff from taking

advantage of the IGP.[7]  *Id.*  Therefore, the Court recommends that Defendants Johns and Murphy

be granted summary judgment on the grounds that Plaintiff has failed to exhaust his

administrative remedies with regard to his retaliation claims against him.

## B.    Retaliation Claims Against Johns and Murphy

Plaintiff claims that Defendants Johns and Murphy filed false misbehavior reports against

him in retaliation for grievances he had filed with regard to his participation in the school

---

[7]  Plaintiff appears to state in conclusory fashion in his unsworn opposition that he
attempted to file in excess of twelve to twenty grievances regarding prison conditions, policies,
and procedures not being followed by staff, but only four went to CORC because his filing of
initial grievances and appeals were obstructed.  (Dkt. No. 35-1 at 4.)  Plaintiff has provided no
actual evidence of obstruction with respect to any grievance, including grievances he claims to
have filed against Johns and Murphy.  Bald assertions, unsupported by evidence, are insufficient
sufficient to overcome a summary judgment motion.  *Cole*, 1999 WL 983876 at *3.

program. (Dkt. Nos. 27-3 at 35, 46-48; 35-1 at 10, 14, 16[8].) The Court finds that even if Plaintiff had exhausted his administrative remedies on the retaliation claims, Defendants Johns and Murphy would be entitled to summary judgment.

1.   <u>Legal Standard</u>

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 (2002)). "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381. Otherwise, the retaliatory act is simply *de minimis* and outside the scope of constitutional protection*. See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing *Dawes*, 239 F.3d at 292-93).

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In evaluating whether a causal connection exists

---

[8] Plaintiff's assertion that Murphy filed a false misbehavior report against him in retaliation for his having filed a grievance against him is found in several places. Docket No. 35-1 at page 16 is the only place the claim is asserted in a document submitted under penalty of perjury.

between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro,* 791 F. Supp. 2d at 370 (citations omitted).

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. 506. As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491. Accordingly, claims of retaliation must be supported by specific and detailed facts; conclusory statements are not sufficient. *Flaherty*, 713 F.2d at 13; *see also Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 WL 890658, at * 11 (N.D.N.Y. March

31, 2009) ("Analysis of retaliation claims . . . requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate has engaged and the adverse action taken against him or her, as well as the evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted.").

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

### 2. Analysis

Plaintiff claims that Johns and Murphy filed false misbehavior reports against him in retaliation for filing grievances. The filing of grievances has been found to constitute protected First Amendment conduct for purposes of a retaliation claim. *See Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity" for purposes of a retaliation claim). In addition, the filing a false misbehavior report can be adverse action for retaliation purposes. *Gill*, 389 F.3d at 384.

Plaintiff's retaliation claims against Johns and Murphy fail, however, on the issue of causation. In her Declaration, Johns has stated that at the time she prepared the misbehavior

report on July 17, 2014, she was unaware of any grievances filed by Plaintiff. (Dkt. No. 27-8 at ¶ 12.) Johns has asserted that the misbehavior report was based solely upon the events of July 17, 2014, and not in retaliation for any actions taken by Plaintiff at any other time. *Id*. at ¶ 13.

In addition, although the July 17, 2014, grievance against a female teacher submitted by Plaintiff in opposition to Defendants' motion (Dkt. No. 34 at 1) references a grievance against the same teacher three weeks earlier, evidence submitted by Defendants shows that no grievances relating to the school program were filed by Plaintiff until July 9, 2015. (Dkt. No. 27-4 at 2.) At his deposition, Plaintiff testified that he had never met Johns prior to the day he was called to her classroom. (Dkt. No. 27-3 at 35.) He also testified that he had not written a grievance regarding school prior to the incident with Johns on July 17, 2014. *Id*. at 36.

Based upon the record evidence, Plaintiff did not file a grievance against Johns prior to the issuance of the misbehavior report on July 17, 2014, thus negating the possibility that the filing of a grievance was "a substantial or motivating factor" in Johns' filing the misbehavior report, *Graham,* 89 F.3d at 79, and entitling Johns to summary judgment on Plaintiff's retaliation claim.

Murphy has stated in her Declaration that she had not met Plaintiff at the time she issued a misbehavior report against him on October 6, 2014, and she was unaware of any grievances filed by Plaintiff. (Dkt. No. 27-9 at ¶¶ 9-10.) According to Murphy, her misbehavior report was based solely upon Plaintiff's failure to attend class on October 6, 2014, and during the previous week and not in retaliation for any action by Plaintiff prior to that time. *Id*. at ¶ 11. Plaintiff testified at his deposition that he had never met Murphy prior to October 6, 2014. (Dkt. No. 27-3 at 51.)

Contrary to Plaintiff's conclusory assertion that Murphy filed the misbehavior report in retaliation for grievances he had filed against her (Dkt. No. 35-1 at 10, 14, 16), DOCCS grievance records reveal that Plaintiff filed no grievance against Murphy or anyone else regarding the school program prior to her issuance of the misbehavior report. (Dkt. Nos. 27-2 at ¶ 4; 27-4 at 1-77.) Moreover, since Plaintiff admittedly did not know Murphy prior to issuance of the misbehavior report, there is no evidentiary support for Plaintiff's conclusory claim.

In sum, based upon the foregoing, the Court finds that even if Plaintiff had been found to have exhausted his administrative remedies or been excused from doing so, Johns and Murphy would be entitled to summary judgment on Plaintiff's retaliation claims because no reasonable jury could conclude from the evidence that the filing of grievances by Plaintiff was a substantial motivating factor in the issuance of the misbehavior reports. *See Jeffreys*, 426 F.3d at 554 (in order to avoid summary judgment, "there must be evidence on which the jury could *reasonably* find for the plaintiff").

### C.   Fourteenth Amendment Claim Against Miller

Plaintiff has alleged a Fourteenth Amendment denial of due process claim against Superintendent Miller for failing to overturn the determinations of guilt against Plaintiff at the Tier II hearings on the misbehavior reports issued by Johns and Murphy. (Dkt. No. 27-3 at 51-52.) Miller has stated in his Declaration that Plaintiff's appeals from the hearing officer's determination of guilt and imposition of penalties on the Johns and Murphy misbehavior reports were forwarded to Zazistaski for review and determination, and that Miller himself did not review the appeals or participate in the review or affirmation of the hearing officer's determinations or penalties. (Dkt. No. 27-5 at ¶¶ 8-10, 15-17.) According to Miller, it was

Zazistaski who affirmed the hearing officer's determinations and penalties. *Id*. at ¶¶ 9, 16.

Miller's statements are supported by record evidence. (*See* Dkt. Nos. 27-5 at 8, 15; 27-6 at 1-2;

27-7 at 1,12.)

To be held liable for a constitutional violation under § 1983, a defendant must have had

the requisite amount of personal involvement in the violation. *Wright v. Smith*, 21 F.3d 496, 501

(2d Cir. 1994). Supervisory officials may not be held liable merely because they hold a position

of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Moreover, "a supervisory

official . . . cannot be held liable under section 1983 solely for the acts of his subordinates."

*Friedland v. Otero*, Civil No. 3:11cv606 (JBA), 2014 WL 1247992, at * 9 (D. Conn. Mar. 25,

2014) (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). The Second Circuit has held

that personal involvement by a supervisor necessary to state a claim under § 1983 may be found

where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the

defendant, after being informed of the violation through a report or appeal, failed to remedy the

wrong, (3) the defendant created a policy or custom under which unconstitutional practices

occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly

negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant

exhibited deliberate indifference to the rights of inmates by failing to act on information

indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[9]

A supervisory official has no personal involvement for purposes of § 1983 when his

involvement was limited to forwarding Plaintiff's "disciplinary appeals . . . to other staff

---

[9] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

members." *Pilgrim v. Artus*, No. 9:07-CV-1001 (GLS/RFT), 2010 WL 3724883, at * 7

(N.D.N.Y. Mar. 18, 2010); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding

that referral of appeals down the chain of command does not create personal involvement on the

part of the referee); *Brown v. Goord*, No. 9:04-CV-0785 (TJM/GHL), 2007 WL 607396, at * 10

(N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that a supervisor may "delegat[e] to

high-ranking subordinates the responsibility to read and respond to . . . complaints by prisoners"

without becoming personally involved).

The Court finds, based upon the evidence in the record, that Miller had no personal

involvement in the review and determination of Plaintiff's appeals and is entitled to summary

judgment on Plaintiff's Fourteenth Amendment claim.  Therefore, the Court recommends that

summary judgment be granted in Miller's favor.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 27) be

**GRANTED** in its entirety; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance with

the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.

Dated: October 19, 2016
      Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his

complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution

of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. [4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. [5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. [6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being

met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No."[7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties.[8],[9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,*

495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements. [10] , [11] *Id.*

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

*6 Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion

analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).") Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3 . Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from

relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

### IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

## Footnotes

1   *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).*

2   The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. _____".

3   According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4   Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5   Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6   Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7   During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8   The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco, 814 F.2d 859, 862 (2d Cir.1987).* At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

**9**   Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

**10**   In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

**11**   In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2071698
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Inthanousone BORIHANE, Plaintiff,
v.
Robert OUTHOUSE, Sheriff, Defendant.

No. 9:05-CV-1256.
|
July 18, 2007.

**Attorneys and Law Firms**

Inthanousone Borihane, pro se.

Kenneth M. Alweis, Esq., Sandra J. Sabourin, Esq., of Counsel, Goldberg Segalla, LLP, Syracuse, NY, for the Defendant.

## *ORDER*

NORMAN A. MORDUE, Chief Judge.

 **\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge David E. Peebles, duly filed on the 25th day of June, 2007. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion seeking the entry of summary judgment dismissing plaintiff's complaint against him (Dkt. No. 22) is granted, and the plaintiff's complaint is dismissed in all respects on the basis of mootness.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Inthanousone Borihane, a federal prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against Cayuga County Sheriff Robert Outhouse, alleging deprivation of his civil rights occurring during a time when he was a federal detainee at the Cayuga County Jail ("CCJ"), awaiting sentencing on a bank robbery conviction. In his complaint, plaintiff alleges that while at the CCJ, he was denied access to a pastor, clergy, priest, or other ordained person for religious worship, and a proper law library and related materials meeting minimum standards under the governing state regulations. The remedial portion of plaintiff's complaint seeks only equitable relief, in the form of an order directing his transfer to a facility where he would be permitted to worship and afforded access to a proper law library.

Defendant has moved seeking dismissal of plaintiff's claims against him. Defendant's motion is predicated upon plaintiff's transfer out of the CCJ and into a federal prison facility, an occurrence which, Outhouse asserts, renders plaintiff's claim for injunctive relief academic. For the reasons set forth below I agree, and therefore recommend that defendant's motion be granted.

## I. *BACKGROUND*

When his complaint in this action was filed, plaintiff was an inmate incarcerated in the CCJ, located in Auburn, New York, awaiting sentencing on a federal conviction.[1] Complaint (Dkt. No. 1) ¶ 6. During the times relevant to his claims, plaintiff was housed in the facility's Restrictive Housing Unit ("RHU"). *Id.* Plaintiff maintains that while confined in the CCJ RHU he was subject to constitutional deprivations falling into two distinct areas.[2]

Initially, plaintiff's complaint alleges that he was not provided with adequate legal resources and assistance while confined within the RHU. *Id.* at ¶ 7. Specifically, plaintiff asserts that the law library at the CCJ did not include all of the materials required under the New York

Code of Rules and Regulations; did not offer the services of a notary public available to inmates, upon request, also as required; and did not make available a trained person to help him with his preparation of legal documents. Complaint (Dkt. No. 1) Attachment ¶ 4. Plaintiff further claims that over time, his requests for photocopies and law books were denied or severely restricted by prison officials, and these actions had the effect of unlawfully interfering with his access to the courts. *Id.* at ¶¶ 2, 3.

**\*2** The second aspect of plaintiff's claim surrounds defendant's alleged failure to provide him with access to a pastor or other clergy member while housed in the RHU, despite his multiple requests. *Id.* at ¶ 1. Borihane contends that this denial unlawfully interfered with the free exercise of his chosen religion. [3] Complaint (Dkt. No. 1) ¶ 6.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on October 3, 2005, and was subsequently granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. In his complaint, plaintiff alleges interference with the free exercise of his religious beliefs and impaired access to the courts due to the inadequacy of the law library at the CCJ and the denial by prison officials of his requests for legal materials. Plaintiff's complaint requests only equitable relief, seeking a directed transfer to another facility where he would have access to the requisite religious and legal resources; plaintiff has not requested recovery of monetary damages against the defendant. [4] Complaint (Dkt. No. 1) ¶ 9.

Issue in the case was joined on July 7, 2006 by the filing of an answer generally denying plaintiff's allegations and asserting various affirmative defenses including, *inter alia,* the lack of existence of a justiciable controversy, in light of plaintiff's transfer to another jail facility. Dkt. No. 9. Defendant has since moved, by motion filed on February 15, 2007, under Rules 56 and 12(b)(1) & (6) of the Federal Rules of Civil Procedure, in the alternative, urging dismissal of plaintiff's claims against him as moot, based upon his transfer out of the CCJ. Dkt. No. 22. Defendant's motion, to which plaintiff has filed no opposition, is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Legal Significance of Plaintiff's Failure to Oppose Motion*

Confronted with a motion by the defendant seeking dismissal of his complaint, plaintiff has not provided the court with the benefit of any argument as to why that motion should not be granted. Before turning to the merits of defendant's motion, I must address the plaintiff's failure to respond to that motion and determine what, if any, consequences should result from that failure.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Pub. Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a *pro se* plaintiff's failure to respond. *Robinson v. Delgado,* 96-CV-169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* 95-CV-1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b) (3), however, before summary judgment can be granted in this instance, even in the absence of opposition, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

**\*3** While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to his motion, plaintiff has left the facts set forth in defendant's Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have found it appropriate to enforce Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement. [5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this longstanding practice and, notwithstanding plaintiff's *pro se* status, accept defendant's assertion of facts as set forth in his Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendant's motion for facial sufficiency.

### B. *Summary Judgment Standard* [6]

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*4** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Mootness*

Article III of the United States Constitution confers upon federal courts the authority to decide actual cases and controversies. *Catzanzano v. Wing,* 277 F.3d 99, 107 (2d Cir.2001); *see also Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253 (1990); *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950-51 (1969). Consequently, a federal court presented with an action in which no live controversy exists may not entertain jurisdiction, but instead order dismissal of the case as moot. *Catanzano,* 277 F.3d at 107.

Addressing the concept of mootness, the Second Circuit has noted that

> [t]he hallmark of a moot case or controversy is that the relief sought

can no longer be given or is no longer needed.

*Martin-Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under most circumstances, the transfer of an inmate plaintiff complaining of civil rights violations out of the prison facility in which those violations are alleged to have occurred presents just such a situation, thus mooting any claim for injunctive relief against prison officials of the transferring facility. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996); *Young v. Coughlin,* 866 F.2d 567, 568 n. 1 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989); *Beyah v. Coughlin,* 789 F.2d 986, 988 (2d Cir.1986); *Candelaria v. Greifinger,* No. 96-CV-0017, 1998 WL 312375, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

The constitutional deprivations of which Borihane now complains allegedly occurred while he was confined as an inmate within the CCJ. It has been established to the court's satisfaction, both by virtue of plaintiff's failure to respond to the portion of defendant's Local Rule 7.1(a)(3) Statement making this allegation, and from the court's own records, that plaintiff is no longer an inmate at that facility, having instead apparently been transferred into the custody of the Federal Bureau of Prisons, following his sentencing in connection with his bank robbery conviction. *See* Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 22-6) ¶ 3; *see also* Dkt. No. 14. Since it thus appears that plaintiff is no longer incarcerated at the CCJ, and there is no reason to conclude that the defendant, as the Cayuga County Sheriff, has any further involvement with the terms and conditions of Borihane's confinement, plaintiff's complaint, which seeks only equitable relief including a transfer to another facility where he can be provided with the requested legal and religious materials and services, must be dismissed as moot. *Prins,* 76 F.3d at 506; *Salahuddin,* 467 F.3d at 272.

IV. *SUMMARY AND RECOMMENDATION*

**\*5** In his complaint plaintiff has sought only equitable relief, and does not request monetary damages arising from the alleged denial of his constitutional rights. Since commencement of this action, plaintiff has been transferred out of the CCJ, which the constitutional violations of which he complains are alleged to have occurred, and the named defendant is no longer responsible for the conditions of his confinement. Plaintiff's claims for equitable relief against the defendant are therefore moot, and must be dismissed for failure to satisfy the case and controversy requirement of Article III of the United States Constitution. It is therefore hereby

RECOMMENDED that defendant's motion seeking the entry of summary judgment dismissing plaintiff's complaint against him (Dkt. No. 22) be GRANTED, and that plaintiff's complaint, be DISMISSED in all respects on the basis of mootness.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2071698

Footnotes

1    At the times relevant to his claims, plaintiff was in the custody of the United States Marshal. Because there is no federal facility for housing unsentenced detainees in this district, the United States Marshal contracts with various local authorities, including Cayuga County, for the housing of federal inmates awaiting trial and/or sentencing.

2    Plaintiff also alleges, generally, that his rights to due process, equal protection, and freedom from cruel and unusual punishment were violated, but makes no specific factual allegations in his complaint or the accompanying attachment to support any of those general claims. Complaint (Dkt. No. 1).

3    According to his complaint, Borihane is a practicing Christian. *See* Complaint (Dkt. No. 1) Attachment at ¶ 1.

4     An application by plaintiff for leave to amend his complaint was denied by order issued on December 20, 2006, based upon his failure to comply with the requirements of this court's local rules that he provide a copy of a fully integrated, proposed amended complaint with his motion. Dkt. No. 20. It appears that plaintiff's motion sought leave to name additional defendants and, while injunctive relief remained the focus of plaintiff's quest for relief, to add a claim for recovery of $5,000 "to cover any occurring expenses for filing [his] complaint and for hindering [his] spiritual growth with God." Dkt. No. 14 at p. 23.

5     According to Local Rule 7.1(a)(3), "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

6     Because the defendant has answered, his motion, to the extent that it seeks relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure, is no longer appropriate; instead, under such procedural circumstances a defendant intending to challenge the facial sufficiency of a pleading should move for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure-a provision which gives rise to an analysis generally informed by the same principles as those applicable to motions brought under Rule 12(b)(6). *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). In light of the fact that the defendant has moved in the alternative under Rule 56, and submitted a Local Rule 7 .1(a)(3) Statement in support of his application for summary judgment, I have treated defendants' motion as seeking the entry of summary judgment, and have analyzed it on that basis.

---

                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                          5

2007 WL 607396
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Joseph BROWN, Plaintiff,
v.
Glenn S. GOORD, Commissioner of New
York State Department of Correctional
Services; Dale Artus, Superintendent of Clinton
Correctional facility; Roy Lynch, Sergeant of
Clinton Correctional Facility, Defendants.

No. 9:04-CV-0785.
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Joseph Brown, Elmira, NY, Plaintiff, Pro Se.

Hon. Eliot L. Spitzer, Attorney General for the State of
New York, Roger W. Kinsey, Esq., Assistant Attorney
General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

 **\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred by this Court to the Hon. George
H. Lowe, United States Magistrate Judge, for a Report-
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule N.D.N.Y. 72.3(c).

The Report-Recommendation dated November 20, 2006
recommended that Defendants' motion for summary
judgment be granted and that the action be dismissed in
its entirety. In the Report-Recommendation, Magistrate
Judge Lowe found that Plaintiff had failed to adduce
any evidence indicating that Defendants were personally
involved in the alleged constitutional violations. Plaintiff
filed objections to the Report-Recommendation.

When objections to a magistrate judge's Report-
Recommendation are lodged, the Court reviews the record
*de novo. See* 28 U.S.C. § 636(b)(1). After such a review,

the Court may "accept, reject, or modify, in whole or
in part, the findings or recommendations made by the
magistrate [judge]. The [Court] may also receive further
evidence or recommit the matter to the magistrate [judge]
with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in Plaintiff's objections, this Court has
determined to accept and adopt the recommendation of
Magistrate Judge Lowe for the reasons stated in the
November 20, 2006 Report-Recommendation. The Court
has considered Plaintiff's grounds for objection and has
found them to be without merit.

It is therefore

**ORDERED** that Defendants' motion for summary
judgment [dkt. No. 26-42] is **GRANTED,** and the action
is **DISMISSED** in its entirety. Further, for the reasons
described by Magistrate Judge Lowe in his Report-
Recommendation at pages 5 to 7, the Court finds that
Plaintiff has accumulated more than "3 strikes" for
purposes of 28 U.S.C. § 1951(g).[1] Therefore, any appeal
from the judgment of this the Court, and any future civil
action, would be barred unless Plaintiff can demonstrate
that he "is under imminent danger of serious physical
injury." *Id.* Plaintiff is **ORDERED** to represent on any
future application for *in forma pauperis* status on any case
brought in a court of the United States while Plaintiff is
incarcerated or detained in any facility that he has received
three strikes under 28 U.S.C. § 1951(g).

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge[1].

This matter has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
Senior United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rule N.D.N.Y. 72.3(c). This is a
*pro se* civil rights action brought pursuant to 42 U.S.C.
§ 1983 by Inmate Joseph Brown ("Plaintiff") against
New York State Department of Correctional Services
("DOCS") Commissioner Glenn S. Goord, Clinton
Correctional Facility ("Clinton C.F.") Superintendent
Dale Artus, and Clinton C.F. Sergeant Roy Lynch

("Defendants"). Generally, in his Complaint, Plaintiff alleges that Defendants violated his rights under the First, Eighth and Fourteenth Amendments due to their involvement in (1) the allegedly improper searching of his mail on or about October 8, 2003, (2) the allegedly improper searching of his prison cell on or about October 8, 2003, (3) the allegedly improper testing of his urine for drug usage on or about October 9, 2003, and January 25, 2004, and (4) the allegedly improper conducting of three disciplinary hearings concerning Plaintiff, which occurred in October of 2003 and February of 2004. (Dkt. No. 1 & Attachments [Plf.'s Compl.].)

**\*2** Currently before the Court is Defendants' motion for summary judgment. (Dkt. No. 26.) Generally, Defendants' motion raises the following issues: (1) whether Plaintiff has failed to adduce any evidence indicating that Defendants were personally involved in the constitutional violations that Plaintiff alleges; (2) whether, in the alternative, Plaintiff has failed to state a due process claim under the Fourteenth Amendment concerning the conducting of his three disciplinary hearings; (3) whether, in the alternative, Defendants are protected from liability by the doctrine of qualified immunity; and (4) whether, in the alternative, the Eleventh Amendment bars recovery from Defendants in their official capacity. (Dkt. No. 26, Part 43 [Defs.' Mem. of Law].) For the reasons discussed below, I answer the first two questions in the affirmative (and I therefore do not answer the second two questions). As a result, I recommend that Defendants' motion for summary judgment be granted.

## I. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [3]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). [4] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." [5] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [6]

Imposed over this general burden-shifting framework is the generous perspective with which the Court generally views a *pro se* civil rights plaintiff's papers. [7] For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, generally the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. [8]

Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment." [9] Moreover, "there are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded such special solicitude." [10] I note that, in such cases, the overly litigious inmate is not being denied this special solicitude or status as a form of punishment for his litigiousness but as a form of recognition of his obvious litigation experience (and the lack of need for special solicitude). [11]

**\*3** Here, after carefully considering the matter, I conclude that Plaintiff's litigation experience warrants denying him the special solicitude or status normally afforded *pro se* civil rights litigants. In addition to the current action, it appears that Plaintiff has filed at least nine other such actions in district courts within the Second Circuit alone:

1. *Brown v. C.E.R.T. for D.O.C.S.,* 82-CV-1028 (E.D.N.Y.) (prisoner civil rights action).

2. *Brown v. Queens County D.A.,* 82-CV-2318 (E.D.N.Y.) (prisoner civil rights action).

3. *Brown v. Warden Sirnotty,* 82-CV-2649 (E.D.N.Y) (prisoner civil rights action).

4. *Brown v. Hoke,* 87-CV-2066 (E.D.N.Y.) (habeas corpus petition).

5. *Brown v. Hoke,* 88-CV-0620 (E.D.N.Y.) (habeas corpus petition).

6. *Brown v. New York,* 90-CV-7766 (S.D.N.Y.) (prisoner civil right action).

7. *Brown v. Herbert,* 94-CV-1221 (N.D.N.Y.) (habeas corpus petition).

8. *Brown v. Kelly,* 95-CV-1011 (S.D.N.Y.) (prisoner civil rights action).

9. *Brown v. Fitzpatric,* 99-CV-4502 (S.D.N.Y.) (prisoner civil rights action).

Moreover, it appears that Plaintiff has filed at least six federal court appeals in actions dealing with his imprisonment:

1. *Brown v. Hoke,* No. 87-7197 (S.Ct.).

2. *Brown v. Hoke,* No. 88-6688 (S.Ct.).

3. *In re Joseph C. Brown,* No. 89-6175 (S.Ct.).

4. *Brown v. State of N.Y. D.O.C.S.,* No. 91-2189 (2d Cir.).

5. *Brown v. Queens County D.A.,* No. 96-2783 (2d Cir.).

6. *Brown v. Fitzpatric,* No. 99-0225 (2d Cir.).

Finally, an important point bears mentioning with regard to the *in forma pauperis* ("IFP") status that Plaintiff has enjoyed during this action. On July 6, 2004, Plaintiff applied for permission to proceed IFP. (Dkt. No. 2.) On July 15, 2004, I granted that application. (Dkt. No. 7.) In so doing, I relied on Plaintiff's sworn assertion in his Complaint that he had previously filed only one other federal court action dealing with his imprisonment.[12] In fact, Plaintiff had filed numerous other such actions, as indicated above. Had I known of these numerous prior federal court actions concerning Plaintiff's imprisonment, I would have briefly examined them and learned that Plaintiff had already earned three "strikes" for purposes of 28 U.S.C. § 1915(g) .[13] As a result, I would have concluded that Plaintiff was no longer eligible to proceed IFP,[14] and I would have denied his application. While I decline at this late stage of the proceeding to withdraw my prior Order and to stay the case pending receipt of the Court's filing fee from Plaintiff, or to cite Plaintiff's lack of candor and good faith as an additional reason in favor of dismissing Plaintiff's Complaint, I do believe that the Court's final decision on Defendants' motion should reflect Plaintiff's prior litigation history, and his accumulation of "three strikes" for purposes of 28 U.S.C. § 1915(g).

### III. STATEMENT OF MATERIAL FACTS

**\*4** The facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [15] and are not specifically controverted by the non-movant.[16] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[17] In the event the district court chooses to conduct such an independent review of the record, it may search a verified complaint (which has the effect of an affidavit) for proof of a factual dispute.[18]

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [19] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[20] In addition, such an affidavit (or verified complaint) must not be conclusory.[21] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too general.[22] Moreover, "[a]n affidavit must not present legal arguments." [23]

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [24]

While I apply these legal principles below in the Analysis section of this Report-Recommendation (to the extent necessary), I pause to make four general observations. First, all of the factual assertions set forth in Defendants' Rule 7.1 Statement are supported by the record (although I note that one of those paragraphs does not contain a factual assertion but a legal conclusion, which is not appropriate for a Rule 7.1 Statement).[25] Second, the

majority (i.e., 33 out of 50) of those factual assertions are admitted by Plaintiff. [26] Third, with regard to the few (i.e., 17 out of 50) factual assertions that Plaintiff denies (or denies knowledge regarding), generally Plaintiff's Rule 7.1 Response violates Local Rule 7.1(a)(3) by not setting forth a specific citation to the record where the (alleged) factual issue arises. [27] The only two record citations provided by Plaintiff in support of a denial either do not support the fact asserted by him or are offered in support of a legal argument, not a factual assertion appropriate for a Rule 7.1 Response. [28] With respect to the remainder of Plaintiff's unsupported denials, I decline to perform an independent review of the record to find proof of a factual dispute-although I take notice of any such proof of a factual dispute that I come across during my review of the record. Toward that end, I note that Plaintiff's Complaint is verified.

### IV. ANALYSIS

#### A. Whether Plaintiff Has Failed to Adduce Any Evidence Indicating that Defendants Were Personally Involved in the Constitutional Violations Alleged

**\*5** A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. [29] The standards for assessing the liability of supervisors (such as Defendants Goord and Artus) were stated by the Second Circuit in *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2004):

The liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed of it through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

#### 1. Defendant Goord

Although Plaintiff cites the above-stated legal standard in his memorandum of law, he does not *expressly* identify which of the five ways that Defendant Goord was allegedly involved in the alleged constitutional violations. [30] However, Plaintiff's Complaint, memorandum of law, and Rule 7.1 Response assert that Defendant Goord was involved in the alleged constitutional violations in October of 2003 through the third, fourth and/or fifth means of personal involvement stated above. [31] (I note that Plaintiff does not allege or argue that Defendant Goord was personally involved in any of the other constitutional violations alleged in this action, i.e., any of the violations occurring in January and February of 2004.)

More specifically, Plaintiff's papers can be read as setting forth the following three arguments in support of Defendant Goord's personal involvement: (1) as the Commissioner of DOCS, Defendant Goord was responsible for "creat[ing]" and "enforcing" the "procedures being implemented against plaintiff at Clinton [C.F.]" in October of 2003; (2) as the Commissioner of DOCS, Defendant Goord was responsible for managing his "administrative staff" in October of 2003 who included, among others, Defendants Artus and Lynch; and (3) Defendant Goord failed to take appropriate action after being placed on "actual or constructive notice of the unconstitutional procedures that were being implemented at Clinton [C.F.]" in October of 2003 through the three letters that Plaintiff sent to Defendant Goord between October of 2003 and March of 2004. [32]

Based on the record before me, I find that each of these three arguments is wholly without evidentiary support.

#### a. Creation of a Policy or Custom that Sanctioned Conduct Amounting to a Constitutional Violation, or Allowing Such a Policy or Custom to Continue

There is no evidence that Defendant Goord created, or allowed to continue, a policy or custom that sanctioned any constitutional violation (assuming there was such a violation). Plaintiff does not even bother to specify the "policy, practice or custom[ ]" to which he is conclusorily referring. [33]

**\*6** If Plaintiff is referring to some sort of policy or custom at Clinton C.F. that (allegedly) sanctioned or caused the improper searching of his mail and/or prison cell, and/or the improper testing of his urine in October of 2003, then Plaintiff has failed to (1) identify that particular policy or custom, (2) explain how it sanctioned or caused

the alleged constitutional violations in October of 2003, and (3) provide any evidence indicating that Defendant Goord either created that policy or custom, or knew of it and permitted it to continue. Indeed, Plaintiff's own allegations acknowledge that the wrongdoers in question were acting in *violation* of DOCS policies. [34] In any event, there is no evidence in the record that Defendant Goord ever read any of the three letters sent to him by Plaintiff concerning the events of October of 2003, sufficient to give him *knowledge* that any policy or custom violated the constitution. [35]

If, instead, Plaintiff is referring to Defendant Goord's policy of delegating to high-ranking subordinates the responsibility to read and respond to, complaints by prisoners, then Plaintiff is mistaken that such a policy renders Defendant Goord personally involved in the constitutional violations of which the prisoners complain. [36] Moreover, the record is clear that, following the receipt of these letters by Defendant Goord's office, Defendant Goord's office took action (as described below in Part IV.A. 1.c. of this Report-Recommendation). Plaintiff has failed to adduce any evidence that this action was in some way inadequate, or that (even if it was somehow inadequate) Defendant Goord had any reason to know of any such inadequacy. Again, there is no evidence in the record that Defendant Goord ever read any of the three letters sent to him by Plaintiff concerning the events of October of 2003.

### b. Gross Negligence in Supervision of Subordinates who Committed a Violation

Similarly without merit is Plaintiff's argument that Defendant Goord was "grossly negligent" in managing any subordinates who caused any constitutional violations in October of 2003. Even assuming such a violation occurred, there is no evidence of gross negligence (or even ordinary negligence) by Defendant Goord for the reasons stated above and below (in Parts IV.A.1.a. and IV.A.1.c. of this Report-Recommendation). Plaintiff does not even bother to allege or argue that such violations had occurred previously and that Defendant Goord was on actual or constructive notice of any such prior violations. [37] The rule of absolute liability that Plaintiff espouses would hold Defendant Goord liable for any constitutional violations by a correctional employee at a correctional facility since he is the ultimate "supervisor" of such employees. That is simply not the law.

### c. Failure to Act on Information Indicating that Unconstitutional Acts Were Occurring

This is perhaps Plaintiff's strongest argument in favor of Defendant Goord's personal involvement in the alleged constitutional violations in October of 2003. However, as with Plaintiff's prior two arguments in favor of personal involvement, this argument is wholly devoid of evidentiary support.

**\*7** For purposes of Defendants' motion, it is uncontroverted that on or about October 10, 2003, March 22, 2004, and March 24, 2004, Plaintiff sent three letters (or copies of letters) to Defendant Goord requesting an investigation into the alleged mishandling of prisoner mail, the alleged improper searching of prison cells, and the alleged improper conducting of urinalysis tests of prisoners at Clinton C.F. [38]

Specifically, Plaintiff's letter of October 10, 2003, which was addressed to the DOCS Inspector General and copied to Defendant Goord, stated as follows:

> Please note that I am writing your office requesting that an investigation be conducted against the correspondence office, and a Sergeant R. Lynch here at Clinton Correctional Facility. Enclosed you will find a copy of a recently submitted recently subjected [sic] to continuous harassment by a Sergeant R. Lynch. I have had my cell searched, [a] urinalysis, a block placed on my spouse's phone, and [I have been] served with 2 fictitious misbehavior report [sic]. Both were written by Sgt. Lynch (tier II & tier III), and the tier II was for alleged contraband found in my cell (110-21 unauthorized papers) to which Sgt. Lynch, did not witness [sic] nor did he participate in said cell search.

> For all the above reasons I am requesting that this matter be investigated, and that the illegal tampering with my mail, and [sic] continuous harassment by Sgt. Lynch stop. I am also requesting that my mail and money order, which are being held in the Contraband Locker, be forwarded to me as they were confiscated illegally and depicted no wrong doing [sic] on my part. [39]

Moreover, Plaintiff's letter of March 22, 2004, which was addressed to Defendant Artus and copied to Defendant Goord, stated as follows:

In the month of October, 2003, I filed a Complaint with Commissioner Glenn S. Goord, regarding the harassment/misconduct directed against me by Sergeant Lynch, and the Head Clerk of Inmate Correspondence there at Clinton Correctional Facility. The Complaint was a correspondence issue and I was forwarded a Memo by your office, which stated that an investigation would be conducted; however, I have not heard or received anything regarding said investigation.

Sir, at this time I would like to have any and all papers regarding said investigation, including your findings with regards to my complaint.

I thank you for your time and consideration. [40]

Finally, Plaintiff's letter of March 24, 2004, to Defendant Goord, stated as follows:

In the month of October, 2003, I filed a complaint with your office against a Sergeant R. Lynch, and the Head Clerk of Inmate Correspondence there at Clinton Correctional Facility Annex. I was informed by your office that an investigation would take place; however, I have yet to hear anything at all. The Head Clerk, and Sergeant R. Lynch, without proper authorization [sic] or complying with Directive [sic], read and confiscated my incoming mail and served me with a Tier II Misbehavior Report. It is for this reason that I file my complaint with your office.

**\*8** At this time I would like to be made aware of the status or findings of said investigation. [41]

As an initial matter, I find it extremely questionable that these three letters were sufficient to provide Defendant Goord with even "constructive notice" of the alleged constitutional violations in October of 2003. The second two letters were sent to Defendant Goord in late-March of 2004, several months *after* the completion of the alleged constitutional violations in October of 2003. As a result, I fail to see how the two letters could possibly indicate "that unconstitutional acts *were occurring* " at the time of their receipt, as required for the fifth type of personal involvement. *Hernandez,* 341 F.3d at 145 [emphasis added].

Moreover, the first letter was devoid of factual detail about (1) who in the "correspondence office" at Clinton

C.F. "tamper[ed]" with Plaintiff's mail, when did they do so, and exactly how or why the alleged mishandling of Plaintiff's mail was unconstitutional, (2) who searched Plaintiff's prison cell, when did they do so, and exactly how or why was that search unconstitutional, (3) who conducted a urinalysis test of Plaintiff, when did they do so, and exactly how or why was that test unconstitutional, and (4) how Defendant Lynch could have been responsible for the improper cell search if, as Plaintiff alleges, he "did not participate in said cell search." [42]

In any event, even if Plaintiff's three letters were sufficient to put Defendant Goord on constructive notice of the alleged constitutional violations, it is uncontroverted that, following the receipt of Plaintiff's letters, Defendant Goord's office took action. Specifically, following the receipt of Plaintiff's October 10, 2003, letter to Defendant Goord, Defendant Goord's office forwarded the letter to DOCS Inspector General's Office Director of Operations Kenneth McLaughlin for a response; [43] Mr. McLaughlin responded to Plaintiff by memorandum dated November 19, 2003, which stated that he had referred the matter to (in part) Defendant Artus; [44] following an investigation of Plaintiff's complaint (and the discovery that Plaintiff's previously seized mail and money had been returned, and that Plaintiff had filed a formal grievance regarding the matter on October 9, 2003, which was ultimately found to be without merit), Captain Brown concluded that Plaintiff's complaint was without merit. [45] Similarly, following the receipt of Plaintiff's letters of March 22, 2004, and March 24, 2004, to Defendant Goord, Defendant Goord's office forwarded Plaintiff's March 24, 2004, letter to Deputy Commissioner Lucien J. Leclaire, Jr .; [46] Deputy Commissioner Leclaire investigated the matter and responded to Plaintiff by letter dated May 4, 2004.

Simply stated, no record evidence exists upon which a reasonable fact-finder could conclude that Defendant Goord "fail[ed] to act," as required for the fifth type of personal involvement. *Hernandez,* 341 F.3d at 145. If Plaintiff is arguing that Defendant Goord's actions were inadequate somehow, then Plaintiff has failed to specify the inadequacy, or support it with even a modicum of evidence.

**\*9** As a result, I recommend that the Court dismiss Plaintiff's Complaint against Defendant Goord due to

Defendant Goord's lack of personal involvement in any of the alleged constitutional violations.

### 2. Defendant Artus

Again, although Plaintiff cites the above-stated five-part legal standard in his memorandum of law, he does not *expressly* identify which of the five ways that Defendant Artus was allegedly involved in the alleged constitutional violations.[47] However, Plaintiff's Complaint, memorandum of law, and Rule 7.1 Response assert that Defendant Artus was involved in the alleged constitutional violations in October of 2003 through the third, fourth and/or fifth means of personal involvement stated above.[48]

More specifically, Plaintiff's papers can be read as setting forth the following three arguments in support of Defendant Artus's personal involvement: (1) as the Superintendent of Clinton C.F., Defendant Artus was responsible for "enforc[ing]" and "put[ting] into practical application" the "policy and custom" created by Defendant Goord, which sanctioned or caused the alleged constitutional violations; (2) as the Superintendent of Clinton C.F., Defendant Artus was responsible for managing the staff at Clinton C.F., which included, among others, Defendant Lynch; and (3) Defendant Artus failed to take appropriate action after being placed on "constructive or actual notice" of the alleged constitutional violations at Clinton C.F. through the two appeals and one letter that Plaintiff sent to Defendant Artus in February and March of 2004 .[49]

Based on the record before me, I find that each of these three arguments is wholly without evidentiary support.

### a. Allowing to Continue a Policy or Custom that Sanctioned Conduct Amounting to a Constitutional Violation

There is no evidence that Defendant Artus enforced or allowed to continue a policy or custom that sanctioned any constitutional violation (assuming there was such a violation). As with his allegations concerning Defendant Goord, Plaintiff does not even bother to specify the "policy and custom" to which he is conclusorily referring.[50]

Generally, the same problems that undermine Plaintiff's reliance on this theory of personal involvement to hold Defendant Goord liable undermine Plaintiff's reliance on this theory to hold Defendant Artus liable.[51] For example, Plaintiff's own allegations acknowledge that the wrongdoers in question were acting in *violation* of DOCS policies.[52] In any event, because I have already found that there is no record evidence that Defendant Goord created a policy or custom that sanctioned or caused any constitutional violation, I find that there was no such policy or custom that Defendant Artus could have "enforced."[53] Furthermore, because Defendant Artus (like Defendant Goord) may delegate to high-ranking subordinates the responsibility to read and respond to, complaints by prisoners, such a policy does not render Defendant Artus personally involved in the constitutional violations of which the prisoners complain.[54]

**\*10** I would only add that there is no evidence in the record that Defendant Artus ever read any of the letters or appeals sent to him by Plaintiff concerning the events in question, sufficient to give him *knowledge* that any policy or custom violated the constitution.[55]

### b. Gross Negligence in Supervision of Subordinates who Committed a Violation

Because Plaintiff advances this theory of personal involvement in such a conclusory fashion, it is difficult to identify and discuss this theory.[56] Regardless of the particular nature of this theory on which Plaintiff is attempting to rely, even assuming that one of Defendant Artus's subordinates at Clinton C.F. committed a constitutional violation against Plaintiff, there is no evidence of gross negligence (or even ordinary negligence) by Defendant Artus with regard to his supervision of that subordinate.

If Plaintiff is arguing that Defendant Artus's gross negligence in supervising his subordinates caused one or more of the constitutional violations that occurred in *October of 2003,* then that argument fails for rather obvious reasons. Specifically, Plaintiff does not adduce any evidence (or even allege) that (1) one of Defendant Artus's subordinates exhibited some sort of inclination before October 8, 2003 to commit one of the alleged constitutional violations occurring in October of 2003, (2) Defendant Artus was on actual or constructive notice

of any such inclination before October 8, 2003, or (3) Defendant Artus failed to take proper care in disciplining or training that subordinate before October 8, 2003. [57]

Similarly, if Plaintiff is arguing that Defendant Artus's gross negligence in supervising his subordinates caused one or more of the alleged constitutional violations that occurred in *January or February of 2004,* then that argument fails for two independent reasons. First, Plaintiff has neither alleged nor supported any facts indicating that the staff member responsible for a particular constitutional violation (such as the improper testing of his urine) in October of 2003 was the same staff member (or was acting pursuant to some sort of conspiracy with the staff member) who committed a similar constitutional violation in January or February of 2004. [58] Second, Plaintiff has neither alleged nor supported any facts indicating how Defendant Artus *failed* to take appropriate care in supervising his subordinates between October of 2003 and January or February of 2004. [59] Indeed, all of the available record evidence indicates that, following the receipt of Plaintiff's letters, Defendant Artus's office took appropriate action during that time period. (*See, infra,* Part IV.A.2.c. of this Report-Recommendation.)

As stated earlier, the type of absolute liability that Plaintiff wishes to impose on Defendant Artus due to his position as a supervisor is simply inconsistent with the standard for personal involvement in Section 1983 actions.

### c. Failure to Act on Information Indicating that Unconstitutional Acts Were Occurring

**\*11** For purposes of Defendants' motion, it is clearly established that, in October or November of 2003, Plaintiff's letter of complaint to the DOCS Inspector General's Office regarding various of the events complained of in this action was referred to Defendant Artus's office for review. In addition, it is uncontroverted that, in February and March of 2004, Plaintiff filed two appeals with, and sent one letter to, Defendant Goord, regarding various of the events complained of in this action. (I note that the two disciplinary convictions from which Plaintiff appealed in October of 2003 were decided, not personally by Defendant Artus, but by his designee, Clinton C.F. Captain S. Brown, as permitted by 7 N.Y.C.R.R. § 253.8.) [60]

Specifically, at some point between October 10, 2003, and November 19, 2003, the DOCS Inspector General's Office referred to Defendant Artus's office for review a letter of complaint sent by Plaintiff to the Inspector General's Office dated October 10, 2003, regarding the alleged events of October 8 and 9, 2003. [61] Plaintiff's underlying letter of October 10, 2003, stated as follows:

> Please note that I am writing your office requesting that an investigation be conducted against the correspondence office, and a Sergeant R. Lynch here at Clinton Correctional Facility. Enclosed you will find a copy of a recently submitted recently subjected [sic] to continuous harassment by a Sergeant R. Lynch. I have had my cell searched, urinalysis [sic], a block placed on my spouse's phone, and served with 2 fictitious misbehavior report [sic]. Both were written by Sgt. Lynch (tier II & tier III), and the tier II was for alleged contraband found in my cell (110-21 unauthorized papers) to which Sgt. Lynch, did not witness [sic] nor did he participate in said cell search.

> For all the above reasons I am requesting that this matter be investigated, and that the illegal tampering with my mail, and [sic] continuous harassment by Sgt. Lynch stop. I am also requesting that my mail and money order, which are being held in the Contraband Locker, be forwarded to me as they were confiscated illegally and depicted no wrong doing [sic] on my part. [62]

Furthermore, on February 9, 2004, Plaintiff appealed to Defendant Artus's office from the determination of guilt (on the charge of using drugs) at Plaintiff's disciplinary hearing on February 5, 2004 . [63] The stated grounds for the appeal were, in pertinent part, as follows:

> 1.) Officer Goff was in violation of Directive # 4937, Procedure # IV sub. D(2). Urine specimen were [sic] left unsecure for about an hour.

> 2.) I was denied due process when the hearing officer denied me information / statement [sic] of the confidential sources; also, when I was denied the requested log of 1/26/04, by Officer Cumber.

> 3.) Officer Cumber could not have been certified or properly trained. Albeit when asked, he stated that he has been testing urine for the past 2 years, he could

not give me a date that his certification began or ended. In fact, he stated that there is no set time. Nor could Officer Cumber answer any of my questions regarding the testing unit.

**\*12** 4.) Hearing Officer error when [sic] he failed to dismiss [the] misbehavior report against me, after noting that another inmate testing positive before me[ ] had the same exact negative, cutoff, and high calibration rate [sic] for test one and two. We also had the same positive rate for Cannabinoids, which is impossible.

5.) [The][d]isposition imposed given the evidence against me was harsh. I have never used drugs and have not had a dirty urine in or about 20 years. [64]

Moreover, on February 20, 2004, Plaintiff appealed to Defendant Artus's office from the denial (by the Clinton C.F. Inmate Grievance Review Committee) of his grievance dated February 10, 2004 (Grievance No. CLA-4014-04), complaining that improper urinalysis test procedures were employed on February 5, 2004. [65] Plaintiff's underlying grievance had complained that Clinton C.F. Corrections Officers Goff and D. Cumber had violated DOCS directives and procedures by collecting and testing Plaintiff's urine without properly labeling it with Plaintiff's identifying information; as a result, the grievance had requested the following relief: "That the issue of officer Cumber's certification be investigated and that I be given proof of his certification of 1/26/04. Also, Goff and Cumber ordered by their supervisors to comply with any and all Departmental Directives, Rules, Policies, and Procedures." [66] In denying the grievance, the Clinton C.F. Inmate Grievance Review Committee had responded: "Per investigative report, urine specimen was collected according to directives and procedures required. Officer Cumber was certified in use of equipment on Oct. 27, 2002." [67]

Finally, Plaintiff's letter of March 22, 2004, which was addressed to Defendant Artus, stated as follows:

In the month of October, 2003, I filed a Complaint with Commissioner Glenn S. Goord, regarding the harassment/misconduct directed against me by Sergeant Lynch, and the Head Clerk of Inmate Correspondence there at Clinton Correctional Facility. The Complaint was a correspondence issue and I was

forwarded a Memo by your office, which stated that an investigation would be conducted; however, I have not heard or received anything regarding said investigation.

Sir, at this time I would like to have any and all papers regarding said investigation, including your findings with regards to my complaint.

I thank you for your time and consideration. [68]

The problem with Plaintiff's reliance on these appeals and letters to show Defendant Artus's personal involvement in the alleged constitutional violations is not that the appeals and letters do not put Defendant Artus on "constructive notice" of the alleged violations but that each of the appeals and letters was followed by action taken by Defendant Artus's office.

Specifically, following the receipt of Plaintiff's letter to the Inspector General's Office dated October 10, 2003, and Plaintiff's letter to Defendant Artus dated March 22, 2004, Defendant Artus's office forwarded the matter to Clinton C.F. Captain S. Brown for investigation and response. [69] Following an investigation of Plaintiff's complaint (and the discovery that Plaintiff's previously seized mail and money had been returned, and that Plaintiff had filed a formal grievance regarding the matter on October 9, 2003, which was ultimately found to be without merit), Captain Brown concluded that Plaintiff's complaint was without merit. [70] In a letter to Plaintiff dated April 8, 2004 (a copy of which was sent to Defendant Artus), Captain Brown summarized the actions that he had taken in the fall of 2003 with respect to Plaintiff's complaint:

**\*13** An investigation was conducted into your complaint regarding mail.

As you are aware, you had your wife send you in 10 dollars and inmate Velez 10 dollars. You admitted that you had Velez sent money yet had several different stories regarding why.

You received the letter and $10.00 was placed in your account and the $15.00 m/o was returned to your wife as it was considered to be an illegal exchange.

I conferred with the IGRC and note you signed off a complaint [sic], and the money and letter was returned to you.

Therefore, I find no wrongdoing on any staff member's part; they performed their duties in an exemplary manner. [71]

Similarly, following Plaintiff's February 9, 2004, appeal to Defendant Artus's office from his disciplinary conviction of February 5, 2004, Defendant Artus's office reviewed and affirmed that conviction on March 16, 2004; the conviction was later also reviewed and affirmed by the Central Office Review Committee on March 30, 2004. [72]

Finally, following Plaintiff's February 20, 2004, appeal to Defendant Artus's office from the denial (by the Clinton C.F. Inmate Grievance Review Committee) of Plaintiff's grievance dated February 10, 2004, Defendant Artus's office referred the appeal for review to First Deputy Superintendent, William D. Brown; First Deputy Superintendent Brown reviewed and upheld the disposition of the Inmate Grievance Review Committee on February 19, 2004, which disposition was later also reviewed and upheld by the Central Office Review Committee on March 17, 2004. [73]

Simply stated, no record evidence exists upon which a reasonable fact-finder could conclude that Defendant Artus "fail[ed] to act," as required for the fifth type of personal involvement. *Hernandez,* 341 F.3d at 145. If Plaintiff is arguing that Defendant Artus's actions are inadequate somehow, then Plaintiff has failed to specify the inadequacy, or support it with evidence.

As a result, I recommend that the Court dismiss Plaintiff's Complaint against Defendant Artus due to Defendant Artus's lack of personal involvement in any of the alleged constitutional violations.

### 3. Defendant Lynch

With respect to the various constitutional violations that Plaintiff alleges, Plaintiff has failed to either (1) allege facts indicating that Defendant Lynch was personally involved in any of those violations or (2) adduce any evidence upon which a reasonable fact-finder could base a conclusion that Defendant Lynch was personally involved in any of those violations.

As stated earlier, Plaintiff alleges that Defendants violated his rights under the First, Eighth and Fourteenth Amendments due to their involvement in (1) the allegedly

improper searching of his mail on or about October 8, 2003, (2) the allegedly improper searching of his prison cell on or about October 8, 2003, (3) the allegedly improper testing of his urine for drug usage on or about October 9, 2003, and January 25, 2004, and (4) the allegedly improper conducting of three disciplinary hearings concerning Plaintiff, which occurred in October of 2003 and February of 2004. [74]

**\*14** With respect to the allegedly improper searching of Plaintiff's mail on or about October 8, 2003, Plaintiff alleges that Defendant Lynch "confiscated and read" Plaintiff's mail. [75] As an initial matter, this allegation is inconsistent with various other of Plaintiff's allegations, which acknowledge that it was someone *other than Defendant Lynch* who improperly opened and searched his mail. [76] Moreover, it is highly questionable that this isolated incident of improperly opening Plaintiff's non-legal mail states a claim of a constitutional dimension. [77] In any event, even if I were to liberally construe Plaintiff's Complaint as alleging that it was Defendant Lynch who had improperly opened and searched his mail in violation of the Constitution, Plaintiff has adduced no evidence in support of that allegation. [78] The closest Plaintiff comes to adducing such evidence is when he declares under penalty or perjury that the allegations of his Complaint are true and correct, thus converting his Complaint into an affidavit for purposes of a summary judgment analysis. [79] However, Plaintiff's sworn statement that Defendant Lynch "confiscated" Plaintiff's mail is entirely conclusory and not based on personal knowledge; as a result, it does not constitute evidence sufficient to oppose Defendants' motion for summary judgment. [80] Even if Plaintiff's sworn statement were non-conclusory and based on personal knowledge, I find that it would be insufficient evidence from which a fact-finder could conclude that Defendant Lynch was personally involved in the alleged constitutional violation, given the weight of record evidence to the contrary. [81] Finally, even if Defendant Lynch were found to have been somehow personally involved in the alleged constitutional violation, no evidence exists in the record from which a reasonable fact-finder could conclude that any such constitutional violation occurred. [82] Indeed, the alleged constitutional violation-which served as one of the bases for various of Plaintiff's grievances and disciplinary conviction appeals-

was investigated and found to be without merit due to a lack of evidence of any wrongdoing. [83]

With regard to the allegedly improper searching of Plaintiff's prison cell on or about October 8, 2003, Plaintiff alleges that Defendant Lynch ordered that search (which was conducted by corrections officers other than Defendant Lynch). [84] The problem with this allegation is that, in and of itself, the unwarranted search of an inmate's prison cell is not a constitutional violation because "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." [85] Such an unwarranted search could become a constitutional violation under the circumstances alleged only if it was conducted in retaliation for Plaintiff's exercise of a First Amendment right. [86] Here, however, Plaintiff does not allege any facts indicating that he had been engaging in "protected conduct" under the First Amendment before the cell search, or that Defendant Lynch knew of that fact and ordered the search *as a result* of that conduct. [87]

**\*15** With respect to the allegedly improper testing of Plaintiff's urine for drug usage on or about October 9, 2003, Plaintiff alleges that Defendant Lynch ordered that test (which was conducted by a corrections officer other than Defendant Lynch). [88] Plaintiff fails to allege, however, that the test was ordered without cause or for retaliatory reasons; rather, Plaintiff alleges that the "[g]round[ ] for [the] urine test was suspicion." [89] Under New York State regulations, corrections personnel may order an inmate to submit to a urine test based on a reasonable suspicion and information from a source that the inmate is using, or has recently used, illicit drugs or alcohol. [90] In any event, even if Plaintiff had stated a claim for some sort of constitutional violation, Plaintiff has failed to adduce any evidence that Defendant Lynch indeed ordered the test. [91] In fact, the record evidence indicates that it was a Sergeant "P. Devlin" who ordered the test. [92] Nor is there any evidence from which a reasonable fact-finder could conclude that the test violated the Constitution. [93] To the contrary, the denial of Plaintiff's grievances and disciplinary hearing, which were based in part on the urine test, weigh in favor of a conclusion that the test did not violate the Constitution. [94]

With respect to the allegedly improper conducting of two disciplinary hearings concerning Plaintiff, which occurred on October 16, 2003, Plaintiff's sole allegation against Defendant Lynch is that those hearings were the result of two unfounded misbehavior reports authored by Defendant Lynch. [95] As an initial matter, Plaintiff has adduced no evidence that either of those two misbehavior reports were false. [96] Indeed, the record evidence-which establishes that the misbehavior reports led to disciplinary convictions that were affirmed on appeal-is to the contrary. [97] In any event, even if I were to assume that those two misbehavior reports authored by Defendant Lynch were indeed false, Plaintiff has failed to allege that Defendant Lynch was personally involved in a *constitutional violation.* "It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report." [98] Here, Plaintiff's Complaint does not contain an allegation of any such aggravating factors (such as an allegation that the allegedly false misbehavior reports were issued in retaliation for Plaintiff's exercise of a constitutionally protected right). [99]

With respect to the allegedly improper testing of Plaintiff's urine for drug usage on or about January 25, 2004, Plaintiff does not allege that Defendant Lynch was personally involved in that test (such as by ordering it or conducting it). The closest Plaintiff comes to making such an allegation is when he alleges, "While Plaintiff awaited his hearing in punitive segregation at Clinton Annex, Sergeant Lynch[ ] came to Plaintiff's cell and stated[,] 'You know[,] Brown, some guys know how to quit while they're ahead. What's your problem?" [100] Taken in context with the rest of Plaintiff's allegations, the significance of this allegation is its implication that Plaintiff was subjected to a urine test on January 25, 2004, because of a complaint that Plaintiff had previously filed with Defendant Goord's Office regarding the events of October 2003. [101] However, the problem with this allegation is that Defendant Lynch's mere knowledge of Plaintiff's complaint to Defendant Goord's Office does not in any way involve him in the testing of Plaintiff's urine (especially considering the fact that Plaintiff acknowledges that the urine test was requested, not by Defendant Lynch, but by a "Sergeant West"). [102] Plaintiff does not even bother to allege the existence of some sort of conspiracy between Defendant Lynch and Sergeant West. [103] In any event, even if I

were to liberally construe Plaintiff's Complaint as alleging that Defendant Lynch was somehow involved in the testing of Plaintiff's urine on January 25, 2004, I find that Plaintiff has failed to adduce sufficient evidence from which a reasonable fact-finder could conclude that (1) any constitutional violation occurred with regard to the testing of Plaintiff's urine, or (2) Defendant Lynch was personally involved in such a constitutional violation. [104] Rather, the available record evidence-which establishes that Plaintiff's subsequent grievances and disciplinary conviction appeals based on this alleged violation were denied-is to the contrary. [105]

 **\*16** Finally, with respect to the allegedly improper conducting of Plaintiff's disciplinary hearing on February 5, 2004, Plaintiff has failed to allege any facts indicating that Defendant Lynch played any role whatsoever in the conducting of that hearing or the issuance of the misbehavior report on which the hearing was held. [106] In any event, even if I were to liberally construe Plaintiff's Complaint as alleging that Defendant Lynch was somehow involved in Plaintiff's February 5, 2004, disciplinary hearing or the issuance of the underlying misbehavior report, I find that Plaintiff has adduced insufficient evidence from which a reasonable fact-finder could conclude that (1) there was any constitutional violation occurring with regard to Plaintiff's February 5, 2004, disciplinary hearing (or the issuance of the underlying misbehavior report), or (2) Defendant Lynch was personally involved in that constitutional violation. [107] Rather, the available record evidence-which establishes that Plaintiff's subsequent grievances and disciplinary conviction appeals based on this alleged violation were denied-is to the contrary. [108]

For these reasons, I recommend that the Court dismiss all of Plaintiff's claims against Defendants Goord, Artus and Lynch based on Plaintiff's failure to allege facts indicating, and/or his failure to adduce evidence showing, that they were personally involved in the alleged constitutional violations.

### B. Whether, in the Alternative, Plaintiff Has Failed to State a Due Process Claim Under the Fourteenth Amendment Concerning the Conducting of His Three Disciplinary Hearings

Because I have already concluded that adequate reason exists to dismiss Plaintiff's Complaint, I need not, and do not, reach the merits of Defendants' alternative argument that Plaintiff's Complaint should be dismissed due to the fact that Plaintiff has failed to state a due process claim under the Fourteenth Amendment concerning the conducting of his three disciplinary hearings. [109]

### C. Whether, in the Alternative, Defendants Are Protected from Liability by the Doctrine of Qualified Immunity

Again, because I have already concluded that adequate reason exists to dismiss Plaintiff's Complaint, I need not, and do not, reach the merits of Defendants' alternative argument that Plaintiff's Complaint should be dismissed due to the fact that Defendants are protected by qualified immunity as a matter of law. [110]

### D. Whether, in the Alternative, the Eleventh Amendment Bars Recovery from Defendants in Their Official Capacity

Finally, again, because I have already concluded that adequate reason exists to dismiss Plaintiff's Complaint, I need not, and do not, reach the merits of Defendants' alternative argument that Plaintiff's Complaint should be dismissed due to the fact that the Eleventh Amendment bars recovery from Defendants in their official capacity. [111]

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 26) be **GRANTED.**

 **\*17** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2007 WL 607396

Footnotes

1    28 U.S.C. § 1915(g) provides:

     In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section
     if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or
     appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state
     a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

1    I would like to thank my intern, Francesco P. Trapani, currently a second-year law student at Syracuse University College
     of Law, who assisted in the researching and writing of this Report-Recommendation.

2    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S.
     242, 248 (1986).

3    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720
     (2d Cir.1990) [citation omitted].

4    *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

5    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby,
     Inc.,* 477 U.S. 242, 247-48 (1986).

6    *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N . Y. March 29, 2004) [internal quotations omitted;
     emphasis added].

7    *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d
     146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro
     se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

8    *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case);
     *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,*
     981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

9    *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations
     omitted], *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although
     "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to
     allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion
     ineffectual." *Kadosh v. TRW, Inc.,* No. 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

10   *See, e.g., Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 & n. 2 (N.D.N.Y. June 22, 2006) (McAvoy, J; Lowe, M.J.)
     (plaintiff had filed at least 20 actions in Northern District of New York and five other actions in Southern District of New
     York); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *19 & n. 10 (N.D.N.Y. March 31, 2005) (Treece,
     M.J.) (plaintiff had filed 20 actions in the Northern District of New York alone); *Gill v. Riddick,* 03-CV-1456, 2005 U.S.
     Dist. LEXIS 5394, at *7 & n. 3 (N.D.N.Y. March 31, 2005) (Treece, M.J.) (plaintiff had filed 20 actions in Northern District
     of New York alone); *see also Johnson v. Eggersdorf,* 8 Fed. Appx. 140, 143 (2d Cir. May 17, 2001) (unpublished opinion)
     (plaintiff at one point had 12 simultaneously pending lawsuits in Northern District alone), *aff'g,* 97-CV-0938, Decision and
     Order (N.D.N.Y. May 28, 1999) (Kahn, J.), *adopting,* 97-CV-0938, Report-Recommendation, at 1, n. 1 (N.D.N.Y. Apr. 28,
     1999) (Smith, M.J.); *Johnson v. D. Gummerson,* 201 F.3d 431 (2d Cir.1999) (plaintiff at one point had 12 simultaneously
     pending lawsuits in Northern District alone), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. June 11, 1999) (McAvoy,
     J.), *adopting,* 97-CV-1727, Report-Recommendation (N.D.N.Y. April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d
     27, 31 (2d Cir.1994) (plaintiff at one time had at least 30 simultaneously pending lawsuits); *Davidson v. Dean,* 204
     F.R.D. 251, 257 (S.D.N.Y.2001) (plaintiff at one point had 30 simultaneously pending suits); *Santiago v. C.O. Campisi,*
     91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (plaintiff had 10 suits pending in district); *McGann v. U.S.,* 98-CV-2192, 1999 WL
     173596, at *2, 8-10 (S.D.N.Y. March 29, 1999) (court found 79 reported decisions of cases that plaintiff had filed during
     previous 43 years); *Brown v. McClellan,* 93-CV-0901, 1996 U.S. Dist. LEXIS 8164, at *3-4, & n. 3, 1996 WL 328209
     (W.D.N.Y.1996) (plaintiff had filed seven previous lawsuits against prison officials); *Brown v. Selsky,* 93-CV-0268, 1995
     U.S. Dist. LEXIS 213, at *2, n. 1, 1995 WL 13263 (W.D.N.Y. Jan. 10, 1995) (plaintiff had seven cases pending in district).

11   *See, supra,* note 10 of this Report-Recommendation (citing cases discussing rationale for denying special status to overly
     litigious *pro se* litigants).

12   (Dkt. No. 1, ¶ 4.B. [Plf.'s Verified Compl., describing only one other federal court action that he had previously filed dealing
     with his imprisonment].)

13   *See Brown v. Kelly,* 95-CV-1011, Order of Dismissal (S.D.N.Y. Feb. 21, 1996) (*sua sponte* dismissing Plaintiff's civil
     rights action for failure to state a claim and certifying, pursuant to 29 U.S.C. § 1915, that any appeal from the Order

would not be taken in good faith"); *Brown v. Fitzpatric,* 99-CV-4502, Order of Dismissal (S.D.N.Y. June 23, 1999) (*sua sponte* dismissing Plaintiff's civil rights action for failure to state a claim and certifying, pursuant to 29 U.S.C. § 1915, that any appeal from the Order would not be taken in good faith"); *Brown v. Fitzpatric,* No. 99-0225 (2d Cir. Apr. 27, 2000) (dismissing appeal as frivolous within meaning of 29 U.S.C. § 1915).

14    *See* 18 U.S.C. § 1915(g) ("In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.").

15    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g ., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

16    *See* Local Rule 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*").

17    *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment; *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

18    *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

19    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

20    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

21    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

22  *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

23  N.D.N.Y. L.R. 7.1(a)(2).

24  *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

25  The aforementioned legal conclusion is contained in Paragraph 48 of Defendants' Rule 7.1 Statement. (Dkt. No. 26, Part 2, ¶ 48.) The only factual assertion in Defendants' Rule 7.1 Statement that does not contain a record citation is Paragraph 34. (Dkt. No. 26, Part 2, ¶ 34 [Defs.' Rule 7.1 Statement].) This omission appears to have been a simple oversight, since the document cited in the paragraphs preceding and following Paragraph 34 (i.e., the Artus Affidavit) contains evidentiary support for the fact asserted in Paragraph 34. (*See* Dkt. No. 26, Part 3, ¶ 33 [Artus Affid.].)

26  (Dkt. No. 29, ¶¶ 1, 3, 3.a., 5-8, 9.a., 10.a., 13, 15, 17-19, 21, 23, 25 [Plf.'s Rule 7.1 Response, admitting to the facts asserted in Paragraphs 1, 3, 5-8, 13-16, 18, 19, 21-30, 32, 36-44, and 46 of Defendants' Rule 7.1 Statement].)

27  (Dkt. No. 29, ¶¶ 2, 4, 9, 10, 11, 12, 14, 16, 20, 22, 24, 26, 27 [Plf.'s Rule 7.1 Response, denying or denying knowledge of the facts asserted in Paragraphs 2, 4, 9-12, 17, 20, 31, 33-35, and 45, 47-50 of Defendants' Rule 7.1 Statement], ¶¶ 4.a., 9.a., 10.a. [admitting portions of the aforementioned "disputed" paragraphs].)

28  (Dkt. No. 29, ¶¶ 4.a., 26.a. [citing to Paragraph 1 of Plaintiff's Compl. to support Plaintiff's factual assertion that the letter from Plaintiff's wife to Plaintiff did not contain, in part, a fifteen dollar money order to Inmate Valez; and citing Paragraphs 9-14 of Defendant Goord's affidavit to support Plaintiff's legal argument that Defendant Goord was "personally involved" in the constitutional violations alleged in this action].)

29  *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

30  (Dkt. No. 29, Plf.' Mem. of Law, at 5-9.)

31  (Dkt. No. 1, Attachments [Plf.'s Compl.]; Dkt. No. 29, Plf.' Mem. of Law, at 5-9; Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 26.a ..)

32  (Dkt. No. 29, Plf.' Mem. of Law, at 6, 10; *see also* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 26.a.; Dkt. No. 1, Attachments [Plf.'s Compl., attaching letter dated 3/22/04 from Plaintiff to Defendant Artus with copy to Defendant Goord; and attaching letter dated 3/24/04 from Plaintiff to Defendant Goord].)

33  (Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 26.a.)

34  For example, Plaintiff alleges that "the person in correspondence [who had searched Plaintiff's mail] had no authority to read or confiscate Plaintiff's incoming mail without following Directive that govern such [sic]." (Dkt. No. 1, "Statement of Claim," ¶ 1 [Plf.'s Compl.].) In addition, Plaintiff argues that staff members at Clinton C.F. "were not following the

proper policy and procedure for incoming mail according to N.Y. Directive 4422; and were not following the proper policy and procedure for cell searches according to N.Y. Directive 4910." (Dkt. No. 29, Plf.'s Mem. of Law, at 10.) Moreover, in Plaintiff's letter to the Clinton C.F. Grievance Clerk, dated October 9, 2003 (which is attached to his Complaint and incorporated in it by reference), Plaintiff alleges, "Had Inmate Correspondence complied with the rules and regulations governing their job function, and ahdere[d] to Chapter VIII, Directives 4422 and 4421, I would not be faced with said harassment." (Dkt. No. 1, Attachments [Plf.'s Compl.].)

35 (*Compare* Dkt. No. 26, Part 2, ¶ 47 [Defs.' Rule 7.1 Statement, asserting this fact, and citing the affidavit of Defendant Goord, which, at Paragraphs 12 and 13, supports this fact] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 23 [denying "sufficient knowledge to admit or deny" this fact, but failing to set forth a specific citation to the record where any factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court, and thus effectively admitting this fact].)

36 *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

37 (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 29, Plf.'s Mem. of Law, at 7, 10.)

38 (*Compare* Dkt. No. 26, Part 2, ¶¶ 38, 42, 43 [Defs.' Rule 7.1 Statement, asserting these facts, and citing evidence in support of them] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 23 [admitting these facts].)

39 (Dkt. No. 26, Part 23 [attaching Plaintiff's letter dated 10/10/03].)

40 (Dkt. No. 1, Attachments [Plf.'s Compl.], attaching letter dated 3/22/04 from Plaintiff to Defendant Artus with copy to Defendant Goord]; Dkt. No. 26, Part 23 [attaching Plaintiff's letter dated 3/22/04].)

41 (Dkt. No. 1, Attachments [Plf.'s Compl., attaching letter dated 3/24/04 from Plaintiff to Defendant Goord]; Dkt. No. 26, Part 22 [attaching Plaintiff's letter dated 3/24/04].)

42 *See Wright v. Coughlin,* 21 F.3d 496, 501 (2d Cir.1994) (there was no personal involvement on the part of DOCS Commissioner even though he received a letter from plaintiff describing the conditions of his confinement, because the letter failed to state that plaintiff "was being retained in the SHU without a hearing, or that he had been deprived or any rights connected with a hearing").

43 (*Compare* Dkt. No. 26, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact, and citing evidence in support of it] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 23 [admitting this fact].)

44 (*Compare* Dkt. No. 26, Part 2, ¶ 40 [Defs.' Rule 7.1 Statement, asserting this fact, and citing evidence in support of it] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 23 [admitting this fact].)

45 (*Compare* Dkt. No. 26, Part 2, ¶¶ 8, 17-19, 41, 44 [Defs.' Rule 7.1 Statement, asserting these facts, and citing evidence in support of them] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶¶ 8, 14, 15, 23 [admitting the asserted facts, and then denying "sufficient knowledge to admit or deny" one of the facts, but failing to set forth a specific citation to the record where any factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court]; *see also* Dkt. No. 26, Part 3, ¶ 20 [Artus Affid., stating, "After review of the pertinent rules and regulations Captain S. Brown found that the proper procedure governing inmate correspondence had been followed."]; Dkt. No. 26, Part 26, ¶ 19 [Lynch Affid., stating, "After a review of the pertinent rules and regulations Captain S. Brown found that the proper procedure governing inmate correspondence had been followed."]; Dkt. No. 26, Part 38 [attaching Interdepartmental Communication dated 10/9/03 from Defendant Lynch to Captain S. Brown regarding the "Brown/Velez investigation"].) In addition, I note that Plaintiff appears to have agreed on October 17, 2003, to withdraw his formally filed grievance and simply grieve the matters at issue through the disciplinary process, which also resulted in a finding that Plaintiff's complaints were without merit. (*See, e.g.,* Dkt. No. 26, Part 37 [attaching Plaintiff's grievance dated 10/9/03, bearing handwritten note signed by Plaintiff, which stated, "10/17/03 returned mail & money. [W]ill appeal via disciplinary. *Joseph C. Brown* "].)

46 (*Compare* Dkt. No. 26, Part 2, ¶ 45 [Defs.' Rule 7.1 Statement, asserting this fact, and citing evidence in support of it] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 24 [denying "sufficient knowledge to admit or deny" this fact, but failing to set forth a specific citation to the record where any factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court, and thus effectively admitting this fact].)

47 (Dkt. No. 29, Plf.' Mem. of Law, at 9-11.)

48    (Dkt. No. 1, Attachments [Plf.'s Compl.]; Dkt. No. 29, Plf.' Mem. of Law, at 9-11; Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶¶ 2, 33-35.)

49    (Dkt. No. 29, Plf.' Mem. of Law, at 9-11; *see also* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶¶ 2, 33-35; Dkt. No. 1, Attachments [Plf.'s Compl., attaching letter dated 3/22/04 from Plaintiff to Defendant Artus].)

50    (Dkt. No. 29, Plf.' Mem. of Law, at 10.)

51    *See, supra,* Part IV.A. 1.a. of this Report-Recommendation.

52    In addition to Plaintiff's numerous assertions acknowledging that the wrongdoers were violating DOCS policies regarding mail and cell searches (*see, supra,* note 34 of this Report-Recommendation), Plaintiff has acknowledged that the wrongdoers were violating DOCS policies regarding the collection of urine specimens and the conducting of Tier hearings. (Dkt. No. 29, Plf.'s Mem. of Law, at 10 [arguing, "[S]taff members at Clinton [C.F.] were not following the proper policy and procedure for urine specimen collection according to N.Y. Directive 4937 coupled with the Tier hearings not being conducted properly...."]; Dkt. No. 26, Part 9 [attaching Plaintiff's appeal to Superintendent's Office from disciplinary hearing determination of 2/5/04, in which Plaintiff argued that "Officer Goff was in violation of Directive # 4937, Procedure # IV sub. D(2). Urine specimen were [sic] left unsecure for about an hour"].)

53    *Id.*

54    *See* *Reid v. Artus,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (no basis for personal involvement where Superintendent Artus assigned another officer to investigate plaintiff's complaint); *Gonzalez v. Coughlin,* 92-CV-7263, 1996 WL 496994, at *3-4 (S.D.N .Y. Sept. 3, 1996) (dismissing plaintiff's claim against prison superintendent for lack of personal involvement where plaintiff sent letter to superintendent, who referred matter to his deputy; stating, "Superintendent Keane receives a large volume of complaints every day, [and] for him to respond [to] or investigate each complaint would be practically impossible").

55    (Dkt. No. 26, Part 39 [attaching response to Plaintiff's letter addressed to Defendant Artus dated March 22, 2004 which was not signed by Defendant Artus, but rather by his subordinate Captain Brown]; Dkt. No. 26, Part 3, ¶ 3 [Artus Affid., stating that he "was not personally involved in the decisions made by the staff at Clinton Correctional Facility with regard to Mr. Brown, his mail, cell search or drug testing"], ¶¶ 3 1-33 [stating, with regard to Plaintiff's Tier III hearing appeal, that "it is the standard custom and practice ... for the First Deputy Superintendent to review inmate Grievances that are not resolved. During the relevant time period First Deputy Superintendent, William D. Brown, routinely reviewed inmate grievance appeals"], ¶¶ 33-37 [stating, with regard to Plaintiff's appeal of Deputy Superintendent Brown's decision to CORC, that "I do not make decisions of this kind but I reasonably rely upon my staff to investigate and respond to these types of inquiries"]; Dkt. No. 26, Part 42, at 42 [attaching Plf.'s deposition transcript, wherein Plaintiff testified that he did not know if Defendant Artus personally received any of Plaintiff's appeals].)

56    (Dkt. No. 29, Plf.'s Mem. of Law, at 10-11 [arguing, "Defendants are guilty of their combined gross negligence and deliberate indifference to the constitutional rights of the plaintiff at Clinton [C.F.], as indicated by their knowledge, their exhibits, affidavits and letters from plaintiff, [sic] that unconstitutional practices were taking place, and their failure to act on the basis of the information received"].)

57    (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 29, Plf.' Mem. of Law, at 10.)

58    (*Compare* Dkt. No. 1, "Statement of Claim," ¶ 3 [Plf.'s Compl., alleging that Plaintiff was given a urine test at the request of Defendant Lynch] *with* Dkt. No. 1, "Statement of Claim," ¶ 7 [Plf.'s Compl., alleging that Plaintiff was given a second urine test at the request of Sergeant West] *and with* Dkt. No. 1, "Statement of Claim," ¶ 13 [Plf.'s Compl., alleging that the second urine test was improperly administered by two unidentified corrections "officers," not a corrections "sergeant" such as Defendant Lynch]; *compare* Dkt. No. 1, "Statement of Claim," ¶ 5 [Plf.'s Compl., alleging simply that, at his October 2003 disciplinary hearing, he was found guilty, and not alleging any particular procedural right he was denied or the identity of the hearing officer] *with* Dkt. No. 1, "Statement of Claim," ¶ 13 [Plf.'s Compl., alleging simply that, at his February 2004 disciplinary hearing, he was "denied the right to challenge the credibility of the confidential information, and not alleging the identity of the hearing officer; *see also* Dkt. No. 26, Part 11 [attaching Grievance No. CLA-4014-04, alleging that the two corrections officers responsible for improperly administering Plaintiff's urinalysis test on 2/5/04 were Officers Goff and Cumber] .)

59    (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 29, Plf.' Mem. of Law, at 9-11.)

60    (Dkt. No. 26, Part 36 [attaching Plaintiff's disciplinary history, showing that Plaintiff's appeals from his two Tier II disciplinary convictions on 10/8/03 were affirmed by Captain S. Brown on 10/22/03].)

61    (Dkt. No. 26, Part 20 [attaching memorandum from DOCS Inspector General's Office Director of Operations Kenneth McLaughlin to Plaintiff dated 11/19/03, stating the referenced fact].)

62    (Dkt. No. 26, Part 23 [attaching Plaintiff's letter dated 10/10/03].)

63    (*Compare* Dkt. No. 26, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact, and citing evidence in support of it] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 18 [admitting this fact].)

64    (Dkt. No. 26, Part 9 [attaching appeal to Superintendent's Office from disciplinary hearing determination of 2/5/04].)

65    (*Compare* Dkt. No. 26, Part 2, ¶¶ 30-32 [Defs.' Rule 7.1 Statement, asserting these facts, and citing evidence in support of them] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶¶ 19-21 [admitting most of these facts, and denying "sufficient knowledge to admit or deny" some of the facts, but failing to set forth a specific citation to the record where any factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court, and thus effectively admitting that fact].)

66    (Dkt. No. 26, Part 11 [attaching Grievance No. CLA-4014-04, dated 2/10/04].)

67    (Dkt. No. 26, Part 12 [attaching I.G.R.C. Response to Grievance No. CLA-4014-04, dated 2/17/04].)

68    (Dkt. No. 1, Attachments [Plf.'s Compl., attaching letter dated 3/22/04 from Plaintiff to Defendant Artus with copy to Defendant Goord]; Dkt. No. 26, Part 23 [attaching Plaintiff's letter dated 3/22/04].)

69    (Dkt. No. 26, Part 24 [attaching letter from Clinton C.F. Captain S. Brown to Plaintiff dated 4/8/04, which was copied to Defendant Artus, responding to Plaintiff's letter to Defendant Artus dated 3/22/04, and discussing the actions Captain Brown had taken in response to Plaintiff's complaints in October or 2003]; *cf.* Dkt. No. 26, Part 3, ¶ 19 [Artus Affid., stating, "The grievance [filed by Plaintiff] was referred to Captain S. Brown, by the grievance committee for investigation"].)

70    (*Compare* Dkt. No. 26, Part 2, ¶¶ 8, 17-19, 41, 44 [Defs.' Rule 7.1 Statement, asserting these facts, and citing evidence in support of them] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶¶ 8, 14, 15, 23 [admitting the asserted facts, and then denying "sufficient knowledge to admit or deny" one of the facts, but failing to set forth a specific citation to the record where any factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court]; *see also* Dkt. No. 26, Part 3, ¶ 20 [Artus Affid., stating, "After review of the pertinent rules and regulations Captain S. Brown found that the proper procedure governing inmate correspondence had been followed."]; Dkt. No. 26, Part 26, ¶ 19 [Lynch Affid., stating, "After a review of the pertinent rules and regulations Captain S. Brown found that the proper procedure governing inmate correspondence had been followed."]; Dkt. No. 26, Part 38 [attaching Interdepartmental Communication dated 10/9/03 from Defendant Lynch to Captain S. Brown regarding the "Brown/Velez investigation"].) In addition, I note that Plaintiff appears to have agreed on October 17, 2003, to withdraw his formally filed grievance and simply grieve the matters at issue through the disciplinary process, which also resulted in a finding that Plaintiff's complaints were without merit. (*See, e.g.,* Dkt. No. 26, Part 37 [attaching Plaintiff's grievance dated 10/9/03, bearing handwritten note signed by Plaintiff, which stated, "10/17/03 returned mail & money. [W]ill appeal via disciplinary. *Joseph C. Brown* "].)

71    (Dkt. No. 26, Part 24 [attaching letter from Clinton C.F. Captain S. Brown to Plaintiff dated 4/8/04].)

72    (*Compare* Dkt. No. 26, Part 2, ¶¶ 26-29 [Defs.' Rule 7.1 Statement, asserting these facts, and citing evidence in support of them] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶ 18 [admitting the asserted facts]; *see also* Dkt. No. 26, Part 10 [attaching CORC decision dated 3/30/04].)

73    (*Compare* Dkt. No. 26, Part 2, ¶¶ 32-37 [Defs.' Rule 7.1 Statement, asserting these facts, and citing evidence in support of them] *with* Dkt. No. 29, Plf.'s Rule 7.1 Response, ¶¶ 21-23 [admitting most of the asserted facts, and denying "sufficient knowledge to admit or deny" some of the facts, but failing to set forth a specific citation to the record where any factual issue arises, as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court, and thus effectively admitting that fact]; *see also* Dkt. No. 26, Part 14 [attaching decision by First Deputy Superintendent William D. Brown dated 2/19/04]; Dkt. No. 26, Part 16 [attaching decision by CORC dated 3/17/04].)

74    (Dkt. No. 1 & Attachments [Plf.'s Compl.].)

75    (Dkt. No. 1, "Statement of Claim," ¶ 1 [Plf.'s Compl.].)

76    (*See, e.g.,* Dkt. No. 1, "Statement of Claim," ¶ 1 [Plf .'s Compl., alleging that, after Plaintiff asked Defendant Lynch way his mail "was read," Defendant Lynch replied that "*someone in correspondence* thought is suspicious [that] two inmates [were] receiving money orders from the same person"; and alleging that Plaintiff had informed Defendant Lynch that "he *or the person in correspondence* had no authority to read or confiscate Plaintiff's incoming mail without following [the] Directive that govern[ed] such [a reading and confiscation]."]; Dkt. No. 1, Attachments [Plf.'s Compl., attaching as an exhibit Plaintiff's grievance dated 10/9/03, directed against Defendant Lynch and *the Head Clerk of Inmate Correspondence,* alleging that "[h]ad Inmate Correspondence complied with the rules and regulations governing their job function, and ahdere[d] to Chapter VIII, Directives 4422 and 4421, I would not be faced with said harassment," and requesting as relief that the "person(s) who read my mail without following proper procedures and obtaining proper authorization [ ] be reprimanded ...."] [emphasis added].)

77    *See Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *12-13 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J.) ("[A]n isolated event of [mail] tampering will be insufficient to allege a constitutional violation unless the inmate can show that prison

officials regularly and unjustifiably interfered with the incoming legal mail.... With regard to non-legal incoming mail, a prison's regulations or practices affecting a prisoner's receipt of non-legal mail must be reasonably related to legitimate penological interests.... Prison security is a sufficiently important governmental interest to justify limitations on a prisoner's First Amendment rights.... In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest.") [internal quotation marks and citations omitted]; *see also Morgan v. Montanye,* 516 F.2d 1367, 1370-1372 (2d Cir.1975) (affirming dismissal of inmate's claim alleging isolated instance of prison officials' improper opening of his privileged legal mail).

78   (*See generally* Dkt. No. 1 [Plf.'s Verified Compl. and Attached Exhibits]; Dkt. No. 29 [Plf.'s Papers in Response to Defs.' Motion for Summary Judgment].)

79   (Dkt. No. 1 at 7 [Plf.'s Compl.].)

80   *See, supra,* Part III of this Report-Recommendation.

81   (*See, e.g.,* Dkt. No. 26, Part 26, at ¶¶ 5-6 [Lynch Affid., stating, "In accordance with the rules and regulations regarding general incoming correspondence, *the correspondence office* had inspected the plaintiff's general correspondence for cash, checks, money order.... The correspondence office in turn sent the materials to Captain Brown, who then sent them to me for investigation."] [emphasis added].)

82   (*See generally* Dkt. No. 1 [Plf.'s Verified Compl. and Attached Exhibits]; Dkt. No. 29 [Plf.'s Papers in Response to Defs.' Motion for Summary Judgment].)

83   (*See, e.g.,* Dkt. No. 26, Part 2, ¶¶ 15-17, 38, 41, 44 [Defs.' Rule 7.1 Statement, supporting its factual assertions with citations to record evidence]; Dkt. No. 26, Part 36 [attaching Plaintiff's disciplinary history, showing that Plaintiff's appeals from his two Tier II disciplinary convictions on 10/16/03 were affirmed by Captain S. Brown on 10/22/03]; Dkt. No. 26, Part 24 [attaching letter from Clinton C.F. Captain S. Brown to Plaintiff dated 4/8/04, stating that, after conducting an investigation into Plaintiff's allegations, "I find no wrongdoing on any staff member's part; they performed their duties in an exemplary manner."].) *See also, supra,* note 77 of this Report-Recommendation [citing cases indicating that the violation alleged is not one of a constitutional dimension].

84   (Dkt. No. 1, "Statement of Claim," ¶ 2 [Plf.'s Compl.].) I note that Defendant Lynch admits this allegation. (Dkt. No. 26, Part 26, ¶ 11 [Lynch Affid.].)

85   *Hudson v. Palmer,* 468 U.S. 517, 526 (1984); *see also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) (Pooler, J.) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights.") (Kaplan, J., sitting by designation), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

86   *See, e.g., Dawkins v. Jones,* 2005 U.S. Dist. LEXIS 1197, at *8, 12 18-19, 46-47 (S.D.N.Y. Jan. 31, 2005) (considering inmate's claim of improper pat searches not as a Fourth Amendment claim but as a First Amendment claim, premised on the allegedly retaliatory nature of those pat searches).

87   (*See generally* Dkt. No. 1, "Statement of Claim," ¶¶ 1-2 [Plf.'s Compl.].)

88   (Dkt. No. 1, "Statement of Claim," ¶ 3 [Plf.'s Compl.].)

89   (*Id.*)

90   *Harris v. Keane,* 962 F.Supp. 397, 407 (S.D.N.Y.1997) (citing 7 N.Y.C.R.R. § 1020.4[a][1] ).

91   (*See generally* Dkt. No. 1 [Plf.'s Verified Compl. and Attached Exhibits]; Dkt. No. 29 [Plf.'s Papers in Response to Defs.' Motion for Summary Judgment].)

92   (Dkt. No. 26, Part 5 [Ex. B to Artus, Affid., attaching Request for Urinalysis Test dated 10/8/03, authored by Sgt. P. Devlin based on his suspicion of drug use through his acquisition of confidential information].)

93   (*See generally* Dkt. No. 1 [Plf.'s Verified Compl. and Attached Exhibits]; Dkt. No. 29 [Plf.'s Papers in Response to Defs.' Motion for Summary Judgment].)

94   (*See, e.g.,* Dkt. No. 26, Part 36 [attaching Plaintiff's disciplinary history, showing that Plaintiff's appeals from his two Tier II disciplinary convictions on 10/16/03 were affirmed by Captain S. Brown on 10/22/03]; Dkt. No. 26, Part 24 [attaching letter from Clinton C.F. Captain S. Brown to Plaintiff dated 4/8/04, stating that, after conducting an investigation into Plaintiff's allegations, "I find no wrongdoing on any staff member's part; they performed their duties in an exemplary manner."].)

95   (Dkt. No. 1, "Statement of Claim," ¶¶ 4-6 [Plf.'s Compl., alleging that both of his October 2003 misbehavior reports were "written and signed by Sergeant Lynch," and alleging no other role in, or misconduct by, Defendant Lynch in the two disciplinary hearings that were held on October 16, 2003, pursuant to the issuance of the two misbehavior reports].)

96   (*See generally* Dkt. No. 1 [Plf.'s Verified Compl. and Attached Exhibits]; Dkt. No. 29 [Plf.'s Papers in Response to Defs.' Motion for Summary Judgment].)

97   (*See, e.g.,* Dkt. No. 26, Part 36 [attaching Plaintiff's disciplinary history, showing that Plaintiff's appeals from his two Tier II disciplinary convictions on 10/16/03 were affirmed by Captain S. Brown on 10/22/03]; Dkt. No. 26, Part 24 [attaching letter from Clinton C.F. Captain S. Brown to Plaintiff dated 4/8/04, stating that, after conducting an investigation into Plaintiff's allegations, "I find no wrongdoing on any staff member's part; they performed their duties in an exemplary manner."].)

98   *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J., adopting report-recommendation by Peebles, M.J.); *see also Freeman v. Rideout,* 808 F.2d 949, 951-953 (2d Cir.1986); *Hodges v. Jones,* 873 F.Supp. 737, 743-744 (N.D.N.Y.1995) (Chin, J., sitting by designation). "The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing." *Ciaprazi,* 2005 WL 3531464, at * 13 [citing *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986) ].

99   (Dkt. No. 1, "Statement of Claim," ¶¶ 1-6 [Plf.'s Compl.].)

100   (Dkt. No. 1, "Statement of Claim," ¶ 8 [Plf.'s Compl.].)

101   (Dkt. No. 1, "Statement of Claim," ¶¶ 5-8 [Plf.'s Compl .].)

102   (Dkt. No. 1, "Statement of Claim," ¶ 7 [Plf.'s Compl.].)

103   (*See generally* Dkt. No. 1, "Statement of Claim," ¶¶ 7-12 [Plf.'s Compl.].)

104   (*See generally* Dkt. No. 1 [Plf.'s Verified Compl. and Attached Exhibits]; Dkt. No. 29 [Plf.'s Papers in Response to Defs.' Motion for Summary Judgment].)

105   (Dkt. No. 26, Part 2, ¶¶ 21-32, 35-37 [Defs.' Rule 7.1 Statement, supporting its factual assertions with citations to record evidence].)

106   (Dkt. No. 1, "Statement of Claim," ¶¶ 7-12 [Plf.'s Compl., not alleging that it was Defendant Lynch who ordered his January, 25, 2004 urine test, which was ordered by a "Sergeant West," or that it was Defendant Lynch who either authored Plaintiff's January 26-27, 2004, misbehavior report or conducted Plaintiff's February disciplinary hearing].)

107   (*See generally* Dkt. No. 1 [Plf.'s Verified Compl. and Attached Exhibits]; Dkt. No. 29 [Plf.'s Papers in Response to Defs.' Motion for Summary Judgment].)

108   (Dkt. No. 26, Part 2, ¶¶ 21-32, 35-37 [Defs.' Rule 7.1 Statement, supporting its factual assertions with citations to record evidence].)

109   (Dkt. No. 26, Part 43, at 10-12 [Defs.' Mem. of Law].)

110   (Dkt. No. 26, Part 43, at 13-17 [Defs.' Mem. of Law].)

111   (Dkt. No. 26, Part 43, at 18-19 [Defs.' Mem. of Law].)

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1264122
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.

No. 99-CV-611 NPMGLS.
|
Aug. 22, 2000.

**Attorneys and Law Firms**

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681 et seq. ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local
Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to
the record where those facts are established. A similar
obligation is imposed upon the non-movant who

> shall file a response to the [movant's]
> Statement of Material Facts. The non-
> movant's response shall mirror the
> movant's Statement of Material Facts

> by admitting and/or denying each of
> the movant's assertions in matching
> numbered paragraphs. Each denial
> shall set forth a specific citation to the
> record where the factual issue arises....
> *Any facts set forth in the [movant's]*
> *Statement of material Facts shall be*
> *deemed admitted unless specifically*
> *controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed
an eleven page, twenty-nine paragraph Statement of
Material Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of
law which failed to admit or deny the specific assertions
set forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here,
the opposing party has failed to comply with the Rule.
*See, e.g., Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-
Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999);
*Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185
F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy, Inc. v.
Stewart and Stevenson Operations, Inc.,* 1998 WL 903629,
at [\*] 1 n. 1 (N.D.N.Y.1998); *Costello v.. Norton,* 1998 WL
743710, at [\*] 1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien
& Gere Engineers, Inc.,* 1998 WL 566773, at [\*] 1 n. 2
(N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

## BACKGROUND

**\*2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

**\*3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee, authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators;[3] as mentioned, Clawson, not Roopnarine, authored the exam question.

**\*4** Plaintiff took the third research methods examination in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for

this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

> [t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating.[4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts: 1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must

be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which

is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *See id.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *See id.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id. Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See, e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his

sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

### B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation." Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d] the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999).

There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[8] In any event, the adverse action which plaintiff claims to

be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[9]

CONCLUSION

**\*10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1264122

Footnotes

1    Amended January 1, 1999.
2    Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.
3    Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence

in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

4    Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

5    In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, ——, 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g., Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct, and only then consider whether this conduct is actionable. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *See id.*

6    Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

7    As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

8    As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

9    Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

---

**End of Document**© 2016 Thomson Reuters. No claim to original U.S. Government Works.

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1247992
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Darrell FRIEDLAND, Plaintiff,
v.
Yadira OTERO, et al., Defendants.

Civil No. 3:11cv606 (JBA).
|
Signed March 25, 2014.

**Attorneys and Law Firms**

Darrell Friedland, pro se.

Deann S. Varunes, Attorney General's Office, Hartford,
CT, for Defendants.

RULING ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

JANET BOND ARTERTON, District Judge.

**\*1** Plaintiff Darrell Friedland, was incarcerated
at Corrigan–Radgowski Correctional Institution, in
Uncasville, Connecticut, [1] when he commenced this civil
rights action pro se pursuant to 42 U.S.C. § 1983
against Lieutenant Yadira Otero, Counselor John Kay,
District Administrator Wayne Choinski and Director
of Offender Classification and Population Management
Fred Levesque (collectively, "Defendants"). Plaintiff
alleges multiple violations of his Fourteenth Amendment
right to due process arising from his security designation
and the discipline to which he was subjected after an
alleged escape attempt. Defendants have filed an amended
motion [Doc. # 39] for summary judgment, arguing that
Plaintiff has failed to establish a legal or factual basis
for his claims, and that in any event, they are entitled to
qualified immunity on each of his claims. For the reasons
that follow, Defendants' motion is granted in part and
denied in part.

**I. Background** [2]
Plaintiff previously served a prison sentence in Ohio.
After he was released on parole, the Ohio parole

officers transferred Plaintiff's parole to Connecticut. On
December 30, 2005, the Connecticut Board of Pardons
and Paroles began supervising Plaintiff's parole.

On August 4, 2006, a Connecticut parole officer remanded
Friedland to the custody of the Connecticut Department
of Correction on a violation of the terms of his parole
in connection with the Vernon Police Department's
investigation of allegations that Plaintiff had been
involved in an assault with a dangerous weapon in
July 2006. Department of Correction officials remanded
Plaintiff to Hartford Correctional Center at that time.
Vernon Police Officers subsequently arrested Plaintiff in
September 2006 on charges of assault in the second degree,
reckless endangerment in the first degree, and carrying a
dangerous weapon.

On August 10, 2006, prison officials at Hartford
Correctional Center issued a disciplinary ticket charging
Friedland with a Security Risk Group affiliation based
on his membership in the Aryan Brotherhood and also
notified Plaintiff that he would have a classification
hearing to determine if he should be designated as a
Security Risk Group Member or Security Risk Group
Safety Threat Member.

On August 10, 2006, Plaintiff participated in a
classification hearing. At the conclusion of the hearing,
prison officials informed Plaintiff in writing that he
had been designated as a Security Risk Group Member
of the Aryan Brotherhood and that he had been
placed on punitive segregation status. On September
26, 2006, prison officials transferred Plaintiff to
Northern Correctional Institution in Somers, Connecticut
("Northern") and placed him in a Close Monitoring
Unit. At the time, Northern was a designated facility for
managing inmates who had been designated as Security
Risk Group Members.

On April 16, 2008, two State of Connecticut Judicial
Marshals transported Friedland from Northern to the
Connecticut Superior Court for the Judicial District
of Rockville in connection with the assault, reckless
endangerment, and weapon possession charges pending
against him. *See State v. Friedland,* Docket Nos. T19R–
CR06–088011–S, T19R–CR06–0088012–S. At this court
appearance, Plaintiff pleaded guilty to two counts of
assault in the second degree in violation of Connecticut
General Statutes § 53a–60, one count of reckless

endangerment in the first degree Connecticut General
Statutes § 53a–63 and one count of carrying a dangerous
weapon in violation of Connecticut General Statutes § 53–
206.[3] He was not sentenced that day.

**\*2** The van that transported Plaintiff back from
Rockville Superior Court, driven by two State of
Connecticut Judicial Marshals had the driver and front
passenger area divided from the back of the van by
a partition, and the back of the van was divided in
half by a partition. Plaintiff was sitting on one side of
this partition with one inmate from Osborn Correctional
Institution, one inmate from Cheshire Correctional
Institution and one inmate from MacDougall–Walker
Correctional Institution ("MacDougall–Walker"). There
were seven inmates from Hartford Correctional Center on
the other side of the partition.

During the ride to MacDougall–Walker, some of the
inmates in the van argued about a baseball cap worn by
an inmate sitting across the partition from Friedland. One
or more of the inmates covered the van's cameras used to
monitor what was happening in the rear of the van. When
one of the inmates on the other side of the partition called
Plaintiff a name, Plaintiff kicked out part of the partition
for access to the other side of the van.[4] At that point, at
least one of the cameras in the van was uncovered. Plaintiff
then moved to the other side of the van and spoke with the
inmate who had called him a name. The Judicial Marshals
were able to hear what the inmates were saying during the
entire incident.

The Judicial Marshals radioed their supervisor about
the incident, who advised them to remain in the area
until the Connecticut State Police arrived at their
location. After State Police Officers arrived approximately
twenty minutes later, the officers and the Marshals'
supervisor decided to keep the inmates in the van and
to transport them to MacDougall–Walker. Upon arrival,
MacDougall–Walker officials unloaded all of the other
inmates, and Plaintiff was then transported to Northern.

On April 17, 2008, a prison official issued Friedland
a disciplinary report charging him with the Class A
Offense of Attempted Escape related to the April 16,
2008 van incident. On May 14, 2008, Defendant Otero
presided over the hearing held on the disciplinary charge,
finding Plaintiff guilty of attempted escape and imposing
sanctions. Defendant Choinski upheld the disciplinary

finding on appeal. On May 13, 2008, correctional officials
at Northern issued an order that Plaintiff be placed on
High Security Status. Plaintiff was not afforded a hearing
prior to this High Security Status designation.

On August 15, 2008, prison officials transported
Friedland back to Rockville Superior Court for
sentencing on the charges to which he had pled guilty on
April 16, 2008. During that court proceeding, Plaintiff
was sentenced to a total effective sentence of five years'
imprisonment, followed by two years of special parole. On
March 4, 2009, Plaintiff appeared in state court pursuant
to his guilty pleas to one count of disorderly conduct
and one count of criminal mischief in connection with his
involvement in the incident in the prison van on April
16, 2008. *See State v. Friedland,* Docket No. T19RCR08–
0092492–S. He was sentenced to thirty days' imprisonment
on both counts to be served concurrently to each other and
to his sentence on the Vernon charges, and was ordered to
pay restitution in the amount of $585.00 for destruction
to the prison van.

## II. Discussion[5]

**\*3** Plaintiff alleges that Defendants violated his
Fourteenth Amendment right to due in several respects
in connection with his discipline arising the alleged
escape attempt from the prison van. Specifically, Plaintiff
claims that: (1) "[t]he 'description of violation' on the
Disciplinary Report was too vague and/or conclusory to
provide meaningful notice;" (2) "[t]he advocate failed to
investigate and to help [ ] Plaintiff prepare a defense when
[ ] Plaintiff was unable to do so on his own; (3) "[t]he
guilty finding [on the attempted escape charge] was not
supported by some evidence;" (4) "[t]he evidence used to
support the charge [of attempted escape] was not disclosed
to [ ] Plaintiff;" (5) "Plaintiff was not afforded a hearing
of any type before being placed on High Security;" and
(6) "[b]ecause he was not in [Department of Correction]
custody at the time of the incident on the van, consistent
with due process the [Department of Correction] could
not sanction him for the incident."[6] (*See* 2d Am. Compl.
[Doc. # 35] ¶ 45.) Friedland seeks injunctive relief
requiring Defendants to remove him from High Security
Status and to expunge the April 17, 2008 disciplinary
report from his record, as well as compensatory damages.
Defendants move for summary judgment on five grounds.
They argue that: (1) Plaintiff has no liberty interest in
his classification to High Security Status; (2) they did not

deny him due process in connection with the disciplinary charge of attempted escape; (3) Plaintiff has not alleged the personal involvement of Defendants Choinski and Levesque in the deprivation of his constitutional rights and thus they are not proper defendants in this action; (4) Plaintiff's claims for injunctive relief are moot; and (5) Defendants are entitled to qualified immunity on each of Plaintiff's claims.

As a preliminary matter, for the purposes of this action, the parties do not dispute that Plaintiff was a pretrial detainee from at least April 16, 2008 through August 15, 2008, when he was sentenced to five years of imprisonment on the Vernon criminal charges. Because all of the relevant events in this case, such as the incident in the prison van, Friedland's disciplinary hearing, and his High Security designation, took place during this time period, Friedland's due process claims will be evaluated by the standards governing pretrial detainees.

The claims of a pretrial detainee confined in a state correctional facility are reviewed under the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 & n. 16 (1979). Because "[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime," the Fourteenth Amendment dictates that he or she may not be punished in any manner-neither cruelly and unusually nor otherwise. *Id.* at 536–37. To state a claim for violation of procedural due process, a plaintiff must demonstrate that he "possessed a protected liberty or property interest, and that ... [the defendants] deprived [him] of that interest without due process of law." *McMenemy v. City of Rochester,* 241 F.3d 279, 285–86 (2d Cir.2001) (citation omitted). "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466 (1983).

**\*4** A pretrial detainee has a liberty interest under the Due Process Clause in avoiding conditions of pretrial confinement that amount to punishment. *See Bell,* 441 U.S. at 535–37. "Not every disability imposed during pretrial detention," however, "amounts to 'punishment' in the constitutional sense." *Id.* at 537. In the absence of an allegation that "the defendant verbally expressed an intent to punish, punitive intent may be inferred from the nature of the conditions or restraints." *Turkmen v. Ashcroft,* 915 F.Supp.2d 314, 338 (E.D.N.Y.2013). A

court may consider " 'whether an alternative purpose to which [the sanction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' " *Bell,* 441 U.S. at 538 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69 (1963)). Thus, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' " *Id.* at 539. "[E]nsuring a detainee's presence at trial," maintaining security and order within the prison facility and operating the facility in a manageable fashion are all examples of valid governmental objectives that could justify the imposition of restrictive conditions of confinement on pretrial detainees. *See id.* at 540. Courts "ordinarily defer to [the] expert judgment" of prison officials "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response" to administrative considerations. *Id.* at 540 n. 23. Even if restrictions placed on a pretrial detainee are not punitive in violation of a protected liberty interest under the Fourteenth Amendment, a court must also inquire whether the state by "statute or regulation prescribes mandatory procedures that ... create a liberty interest." *Covino v. Vermont Dep't Corrections,* 933 F.2d 128, 129 (2d Cir.1991) (citing *Hewitt,* 459 U.S. 460). If the pretrial detainee is able to establish a liberty interest either under the Fourteenth Amendment itself or under state law, the court must then determine what process is due the detainee.

In determining the type of process due a pretrial detainee, courts have focused on the purpose and need for the restraint on the protected liberty interest. The Court of Appeals for the Second Circuit has held that a pretrial detainee who has been subjected to disciplinary sanctions or punitive restraints is entitled to the due process protections set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974). *See Benjamin v. Fraser,* 264 F.3d 175, 190 (2d Cir.2001) (affirming district court's application of *Wolff* to pretrial detainees and noting that the required *Wolff* procedures were applicable to a restraint on the detainee's liberty that was "imposed for disciplinary reasons" or constituted punishment due to its painful and injurious nature). Thus, if the purpose of the restraint on liberty is punitive in nature, the procedural protections set forth in *Wolff* apply. However, if the purpose of the restraint on liberty is administrative, then the minimal procedures outlined in *Hewitt v. Helms,* 459 U.S. 460

(1983) are all that is required. *See Benjamin,* 264 F.3d at 190. Administrative purposes include restraints that are employed to achieve a legitimate governmental interest in protecting the safety of the individual, prison staff or the general prison population.

**A. Procedural Due Process—Disciplinary Charge**
**\*5** On May 14, 2008, following the van incident, Defendant Otero found Plaintiff guilty of attempted escape and sanctioned him to fifteen days of punitive segregation, ninety days' loss of telephone privileges and ninety days' loss of commissary privileges. The parties do not dispute that these sanctions were punitive in nature, and thus Plaintiff was entitled to the due process protections set forth in *Wolff.* Pursuant to *Wolff,* a pretrial detainee charged with a disciplinary violation is entitled to: a disciplinary hearing and written notice of the charges at least twenty-four hours in advance of that hearing; the opportunity to present witnesses and documentary evidence before an impartial hearing officer or committee as long as doing so will not jeopardize prison safety and security; and a written statement including evidence relied on by the hearing officer in reaching his or her decisions and the reasons for the disciplinary action. *See Wolff,* 418 U.S. at 564–66. While a pretrial detainee has no right to retained or appointed counsel at a disciplinary hearing, in some circumstances, he or she may be entitled to the appointment of an advocate or assistance from a fellow inmate. *Id.* at 570. Plaintiff claims that Defendants Otero, Kay, and Choinski violated his procedural due process rights in connection with the discipline imposed for his attempted escape in that the notice of disciplinary charge was vague; Plaintiff's advocate did not provide effective assistance at the hearing; Defendants failed to disclose to Plaintiff the evidence against him; and Defendants' finding of guilt was not supported by any evidence.

*1. Notice of Disciplinary Charge*
Plaintiff does not dispute that he received a disciplinary report in connection with the attempted escape charge more than twenty-four hours before his disciplinary hearing, as required by *Wolff.* Rather, Plaintiff argues that the report was too vague to provide him with meaningful notice of the charge against him. In *Taylor v. Rodriguez,* 238 F.3d 188 (2d Cir.2001), the Second Circuit, considering the minimum requirements for notice to an inmate in the context of a disciplinary or administrative segregation hearing, held that notice is more than a "mere

formality;" it must "be sufficiently specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Id.* at 192–93 (quoting *McKinnon v. Patterson,* 568 F.2d 930, 940 n. 11 (2d Cir.1977)).

The April 17, 2008 disciplinary report issued to Friedland by Lieutenant Bernard Loubier charged Plaintiff with the Class A Offense of Attempted Escape. [7] The description of the violation reads as follows:

> On Thursday, April 17, 2008, following additional investigation conducted by the Security Division, it was determined that the actions taken by Inmate Friedland, Darrell # 336916 while being transported by the Judicial Marshals from Rockville Court (JD19) to the MacDougall–Walker Correctional Institution on Wednesday, April 16, 2008 at approximately 3:05 PM did constitute an attempted escape. Additionally, based on the fact that Connecticut State Police involvement was necessary and because Friedland is expected to be charged by C.S.P. on the charge of Attempted Escape, this disciplinary report is warranted.

**\*6** (*See* May 14, 2008 Disciplinary Process Summary Report, Ex 4 to Blais Aff. [Doc. # 20–8].)
Plaintiff complains that the disciplinary report did not include specific facts as to what conduct constituted an attempted escape. The report includes the specific location, date, and time period during which the alleged attempted escape occurred, April 16, 2008 at approximately 3:05 P.M. in the transportation van on the way back from state court to MacDougall–Walker. The Court concludes that the lack of details as to the specific actions taken by Friedland in the van at approximately 3:05 P.M. does not render the report deficient.

During the investigation of the disciplinary report and at the hearing, Friedland's defense was that he was sitting at the end of the van, did not participate in knocking down the dividing partition and did not attempt to escape. In addition, he claimed that the other inmates in the van could corroborate that he had not attempted to escape from the van. Thus, the specific information as to time, date, and location and the nature of the charge provided minimally adequate notice to Friedland of the conduct at issue and enabled him to attempt to

prepare his defense to the charge. *See Kalwasinski v. Morse,* 201 F.3d 103, (2d Cir.1999) ("discrepancy as to the precise nature of the threatened harm did not represent a failure of specificity that would impair [plaintiff's] ability to prepare his defense, especially since his defense was simply that the ... report was a fabrication"); *Wright v. Dixon,* 409 F.Supp.2d 210, 214 (W.D.N.Y.2006) (although disciplinary report included misstatement as to the time of the misconduct alleged to have been committed by the plaintiff, "the report was otherwise sufficiently detailed to put the plaintiff on notice of the conduct at issue"). Therefore, Plaintiff's advance receipt of the disciplinary report was not constitutionally defective and Defendants' motion for summary judgment is granted as to this claim.

*2. Advocate's Assistance*

Plaintiff states that a prison official assigned Defendant Kay to be his advocate to assist him in preparing for the hearing on the disciplinary report. He contends that Defendant Kay failed to investigate the allegations against him or assist him in preparing a defense by securing witnesses to offer testimony or written statements at the hearing.

Plaintiff acknowledges that on April 21, 2008, Defendant Kay discussed the disciplinary report with him and that he informed Kay that he had not attempted to escape from the van. Friedland avers that he asked Kay to find out the names of the inmates who were on the transportation van with him and to arrange to have them testify on his behalf in support of his claim that he had not tried to escape from the van. Friedland contends that Kay informed him that the inmates could not be transported to Northern for the hearing. When Friedland asked Kay to obtain written statements from the inmates to be submitted at the hearing, he refused to do so. The parties dispute whether Kay was present at the hearing. (*See* Pl .'s Aff. ¶ 35; Otero Aff. [Doc. # 20–9] ¶ 13.) Defendants argue that Kay adequately performed his role as Friedland's advocate.

**\*7** Although an inmate is not entitled to appointed counsel at a disciplinary hearing, in certain circumstances an inmate who is illiterate, confined in a restrictive housing unit, transferred to another correctional institution or unable to grasp the complex nature of the issues, may be entitled to an assigned advocate to assist him in preparing for the hearing. *See Wolff,* 418 U.S. at 570, *Ayers v.* Ryan, 152 F.3d 77, 80–81 (2d Cir.1998) (citing *Eng v. Coughlin,*

858 F.2d 889, 898 (2d Cir.1988). The assigned advocate, "act[s] as [the inmate's] surrogate in doing "what the inmate would have done were he able, but is not required "to go beyond the specific instructions of the inmate" in rendering assistance. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (per curiam).

Here, Plaintiff states that he was in a restrictive housing unit at the time of the hearing, was only able to ascertain the name of one of the ten other inmates who were present on the prison van on April 16, 2008, and was unaware of the whereabouts of any of the inmates in order to secure their presence at his hearing. He instructed Kay to either arrange to have the inmates testify or get written statements from them, but Kay refused to do so and no witnesses were present nor were any witness statements introduced at the hearing. (*See* Pl.'s Aff. ¶¶ 27–32, 35.) Kay's Advocate Investigation Report is unclear regarding any requests for witness statements or testimony requested by Friedland as those sections were left blank and no mention was made of witnesses in the Conclusion and Recommendation section of the report. (*See* May 14, 2008 Disciplinary Process Summary Report at 8–9.)

Defendants contend that Kay's report suggests that Plaintiff did not ask to present witnesses at the hearing. Since Kay has not submitted an affidavit, there is conflicting evidence as to whether Friedland asked Kay to secure witness testimony or statements to be submitted at the hearing and whether the lack of access to these statements or testimony deprived Plaintiff of the opportunity to marshal evidence and present a defense. Thus, Defendants have not met their burden of demonstrating that there are no issues of material fact in dispute regarding the adequacy of the assistance provided to Plaintiff by Kay in preparation for the hearing, and their motion for summary judgment is therefore denied as to this procedural due process claim.

*3. Written Statement of Reasons*

Plaintiff claims that Defendant Otero's Disciplinary Summary Process Report was deficient because it did not set forth the evidence that she relied on to support her finding of Friedland's guilt on the attempted escape charge. Defendants contend that Otero's Summary Process Report provided a sufficient description of the evidence that she may have relied on and her reasons for reaching her decision.

However, a review of Otero's Disciplinary Summary Process Report reflects that it does not include or describe any specific evidence relied on or the reasons for her disciplinary finding. Rather, the Summary Process Report simply refers generally to "documentation submitted" in support of the decision. It is only Defendant Otero's affidavit that says "documentation submitted" means the Incident Report Package prepared in connection with the disturbance that occurred on the prison van driven by Judicial Marshals, a Medical Incident Report and a Use of Force Report. (*See* Otero Aff. ¶ 16; *see also* May 14, 2008 Disciplinary Process Summary Report; April 16, 2008 Incident Report, Ex. 3 to Blais Aff.) Thus, in the absence of Otero's Affidavit, submitted in support of Defendants' motion for summary judgment, a reasonable jury could conclude that the Summary Report did not identify the documents that constituted the evidence Otero relied on in reaching her decision on the disciplinary charge against Friedland.

**\*8** It is well-established that a pretrial detainee has a due process right to a written statement describing the evidence upon which a hearing officer relied in finding the detainee guilty of a disciplinary infraction. *See Wolff,* 418 U.S. at 564–65; *Sira v. Morton,* 380 F.3d 57, 74 (2d Cir.2004); *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1981). There are limits, however, on this disclosure requirement for evidence supporting a disciplinary decision. The Supreme Court has held that institutional safety concerns may provide a sufficient reason to exclude a description of certain evidence in the written statement of reasons. *See Wolff,* 418 U.S. at 565. If a prison official wishes to exclude details about particular evidence on which he or she relied in finding guilt for safety and security reasons, that justification must be set out in the written report documenting the basis for the disciplinary decision. *See id.*

Defendant Otero's Summary Process Report provided no description of the evidence that she relied on to support her guilty finding and she offered no security justification for the omission. Without either, a reasonable jury could conclude that Defendant Otero's Summary Process Report fails to meet the requirement in *Wolff* that the hearing officer provide a written statement of the evidence relied on and the reasons for her disciplinary action. *See Davidson v. Capuano,* No. 78 CIV. 5724(RLC), 1988 WL 68189, at \*12 (S.D.N.Y. June 16, 1988) (holding that hearing officer's report that simply listed a reference

to a source of information—a "Misbehavior Report"— as the evidence relied did not satisfy the requirements of *Wolff* ); *Powell v. Ward,* 487 F.Supp. 917, 930 (S.D.N.Y.1980) (finding limited statements listing only a source or sources of information related to charges were inadequate and failed to comply with *Wolff* ), *modified on other grounds,* 643 F.2d 924 (2d Cir.1980), *cert. denied,* 454 U.S. 832 (1981). The Court concludes that Plaintiff has presented a viable due process claim with respect to Otero's failure to identify the specific evidence upon which she relied in her disciplinary decision, and Defendants' motion for summary judgment is therefore denied as to this procedural due process violation.

### *4. Some Evidence To Support Guilty Finding*

Plaintiff argues that there was no evidence to support Defendant Otero's decision that he was guilty of attempted escape. The Due Process Clause of the Fourteenth Amendment requires that a hearing officer's determination be supported by "some evidence." *Superintendent v. Hill,* 473 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' " the hearing officer's disciplinary determination. *Sira,* 380 F.3d at 69 (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000)) (analyzing evidence in summary judgment record although the defendants failed to identify or describe this evidence in the disciplinary decision).

**\*9** The documentation relied on by Defendant Otero in support of her guilty finding included an Incident Report. (*See* Otero Aff. ¶ 16.) That Report included statements from the Judicial Marshal who was driving the prison van and the Judicial Marshal who was sitting in the passenger seat. One of the Marshals indicated that she overheard inmates in the back of the van talking about escaping, heard Plaintiff kicking the partition and observed Plaintiff walk through the broken partition to the other side of the van and then begin to kick the partition that divided the back of the van from the front of the van where she and the other Judicial Marshal were sitting. She related that she heard Plaintiff and the other inmates say that they were trying to get through to the driver's side of the van which caused her to fear for her life. (*See* May 14, 2008 Disciplinary Process Summary Report at 35–38.) Thus, although the basis for Defendant Otero's decision may not have been clear in her Summary Report, the documents upon which she avers that she relied constitute some reliable evidence to support

Defendant Otero's determination that Plaintiff was guilty of attempted escape by trying to leave escorted custody without permission, and therefore Defendants' motion for summary judgment is granted as to this procedural due process claim. *See Sira,* 380 F.3d at 82–83 (holding that the defendants were not entitled to qualified immunity with respect to the plaintiff's claim that they had not disclosed the evidence upon which they relied in their written statement of reasons, but that they were entitled to qualified immunity on the question of whether the disciplinary decision was supported by "some evidence" in the summary judgment record).

**B. Personal Involvement of Defendant Choinski**

Defendants contend that the claims against Defendant Choinski should be dismissed because he lacked personal involvement in the alleged violation of Plaintiff's due process rights in that he did no more than deny Plaintiff's appeal of Defendant Otero's guilty determination. Plaintiff counters that the denial of his appeal constitutes sufficient personal involvement to impose supervisory liability on Defendant Choinski.

As a supervisory official, Defendant Choinski cannot be held liable under section 1983 solely for the acts of his subordinates. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). Plaintiff may show supervisory liability by demonstrating one or more of the following criteria: (1) the defendant actually and directly participated in the alleged unconstitutional acts; (2) the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) the defendant was grossly negligent in supervising the correctional officers who committed the constitutional violation; and (5) the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted). In addition, Plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury. *See Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

**\*10** In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Supreme Court found that a supervisor can be held liable only "through the official's own individual actions."

*Id.* at 676. This decision arguably casts doubt on the continued viability of some of the categories for imposing supervisory liability enunciated in *Colon.* The Second Circuit, however, has not revisited the criteria for supervisory liability following *Iqbal. See DeJesus v. Albright,* No. 08 Civ. 5804(DLC), 2011 WL 814838, at \*6 n. 4 (S.D.N.Y. Mar. 9, 2011). Because it is unclear whether *Iqbal* overrules or limits *Colon* the Court will continue to apply each of the categories for supervisory liability set forth in *Colon.*

After Defendant Otero found Plaintiff guilty of attempted escape, Plaintiff filed an appeal of the decision and the sanctions imposed by Defendant Otero. In response, Defendant Choinski engaged in an extensive review of the appeal and concluded there was sufficient evidence to support the guilty finding and that no serious due process failure had occurred prior to or during the disciplinary hearing. (*See* Appeals Decision, Ex. 5 to Blais Aff.)

The Second Circuit has held that a supervisory official in charge of a correctional facility may be personally involved in depriving an inmate of his due process rights during a hearing on a disciplinary charge if he or she affirmed the appeal of the hearing officer's decision. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (concluding that the plaintiff had "sufficiently alleged that Superintendent Smith was personally involved in depriving him of his due process right to call witnesses" at the hearing on the misbehavior report when Smith affirmed the guilty finding on appeal); *Wright v. Smith,* 21 F.3d 496, 502 (2d Cir.1994) (concluding that Superintendent "Smith was [a] supervisory official [who], after learning of the violation through a report or appeal, ... failed to remedy the wrong"). Furthermore, in situations where the supervisory official has actively considered the issues raised by the inmate in reviewing and responding to the appeal rather than simply rubber-stamping the underlying decision of the hearing officer, personal involvement on the part of the supervisory official has been found. *See Molano v.. Bezio,* No. 10–CV–6481L, 2012 WL 1252630, at \* 5 (W.D.N.Y. Apr. 13, 2012) (holding that a supervisory official was involved in a due process violation because he considered deficiencies underlying the hearing as well as exculpatory evidence in modifying the sentence imposed by the hearing officer); *Thomas v. Calero,* 824 F.Supp.2d 488 (S.D.N.Y.2011) (concluding that the Director of Special Housing/Inmate Disciplinary Programs' decision to affirm the Hearing

Officer's "determination of guilt with only a modification of the penalty [was] sufficient to demonstrate involvement and could lead a trier or fact to impose liability under the second *Colon* factor").

**\*11** The evidence submitted supports Plaintiff's contention that Defendant Choinski became aware of the alleged procedural due process deprivations in reviewing the written appeal of the disciplinary finding before the sanctions imposed by Defendant Otero had expired, but failed to remedy the violations. *See Rodriguez v. Selsky,* Civil Action No. 9:07–CV–0432(LEK/DEP), 2011 WL 1086001, at \*6 (N.D.N.Y. Jan. 25, 2011) (prison supervisor's decision to affirm "constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated by the Second Circuit for informing the supervisory liability analysis"), *report & rec. adopted,* No. 07–CV–0432, 2011 WL 830639 (N.D.N.Y. Mar. 3, 2011); *Garcia v. Selsky,* 680 F.Supp.2d 479, 481 (W.D.N.Y.2010) ("[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeal[ ] as opposed to merely rubber-stamping the results.") (internal quotation marks and citations omitted)).

Thus, Defendant Choinski's investigation of Plaintiff's due process claims in connection with the issuance of the disciplinary report and the hearing to dispose of the disciplinary report constituted sufficient involvement under the second *Colon* factor, and Defendant's motion for summary judgment is therefore denied as to claims against Defendant Choinski relating to his alleged failure to remedy the underlying procedural defects associated with the disciplinary hearing.

### C. Procedural Due Process—High Security Placement
Plaintiff claims that Defendant Levesque's decision to place him on High Security Status before he had been found guilty of attempted escape violated his due process rights. Defendant Levesque counters that because the placement on High Security Status was not punitive, and rather was as a result of legitimate safety and security concerns, Plaintiff's security designation did not violate his due process rights.

The parties do not dispute that on April 29, 2008, Warden Jeffrey McGill sent a letter to Director of Offender and Classification and Population Management Levesque recommending that Plaintiff be placed on High Security Status pursuant to State of Connecticut Administrative Directive 9.4(14) due to his conduct in kicking the partition in the transport van on April 16, 2008. Warden Murphy determined that Friedland met the criteria for high security placement because he was an inmate who has engaged in "an instant serious escape [or] attempted serious escape." (*See* Admin. Dir. 9.4, Ex. 2 to Cruickshank Aff. [Doc. # 40–3] at 10.) In response, on May 8, 2008, Director Levesque sent a letter to Warden McGill indicating that he concurred with the recommendation of Plaintiff's placement on High Security Status and directed Warden McGill to hold a Classification Hearing to inform Plaintiff of his designation to this status. (*See* Levesque Letter, Ex. 2 to Milling Aff. [Doc. # 20–10].) However, no such hearing was held, and on May 13, 2008, Counselor Suse issued Friedland a document entitled High Security Placement, advising him that he had been placed on High Security Status pursuant to State of Connecticut Administrative Directive 9.4, and explaining the restrictions under which he would be managed during his placement on High Security Status. (*See* High Security Placement, Ex. 3 to Milling Aff.) Friedland signed the High Security Placement document on May 19, 2008. Friedland states that he was confined on High Security Status until his release on parole.

#### 1. Personal Involvement of Defendant Levesque
**\*12** Defendants argue that Defendant Levesque is named only because of his role as a supervisory official within the Department of Correction, and that he lacked any personal involvement in Plaintiff's case. However, based on the Amended Complaints and the exhibits in the record, it is clear that Defendant Levesque was directly involved in the decision to place Plaintiff on High Security Status as the Director of Inmate Classification and Population Management. Thus, Defendants' motion for summary judgment on the ground that Defendant Levesque lacked the personal involvement necessary to establish supervisory liability is denied.

#### 2. Protected Liberty Interest—Due Process Clause
A pretrial detainee has a liberty interest in being free from punishment "prior to an adjudication of guilt in

accordance with due process of law." *Bell,* 441 U.S. at 535. Defendant Levesque argues that Plaintiff has no protected liberty interest under the Due Process Clause of the Fourteenth Amendment because he was placed High Security Status not for punitive reasons, but rather for the legitimate governmental purpose of safety and security as a result of his attempted escape from the prison van on April 16, 2008. (*See* Aldi Aff. [Doc. # 40–4] ¶ 33.) Plaintiff has presented no evidence based on which a jury could reasonably conclude that his designation to High Security Status was punitive in any way.

Connecticut Department of Correction Security Risk Coordinator Aldi avers that an inmate's placement on High Security Status permits Department of Correction staff to engage in increased supervision of an inmate who might be a threat to the security of the prison facility, staff, inmates, or the public. (*See id.* at ¶ 13.) There is nothing in the Administrative Directives that prohibits a prison official from designating an inmate to High Security Status prior to a disciplinary finding of guilt as to an attempted escape charge. (*See id.* at ¶¶ 32–34.) Plaintiff's placement on High Security Status was based on his involvement in the incident in the prison van on April 16, 2008 and was documented in the Incident Report prepared by Department of Correction officials later that day. (*See* April 16, 2008 Incident Report.) Although Plaintiff avers that he did not attempt to escape from the prison van, he concedes that he kicked out the partition in the van, walked over the broken partition to the other side of the van and confronted an inmate sitting there. (*See* Pl .'s Aff. ¶¶ 16–20.)

Defendant Levesque further contends that Plaintiff's High Security Status designation was not an exaggerated response to Plaintiff's behavior, but was reasonably related to the legitimate penological objective of maintaining the safety and security of the prison staff and the public as well as monitoring and managing Plaintiff's custody. In light of the Department of Correction's consideration of the conversations overheard by the State Judicial Marshals who were driving the van, as well as their observations of Plaintiff's behavior, and Plaintiff's concession that he did kick out the partition in the van, the decision to place Plaintiff on High Security Status was not an unreasonable or excessive response to Plaintiff's conduct in the van. *See Bell,* 441 U.S. at 540 n. 23 (determination whether particular restriction or limitation is reasonably related to the function of pretrial confinement requires courts to remember that the implementation of such restrictive measures is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.")

**\*13** Plaintiff has submitted no evidence to demonstrate that the decision to place him on High Security Status was done for a punitive purpose rather than for the legitimate administrative purpose of maintaining safety, security, and order in the prison. Therefore, the Court concludes that Plaintiff's designation to High Security Status did not constitute punishment, and thus the Fourteenth Amendment does not provide a protected liberty interest in his avoidance of that classification. *See Taylor v. Comm'r New York Dep't Corrections,* 317 F. App'x 80, 82 (2d Cir.2009) (affirming district court's determination that inmate's confinement in punitive segregation unit for approximately two months did not constitute punishment because "there was no evidence in the record demonstrating prison officials intended to punish inmate and confinement not excessive in relation to purpose of maintaining safety"); *Covino v. Vermont Dep't of Corrections,* 933 F.2d 128, 129 (2d Cir.1991) ( "[T]he transfer of an inmate to less amendable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself."); *Adams v. Galletta,* No. 96 CIV. 3750(JGK), 1999 WL 959368, at *4 (S.D.N.Y. Oct. 19, 1999) (concluding pretrial detainee had not been deprived of a liberty interest under the Due Process Clause of the Fourteenth Amendment because his designation as a Central Monitoring Case was due to his being an escape risk and his "subsequent housing in maximum security was not punitive").

*3. Liberty Interest Under State Law*

The Second Circuit has held that even if a restraint or restriction placed on a pretrial detainee is not punitive, a Court must also determine whether the state by "statute or regulation prescribes mandatory procedures that ... create a liberty interest." *Covino,* 933 F.2d at 129 (citing *Hewitt,* 459 U.S. 103). In *Hewitt,* the Supreme Court analyzed Pennsylvania laws governing placement of prisoners in administrative segregation and concluded that these laws created a liberty interest because they included "language of unmistakably mandatory character, requiring that

certain procedures be employed ... and that administrative segregation will not occur absent specified substantive predicates ....“ identified as “the need for control” and “the threat of a serious disturbance.” *Id.* at 471–72 & n. 6 (internal quotation marks omitted).

Defendant Levesque neglects to engage in any examination or discussion of whether the State of Connecticut's Administrative Directives governing Classification and Restrictive Housing placement include mandatory language that might be construed to require procedural due process protections prior to or after a pretrial detainee's placement on or designation to High Security Status. Instead, without discussion, he simply concludes that Plaintiff has no liberty interest in his classification to High Security Status under state law because the Department of Correction has discretion to determine prisoner classifications.

**\*14** The language in Administrative Directive 9.4 governing the imposition of restrictive conditions of confinement on inmates suggests that a hearing might be required in connection with an inmate's placement on High Security Status. (*See* Admin. Dir. 9 .4.) Specifically, Administrative Directive 9.4(14) provides that “[a]n investigation shall be conducted by the Unit Administrator or designee to determine if an inmate may be considered for a High Security Monitoring Hearing, if such inmate meets one of the criteria listed in this section.” (*Id.*) It requires “each [prison] facility to establish procedures to review each inmate, consistent with classification practices, to determine if an inmate shall be considered for a High Security Monitoring Hearing.” (*See id.* at 9.4(14)(A)). Furthermore, Administrative Directive 9.4(14) includes language that suggests that High Security placement will not occur unless an inmate meets certain listed criteria. (*See* Admin. Dir. 9.4.) This language could be construed to require specific substantive predicates prior to an inmate's placement on High Security Status. Additionally, the August 8, 2008 letter from Defendant Levesque to Warden Jeffrey McGill confirms that Defendant Leveque understood that a hearing was required or would be held in connection with the recommendation that Plaintiff be placed on High Security Status. (*See* Levesque Letter.) Thus, an examination of the evidence presented by Defendants reflects that there are issues of fact as to whether Plaintiff satisfied the criteria to be entitled to a High Security Monitoring Hearing pursuant to Administrative Directive 9.4, such that he

had a protected liberty interest under state law to such a hearing.

*4. Process to Which Plaintiff Was Entitled*
Assuming that Plaintiff has demonstrated a liberty interest in his security status designation, Plaintiff was entitled to at least “the minimal procedures outlined in *Hewitt.*” *Benjamin,* 264 F.3d at 190. In *Hewitt,* the Supreme Court held that “[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation,” and the “proceeding must occur within a reasonable time following the inmate's transfer.” *Id.* at 476 & n. 8.

Defendant Levesque has not addressed whether Plaintiff's receipt of written notice of his placement on High Security Status met the requirements of *Hewitt.* After Defendant Levesque approved Plaintiff's designation to High Security Status on May 9, 2008, Counselor Supervisor Mark R. Suse prepared a notice of High Security Placement dated March 13, 2008. On May 19, 2008, Plaintiff signed the notice indicating that he had been informed of his placement on High Security Status. The notice advised Plaintiff that he had been placed on High Security Status pursuant to Administrative Directive 9.4 and described the restrictions that would accompany the placement. The notice did not include the basis for the designation. Thus, although the notice was provided to Plaintiff within a reasonable time after Defendant Levesque's decision to place him on High Security Status, it did not include the charges against him or the basis for his designation to High Security Status. Furthermore, there is no evidence to suggest that the mere delivery of the notice to Plaintiff by Counselor Suse met the requirement that Plaintiff be given an opportunity to present his views to either Defendant Levesque or Warden McGill as to the decision to place him on High Security Status. Based on the modicum of evidence presented by parties, Defendant Levesque has failed to show that he is entitled to judgment as a matter of law on the claim relating to the process afforded to Plaintiff in connection with his placement on High Security Status in May 2008. Accordingly, Defendants' motion for summary judgment is denied with respect to this claim.

**D. Injunctive Relief**

**\*15** Plaintiff requests injunctive relief in the form of an order that Defendants remove him from High Security Status and expunge the disciplinary report charging him with attempted escape. Defendants argue that these requests are now moot because Plaintiff has been discharged from the Department of Correction.

The Second Circuit has held that an inmate's request for injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution. *See Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976). *See also Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."). Other courts concur with this result. *See, e.g., McAlpine v. Thompson,* 187 F.3d 1213, 1215 (10th Cir.1999) (noting that an inmate's claim for prospective injunctive relief regarding conditions of confinement is rendered moot upon his release from confinement).

Plaintiff has informed the Court that he is no longer incarcerated within the Connecticut Department of Correction. In his response to Defendants' argument that the injunctive relief is moot, Plaintiff indicated that after his release on special parole from his Connecticut sentence on September 28, 2012, he was taken into custody by Massachusetts Department of Corrections and is confined in a Massachusetts Correctional Institution in South Walpole, Massachusetts. He acknowledged that the term of special parole from the Connecticut sentence expired on September 15, 2013. Thus, at this point, Plaintiff is currently no longer on parole or within the custody of the Connecticut Department of Correction. As such, he is no longer on High Security Status. The Court therefore concludes that Plaintiff's request for injunctive relief pertaining to his removal from High Security Status by Connecticut prison officials is moot.

With regard to Plaintiff's request that the disciplinary report for attempted escape be expunged, the Court concludes that this request is not moot. If a jury were to determine that Defendants denied Plaintiff due process in connection with the issuance of the disciplinary report, the Court might award relief in the form of expungement of the report. Therefore, Defendants' motion for summary judgment is granted as to the request for injunctive relief regarding Plaintiff's removal from High Security Status and denied as to the request for injunctive relief pertaining to the expungement of the disciplinary report.

### E. Qualified Immunity

Defendants argue that they are entitled to qualified immunity on all of Plaintiff's claims. Defendants have the burden of proving the affirmative defense of qualified immunity in a motion for summary judgment or at trial. *See Vincent v. Yelich,* 718 F.3d 157, 166 (2d Cir.2013).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To determine if an official is entitled to qualified immunity, a court considers whether (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official and (2) the right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd,* 563 U.S. ——, ——, 131 S.Ct. 2074, 2080 (2011) (citation omitted). A negative answer to either question means that immunity from monetary damages claims is appropriate. *Pearson,* 555 U.S. at 236. The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to decide first in view of the particular circumstances surrounding the case to be decided. *See id.* at 236.

**\*16** Under the second prong, a right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.' " *al-Kidd,* 563 U.S. at ——, 131 S.Ct. at 2083 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "A broad general proposition" does not constitute a clearly established right. *See Reichle v. Howards,* —— U.S. ——, 132 S.Ct. 2088, 2094 (2012). Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson,* 483 U.S. at 640).

In support of their qualified immunity argument, Defendants state that:

> [i]n the claim at hand, the most expeditious means of disposing this lawsuit should be utilized and that would be to address whether the defendant violated the plaintiff's constitutional rights, pursuant to the Due Process Clause of the Fourteenth Amendment. It is clear from the evidence that this is not the case as to these defendants.

Defs.' Mem. Supp. [Doc. # 40] at 25–26. Defendants offer no further discussion. It is apparent that Defendants are arguing that they are entitled to qualified immunity under the first prong of the standard.

In summary, the Court has determined that there are outstanding issues of material fact with regard to Plaintiff's due process claims relating to the disciplinary hearing and the decision to place Plaintiff on High Security Status that preclude summary judgment. Specifically, there are material facts in dispute as to the adequacy of the assistance provided to Plaintiff by Defendant Kay in preparation for the disciplinary hearing, including securing witness testimony or witness statements and whether Defendant Otero's Summary Process Report provided an adequate written statement of the evidence relied on and the reasons for the disciplinary action.

With regard to the claim that Defendant Levesque denied Plaintiff procedural due process in connection with his placement on High Security Status, the Court has concluded that there are issues of material fact as to whether a liberty interest was created under the circumstances of this case by the language of the Administrative Directives governing an inmate's placement on High Security Status. Furthermore, the evidence presented by Defendant Levesque precludes a finding that he is entitled to judgment as a matter of law on the issue of whether Plaintiff received all the process that he was due in connection with Plaintiff's placement on High Security Status. Thus, Defendants are not entitled to summary judgment on the first prong of the qualified immunity standard.

Although summary judgment might still be appropriate if Defendants could prove that the constitutional rights in questions were not "clearly established" at the time of the violations, Defendants do not address the second prong of the qualified immunity standard. At the time of the disciplinary hearing and Plaintiff's placement on High Security Status, it was well established under *Bell* that a pretrial detainee could not be punished prior to being sentenced for a criminal conviction, that the requirements in *Wolff* applied to the disciplinary hearing of a pretrial detainee involving punitive sanctions or restraints, and that a liberty interest could be created under state law that would require the procedural due process protections set forth in *Hewitt* before a pretrial detainee could be designated to a restrictive classification status for administrative purposes. *See Wolff,* 418 U.S. 539; *Bell,* 441 U.S. 520; *Hewitt,* 459 U.S. 469; *Benjamin,* 264 F.3d 175; *Covino,* 933 F.2d 128. Because Defendants do not offer any argument with regard to the second prong of the qualified immunity standard, the Court will not consider the issue any further at this time.

**\*17** Disputed issues of material fact preclude a finding that Plaintiff's procedural due process rights were not violated such that the Defendants are entitled to judgment as a matter of law. Furthermore, Defendants have not met their burden of demonstrating that Plaintiff's rights to due process in connection with the disciplinary report and placement on High Security Status were not clearly established such that a reasonable officer would not have known that his conduct was unlawful. Accordingly, Defendants' motion for summary judgment on the ground that they are entitled to qualified immunity is denied on this record.

### III. Conclusion

Defendants' Amended Motion [Doc. # 39] for Summary Judgment is GRANTED as to Plaintiff's request for injunctive relief removing him from High Security Status; as to Plaintiff's claim that he received insufficient notice of the disciplinary charge against him; and as to Plaintiff's claim that there was no evidence to support the guilty finding on the escape charge; and is DENIED as to the due process claims relating to Defendant Levesque's decision to place Plaintiff on High Security status; the adequacy of Defendant Kay's assistance in preparing Plaintiff for the hearing on the escape charge; Defendant Otero's failure to identify or describe the evidence relied on to support the guilty finding as to the escape charge; and

Defendant Choinski's decision not to remedy the due process violations of Defendants Kay and Otero after becoming aware of them on appeal.

As discussed in Note six on page six, Defendants failed to address Plaintiff's claim that Defendants lacked the authority to discipline him because he was not in the custody of the Department of Correction at the time of his alleged escape. Therefore, this claim also will be included in the trial of this case.

This case is now ready for trial. It will be administratively closed to permit the process for appointment of pro bono counsel for trial to proceed. This case will be reopened ten days from the date of pro bono counsel's appearance, at which time an expeditious trial schedule will be set.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 1247992

Footnotes

1    Plaintiff is currently confined at the Massachusetts Correctional Institution in Norfolk, Massachusetts.

2    This summary of the undisputed facts is taken from Defendants' Local Rule 56(a)1 Statements [Doc.20–18, 40–1] along with the attached exhibits, Plaintiff's Local Rule 56(a)2 Statement [Doc. # 50–2], and Plaintiff's Affidavit [Doc. # 25–3].

3    Information pertaining to these criminal cases may be found by searching under Plaintiff's last name or case number at http:// www.jud.ct.gov/crdockets/SearchByDef Disp.aspx.

4    Plaintiff admits in his affidavit that he kicked out the partition, but denies that his actions were part of an attempt to escape. (*See* Pl.'s Aff. ¶¶ 18, 20.)

5    Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir.2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed.R.Civ.P. 56(c). Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

6    Defendants failed to address this claim in their amended motion for summary judgment.

7    Escape is defined in the State of Connecticut Administrative Directive 9.5 as: "Leaving a correctional facility without authorization; leaving escorted custody without permission; exceeding assigned limits of community release without permission; or failing to properly return from furlough." (*See* April 16, 2008 Incident Report at 8.) Attempt is defined as "[c]onduct which is likely to result in an act prohibited by this Directive." A prison official is not required to charge an inmate with the separate offense of attempt because it is "deemed to be included in the substantive offense." The offense of attempt "shall be punishable in the same degree as if the substantive offense was committed." (*See id.* at 7.)

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 890658
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone HOUSTON, Plaintiff,

v.

Glenn S. GOORD, et al., Defendants.

No. 9:03-CV-1412 (GTS/DEP).
|
March 31, 2009.

**Attorneys and Law Firms**

Tyrone Houston, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, Stephen M. Kerwin, Esq., Assistant
Attorney General, of Counsel, for Defendants.

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court in this *pro se* prisoner
civil rights action are Defendants' motion for summary
judgment (Dkt. No. 80), and United States Magistrate
Judge David E. Peebles's Report-Recommendation
recommending that Defendants' motion be granted and
Plaintiff's Complaint be dismissed in its entirety (Dkt. No.
85). Plaintiff has timely filed Objections to the Report-
Recommendation. (Dkt. No. 86.) For the reasons set
forth below, the Report-Recommendation is accepted and
adopted in its entirety, Defendants' motion is granted and
Plaintiff's Complaint is dismissed.

### I. RELEVANT BACKGROUND

On November 21, 2003, Plaintiff filed this action against
twenty-two (22) individuals currently and/or formerly
employed by the New York State Department of
Correctional Services, at various correctional facilities.
Generally, in his Complaint, Plaintiff alleges that his
rights under the First and Eighth Amendments were
violated when (1) certain Defendants had him transferred
in retaliation for grievances that he had filed, (2) certain
Defendants issued false misbehavior reports against him
in retaliation for grievances that he had filed, and (3)

certain Defendants deprived him of the opportunity to
engage in outdoor exercise on two separate occasions. (*See
generally* Dkt. No. 1.) [1]

On September 29, 2006, District Judge Lawrence E. Kahn
issued a Memorandum Decision and Order dismissing
(1) Plaintiff's claims for equitable relief due to Plaintiff's
release from incarceration, which mooted this claim,
and (2) Plaintiff's claims against the CORC and all of
the individual defendants in their official capacities on
Eleventh Amendment grounds. (Dkt. No. 69.)

On January 4, 2008, Defendants filed a motion
for summary judgment seeking dismissal of all of
Plaintiff's claims against them. (Dkt. No. 80.) Generally,
Defendants' motion is premised on the following three
grounds: (1) certain of Plaintiff's claims are procedurally
barred based upon his failure to exhaust available
administrative remedies with regard to those claims (2) no
reasonable factfinder could conclude that the issuance of
misbehavior reports or the transfer to different facilities
were *caused* by Plaintiff's filing of grievances; and (3)
no reasonable factfinder could conclude that Plaintiff
was subjected to cruel and unusual punishment based
on being denied certain exercise opportunities. (*Id.*) On
February 1, 2008, Plaintiff filed a response in opposition
to Defendants' motion. (Dkt. No. 82.).

On March 11, 2009, Magistrate Judge Peebles
issued a Report-Recommendation recommending that
Defendants' motion be granted, because (1) certain of
Plaintiff's claims were not properly exhausted, and (2)
no reasonable factfinder could rule in Plaintiff's favor on
any of his claims. (Dkt. No. 85.) Familiarity with the
grounds of the Report-Recommendation is assumed in
this Decision and Order. On March 20, 2009, Plaintiff filed
his Objections to the Report-Recommendation. (Dkt. No.
86.)

### II. APPLICABLE LEGAL STANDARDS

#### A. Standard of Review on Objection
#### from Report-Recommendation

 **\*2** When specific objections are made to a magistrate
judge's report-recommendation, the Court makes a "de
novo determination of those portions of the report
or specified proposed findings or recommendations to
which objection is made." *See* 28 U.S.C. § 636(b)(1)

(C). [2] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y.Sept.22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999). [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations

omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986).

**\*3** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.* [4] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [5] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [6] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [7]-even where the nonmoving party was proceeding *pro se* in a civil rights case. [8]

### III. ANALYSIS

After carefully reviewing all of the papers in this action, including Magistrate Judge Peebles's Report-Recommendation and Plaintiff's Objections thereto, the Court rejects each of Plaintiff's Objections, and agrees with each of the conclusions stated in the Report-Recommendation. (*See* Dkt. Nos 85, 86.) Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. (*See* Dkt. No. 86.)

In particular, Magistrate Judge Peebles correctly determined that Plaintiff failed to exhaust some of his claims, as required by the Prison Litigation Reform Act, in that he failed to file grievances, and/or pursue these claims to completion, before bringing the claims to federal court. [9] Magistrate Judge Peebles also correctly determined that the only evidence that the misbehavior reports filed against Plaintiff were retaliatory is the fact

that they were filed in close proximity to Plaintiff's grievances. However, this inference alone is not enough for Plaintiff to defeat summary judgment, in light of the fact that (1) he was found guilty of at least some of the charges lodged in seven of the nine misbehavior reports with which he takes issue, (2) these reports were issued by nine different corrections officers in four different prisons, and (3) all but one of the officers submitted an affidavit expressly denying retaliatory motivation. [10] In addition, regarding Plaintiff's claim that his numerous transfers to various prison facilities was done in retaliation for filing grievances, as Magistrate Judge Peebles explained, (1) Plaintiff has offered no evidence that he was transferred in retaliation for filing grievances, and (2) Plaintiff has a history of claiming retaliation for numerous adverse actions taken against him. As a result, these retaliation claims are dismissed.

**\*4** Furthermore, as explained in Magistrate Judge Peebles' Report-Recommendation, Plaintiff's Eighth Amendment claims are without merit because (1) the harm that he allegedly suffered as a result of being denied the opportunity to exercise outdoors for less than two weeks is *de minimis,* and (2) being forced to exercise in an area that is eight-feet-five inches by six-feet-nine inches in size, while confined in a SHU facility, is not a constitutional violation. *See, e.g., Cody v. Jones,* 895 F.Supp. 431, 441 (N.D . N.Y.1995) (McCurn, J.) (applying *Sandin* and concluding that no liberty interest was triggered through the failure of the prison to regularly accord plaintiff one hour of daily outdoor exercise for a period of several months); *Anderson v. Coughlin,* 757 F.2d 33, 34-35 (2d Cir.1985) ("[T]hough courts have played a helpful role in assisting prisoners and prison officials to negotiate mutually acceptable terms for the provision of exercise opportunities, as has occurred in this case, they have not found in the Eighth Amendment a broad license to require prison officials to meet all of the recreational standards that have been recommended by penologists.") . [11]

In his Objections to the Report-Recommendation, Plaintiff argues, *inter alia,* that his failures to fully exhaust his available administrative remedies with regard to certain of his claims was due to his being transferred to different facilities shortly after filing grievances, and that his efforts to inform Defendant Goord and Wardens of this issue "are sufficient to invoke the limited exceptions to the grievance requirement." (Dkt. No. 86.) In addition, Plaintiff appears to argue that the Report-

Recommendation should not be adopted because of its failure to appreciate that the "personal involvement on [the] part of all Defendants [regarding his retaliation claims]" constitutes sufficient evidence of a conflict, thereby warranting denial of summary judgment. (Dkt. No. 86.) [12]

With regard to Plaintiff's exhaustion claim, as an initial matter, the Court is not persuaded by Plaintiff's argument that his letters to Defendants Goord and Wardens created an exception to the exhaustion requirement. [13] This is because (1) administrative remedies were available to Plaintiff, who is extremely experienced in the inmate litigation process, [14] (2) Defendants have not waived the exhaustion defense, and (3) special circumstances do not exist which would excuse Plaintiff from complying with the procedural requirements. [15] However, even if the Court were persuaded that Plaintiff's letters created an exception to the exhaustion requirement, such a finding would not help Plaintiff withstand summary judgment on the claims at issue. This is because, while Magistrate Judge Peebles found that some of Plaintiff's retaliatory transfer claims were unexhausted, Magistrate Judge Peebles also found that all of Plaintiff's retaliatory transfer claims were unsupported by sufficient record evidence from which a reasonable factfinder could conclude that the transfers were caused by Plaintiff's filing of grievances (as opposed to being caused by legitimate, penological considerations).

**\*5** Finally, with regard to Plaintiff's claim that a "conflict" existed (or exists) in this case, the Court rejects that argument. Plaintiff has not offered any evidence of such a conflict. The fact that District Judge Gary L. Sharpe issued a ruling in *Houston v. Leclaire,* 01-CV-0067, Decision and Order (N.D.N.Y. filed July 22, 2004) (Sharpe, J.) (denying, in part, defendants' motion for summary judgment requesting dismissal of Plaintiff's retaliation claim arising from the filing of false misbehavior reports against him, and the destruction of his legal materials, in 1999) in no way collaterally estops or otherwise precludes the Court from dismissing Plaintiff's claims in this current action due to a lack of supporting record evidence. [16] As a result, and for the reasons stated by Magistrate Judge Peebles in his Report-Recommendation, Plaintiff's retaliation claims with regard to the misbehavior reports are dismissed.

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report-Recommendation (Dkt. No. 85) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 80) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** in its entirety.

### *REPORT AND RECOMMENDATION*

[DAVID E. PEEBLES](), United States Magistrate Judge.

Plaintiff Tyrone Houston, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to [42 U.S.C. § 1983](), *inter alia,* alleging violation of his civil rights. In his complaint, plaintiff maintains that as a result of having been engaged in activity protected under the First Amendment to the United States Constitution, including filing grievances and commencement and pursuit of prior lawsuits, he was subjected by prison officials to a series of inter-prison transfers, the filing of false misbehavior reports, the imposition of unwarranted disciplinary confinement, and unfavorable program assignments. Plaintiff also complains of the deprivation of outdoor exercise, contending that the denial represented cruel and unusual punishment, in violation of his rights under the Eighth Amendment. Plaintiff's complaint seeks both equitable relief and the recovery of compensatory and punitive damages.

Currently pending before the court is a motion filed on behalf of the defendants seeking the entry of summary judgment dismissing each of plaintiff's claims. In support of their motion, defendants assert that certain of plaintiff's causes of action are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and that all of his claims are subject to dismissal on the merits, arguing that no reasonable factfinder could conclude that he was subjected to unlawful retaliation or cruel and unusual punishment. For the reasons set forth below, I recommend that defendants' motion be granted.

### I. *BACKGROUND* [1]

**\*6** At the times relevant to his claims plaintiff Tyrone Houston, apparently also known as Tyrone Black, was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff's claims, which are expansive in terms of both their substantive breadth and the time period involved, arise from incidents occurring while he was confined in various facilities operated by the DOCS including, the Mid-State Correctional Facility, the Mohawk Correctional Facility, the Marcy Correctional Facility, the Great Meadow Correctional Facility, the Downstate Correctional Facility, the Auburn Correctional Facility, the Five Points Correctional Facility, the Cayuga Correctional Facility, the Elmira Correctional Facility, and the Ogdensburg Correctional Facility.

During the period of his incarceration, plaintiff filed a series of grievances and commenced suits against various prison workers. Plaintiff claims that as a direct result of that activity he experienced recrimination, in the form of issuance of several false misbehavior reports, leading to procedurally flawed disciplinary hearings and ensuing unlawful disciplinary confinement in various facility special housing units ("SHUs"). Plaintiff also attributes the various inter-prison transfers which he experienced, including in October of 2000 to the Mohawk Correctional Facility in lieu of a facility closer to his place of residence, to retaliatory animus, in further response to his grievances and lawsuits. Plaintiff additionally asserts that while in disciplinary confinement, he was subject to a DOCS policy under which SHU inmates are ineligible for participation in outdoor exercise. As a result, plaintiff was unable to participate in such outdoor activities for an aggregate period of 222 days, extending intermittently from September of 2001 until mid-2003. [2]

### II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 21, 2003. Dkt. No. 1. As defendants, plaintiff's complaint names twenty-two present or past employees of the DOCS including the agency's commissioner, Glenn S. Goord, as well as the Central Office Review Committee (the

"CORC"), which was sued as an entity, and asserts claims against the defendants in both their individual and official capacities. [3] *Id.* Issue was joined by the filing of answers on behalf of the majority of the defendants on September 30, 2005, and by defendant Dana C. Smith on November 28, 2005, generally denying the material allegations of plaintiff's complaint and interposing various affirmative defenses. Dkt. Nos. 58, 60.

On January 4, 2008, following the completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 80. In their motion, defendants argue that portions of plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before commencing suit. Addressing the merits, defendants assert that plaintiff's claims lack factual support and that the record fails to contain evidence from which a reasonable factfinder could conclude that the adverse actions attributed by the plaintiff to retaliatory animus were in fact motivated by his protected activity. Defendants also contend that as a matter of law plaintiff's complaints regarding the denial of exercise do not implicate constitutional considerations. Plaintiff has since responded in opposition to defendants' motion in papers filed with the court on February 1, 2008. Dkt. No. 83.

**\*7** Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation to the assigned district judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [4] *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,*

391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law ...." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process). When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is appropriately granted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See* Building Trades Employers' Educ. Ass'n v. McGowan, 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also* Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Failure to Exhaust Remedies*

**\*8** In their motion defendants assert that, as a threshold matter, certain of plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to those claims.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit.[5] *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

**\*9** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[6] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id .* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Without question the plaintiff, who by all accounts has frequently availed himself of New York's IGP while in DOCS custody, has filed grievances raising many of the issues forming the basis for his complaint in this action. The record now before the court, however, contains no indication that this is true with regard to all of Houston's claims. The only grievance which plaintiff claims to have lodged addressing the question of his many, allegedly retaliatory inter-prison transfers, for example, was filed on March 17, 2003. *See* Complaint (Dkt. No. 1) ¶ 46

and pp. 109-111. [7] Accordingly, it does not appear that plaintiff has exhausted available administrative remedies with respect to inter-prison transfers effectuated after the filing of that grievance, including his transfers 1) on June 13, 2003, into the Riverview Correctional Facility; 2) on June 16, 2003, into the Gouverneur Correctional Facility; and 3) on August 15, 2003, into the Elmira Correctional Facility. Similarly, there is no indication in the record now before the court that plaintiff's alleged denial of outdoor exercise covering the period from September 15, 2001 through November 21, 2001, forming the basis for a portion of plaintiff's cruel and unusual punishment claim, *see* Complaint (Dkt. No. 1) ¶ 47, was grieved. While plaintiff did apparently file a grievance on July 29, 2003 regarding his confinement in the Gouverneur SHU beginning on June 17, 2003, *see* Complaint (Dkt. No. 1) at p. 120, there is no evidence of pursuit of that grievance through to completion.

**\*10** In light of these failures and the fact that plaintiff has not offered any evidence which would indicate that the grievance procedure was not available to him or otherwise form a proper basis for excusing the grievance requirement, I recommend that the portions of plaintiff's claims for which there was no grievance filed and pursued to completion be dismissed on this procedural basis. [8]

### C. Retaliation

Plaintiff's complaint centers principally upon his claim of retaliation, which is comprised of two discrete components. First, plaintiff maintains that the issuance of various misbehavior reports, alleged by him to have contained false accusations, and resulting findings of guilt following disciplinary hearings, were prompted by his having engaged in protected activity, including the filing of grievances and lawsuits. Additionally, plaintiff asserts that for the same retaliatory reasons he was excessively transferred among various prison facilities, including into some at remote locations from his place of residence. In their motion, defendants contend that the record fails to disclose the basis upon which a reasonable factfinder could conclude that the adverse actions upon which plaintiff's retaliation claims hinge were in fact prompted by retaliatory animus.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. See *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that: 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff successfully shoulders this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*11** Analysis of retaliation claims thus requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate plaintiff has engaged and the adverse action taken against him or her, as well as evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

#### 1. *False Misbehavior Report Claim*

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he

| Date of Issuance | Author | Alleged Protected Activity Precipitating Issuance | Disposition |
|---|---|---|---|
| 4/8/01 | Van Slyke | Submission of grievance dated 4/12/01 against Van Slyke's girlfriend, identified only as "SHU Counselor".[9] | Dismissed (no hearing held) |

**\*12** *Id.*

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between an instance of protected activity alleged in his complaint and a corresponding misbehavior report is the inference to be drawn from the relevant chronology. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report can in certain instances suffice to avoid summary judgment dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) citing *Flaherty v. Coughlin,* 713. F.2d 10, 14 (2d Cir.1983). As defendants note, however, in many circumstances this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999); *see*

difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Plaintiff's complaint alleges the issuance of nine allegedly false misbehavior reports, each authored by a different corrections officer, between April 8, 2001 and June 9, 2003. Complaint (Dkt. No. 1) ¶¶ 13-29. In each instance plaintiff attributes the issuance to retaliatory motives, citing different protected activity, as follows:

*also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

In this instance there are misbehavior reports issued which, taken in isolation, could give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Taken together and considered in the light of all relevant facts, however, the record in this instance simply does not support the inference of such a connection. Prior to April of 2001, plaintiff had amassed a disciplinary record which included twelve separate findings of guilt in connection with alleged violations between October, 1993 and July, 27, 1999. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. B. The allegedly retaliatory misbehavior reports now in dispute were issued over a two-year period by nine different corrections workers, while

plaintiff was incarcerated at four different prison facilities. With the exception of defendant Hammill, each of the individuals authoring the subject misbehavior reports has submitted an affidavit expressly denying having done so prompted by retaliatory motivation.[12] In seven of the nine instances, plaintiff was found guilty of at least some of the charges lodged, with an acquittal in one additional instance and one other misbehavior report having been dismissed for failure to conduct a timely disciplinary hearing. Given the totality of these circumstances, no reasonable factfinder could conclude that the issuance of the various misbehavior reports and resulting findings of guilty was prompted by retaliatory animus. I therefore recommend dismissal of this portion of plaintiff's retaliation claim.

### 2. Prison Transfer Claim

The second aspect of plaintiff's retaliation claim concerns his frequent transfer among prisons.[13] The record supports plaintiff's claim regarding the frequency of his prison transfers. Plaintiff was transferred among various New York prisons thirteen times between May 7, 2001 and August 15, 2003, as set forth below:

**\*13** Complaint (Dkt. No. 1) ¶¶ 7-10, 32-46; Knapp-David Aff. (Dkt. No. 80-22) Exh. B. Citing some specific instances of protected activity, plaintiff alleges that all of these transfers were prompted by retaliatory motives on the part of prison officials. *See* Complaint (Dkt. No. 1), *id.* Without question, prison officials retain significant flexibility and wide discretion in managing the corrections system and placing inmates appropriately. *See* N.Y. Correction Law §§ 23, 72 and 112(1); *see also Prins v. Coughlin,* 76 F.3d 504, 507 (2d Cir.1996) *citing Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538 (1976) (prisoner generally has no due process right to challenge a transfer from one facility to another). As the Supreme Court has noted, New York's statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543 (1976).

While the discretion of prison officials to place and transfer prisoners is broad, it is not unfettered; when such a transfer is made out of purely retaliatory motivation, in response to constitutionally protected activity, a claim

of unlawful retaliation under the First Amendment is established. *Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989); *Hohman v. Hogan,* 597 F.2d 490, 492-93 (2d Cir.1979).

In this instance plaintiff's allegations of retaliatory transfers appear to center upon defendants Knapp-David, LeClaire and Goord. *See* Complaint (Dkt. No. 1) ¶¶ 32, 35-42, 45 and pp. 18-19, 79-81, 88-89, 91-92, 94-95. Plaintiff apparently theorizes that these high ranking DOCS officials undertook a campaign of retaliatory transfers in order to punish him for his filing of grievances and lawsuits against various corrections workers assigned to the prison to which plaintiff was assigned.

In an affidavit given in support of defendants' motion, defendant Knapp-David, formerly the Director of Classification and Movement for the DOCS, explains the hub system implemented by the agency to designate the 63,500 inmates in the system and the process utilized to effectuate inmate transfers. Knapp-David Decl. (Dkt. No. 80-22) ¶¶ 2-7. That affidavit reflects that "transfers of inmates between hubs or transfer of maximum security inmates were approved and made by classification analysts on [Knapp-David's] staff when [she] was the Director of Classification and Movement .... As a routine matter [she] was not personally involved in inmate transfer decisions."[14] *Id.* ¶ 3. In that declaration defendant Knapp-David denies both having any retaliatory motivation, and participating in the decisions to make the disputed transfers. *Id* . Since personal involvement is a constitutional violation is a pre-requisite to establishing liability, defendant Knapp-David is entitled to dismissal on this basis. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977).

**\*14** Aside from his sheer conjecture, plaintiff has offered no evidence from which a reasonable factfinder could determine that any of the cited prison transfers were ordered out of retaliation for plaintiff's filing of grievances and commencement of lawsuits, rather than resulting from legitimate, penological considerations. Given this and plaintiff's well documented history of claiming retaliation in connection with many adverse actions taken against him overtime by prison officials, I conclude that the entry of summary judgment dismissing this portion of plaintiff's retaliation claim is also warranted.[15]

### D. Cruel and Unusual Punishment

The last element of plaintiff's complaint is focused upon the alleged denial of the opportunity to engage in outdoor exercise while confined to S-Blocks and at Ogdensburg. Complaint (Dkt. No. 1) ¶¶ 47-48. Defendants maintain that they are entitled to the entry of summary judgment dismissing this claim as well.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

Without question, prison inmates must be afforded a reasonable opportunity for exercise. *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985); *see also Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996) and *Sostre v. McGinnis,* 442 F.2d 178, 193 & n .25 (2d Cir.1971)

(en banc), *rev'd on other grounds, cert. denied Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 11190 (1972). Not every deprivation of this opportunity, however, rises to a level of constitutional significance; instead, to sustain an Eighth Amendment claim a plaintiff must show that he or she was denied of all meaningful exercise for a substantial period of time. *See Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997). When determining whether this showing has been made, a court may consider such relevant factors as 1) the duration of the deprivation; 2) its extent; 3) the availability of other out-of-cell activities; 4) the opportunity for in-cell exercise; and 5) the justification offered for the deprivation. *See Williams v. Goord,* 111 F.Supp.2d 280, 291 (S.D.N.Y.2000).

**\*15** Plaintiff's exercise claim is comprised of two components. First, he contends that when confined to an "S" block for disciplinary purposes he was not permitted to engage in outdoor exercise, but instead only permitted to exercise utilizing an outdoor recreation pen attached to his cell. *See* Complaint (Dkt. No. 1) ¶¶ 48 and p. 113. Secondly, plaintiff asserts that he was confined to his cell for twenty-four hours each day between March 22, 2003 and April 4, 2003, pending a hearing at the Ogdensburg Correctional Facility, and thus denied any meaningful opportunity to exercise during that period. (Dkt. No. 1) ¶ 49 and p. 116.

#### 1. *"S" Block Confinement*

While confined in facility SHU's, plaintiff was restricted to an exercise area measuring eight feet five inches in width, six feet nine inches in depth, and with the ceiling height of twelve feet seven inches. Complaint (Dkt. No. 1) ¶¶ 47-48; Prack Aff. (Dkt. No. 80-30) ¶ 5. SHU exercise areas have three solid walls, with a fourth side made of woven rod security screen through which inmates can view the open surroundings. Prack Aff. (Dkt. No. 80-30) ¶ 5.

The relevant portions of plaintiff's complaint and exhibits describe standard SHU conditions of confinement, which have been found to pass constitutional muster. *See, e.g., Sostre v. McGinnis,* 442 F.2d at (outdoor exercise for one hour in small enclosed yard open to the sky consistent with Eighth Amendment); *Anderson,* 757 F.2d at 35) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed one hour per day of outdoor exercise-with no access to indoor exercise area); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22,

1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold,* 408 F. Supp 869, 876-877 (M.D.Pa.1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week). In this instance the court declines plaintiff's invitation to enter the arena of prison management, and instead recommends a finding that this portion of plaintiff's complaint fails to allege a cognizable constitutional deprivation.

### 2. *Denial of Exercise While at Ogdensburg*

The second element of plaintiff's cruel and unusual punishment claim relates to the denial of exercise for a period of thirteen days while awaiting a disciplinary hearing. *See* Complaint (Dkt. No. 1) ¶ 49 and p. 116. In order to sustain a constitutional claim this cause of action must assert an "unquestioned and serious deprivation of basic human needs" or "depri[vation] of the minimal civilized measure of life's necessities. *Anderson,* 757 F.2d at 35. The denial of exercise for a period of thirteen days is, relatively speaking, *de minimis* and does not rise to a level sufficient to support a constitutional deprivation. *See Young v. Scully,* 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768 and 91 Civ. 6769, 1993 WL 88144, at *5 (deprivation of exercise over several days found to be *de minimis* ); *Davidson v. Coughlin,* 968 F.Supp. 121, 128-131 (S.D.N.Y.1997) (holding that "temporary and sporadic deprivations of outdoor activity [for no longer than fourteen days in a row] do not fall below the minimum standards of the Eighth Amendment"); *see also Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003); *Branham v. Meachum,* 77 F.3d 626, 630-31(2d Cir.1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment).

**\*16** There appears to be another basis on which dismissal of this portion of plaintiff's complaint would be warranted. The deprivation of exercise while in Ogdensburg does not appear to be attributed to subjective indifference on the part of any of the named defendants to plaintiff's well being, but instead was the result of a facility procedure at Ogdensburg which was later amended following plaintiff's successful grievance regarding the matter. *See* Kurz Decl. (Dkt. No. 80-26) ¶ 9. Under these circumstances plaintiff has failed to establish the subject deliberate indifference on the part of any of the defendants

toward his safety and well being. *Hathaway v. Coughlin,* 99 F.3d 550, 554 (2d Cir.1996) (charged official must act with sufficiently culpable state of mind that is equivalent to criminal recklessness); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

### IV. *SUMMARY AND RECOMMENDATION*

The plaintiff, a frequent litigator and an inmate who over the period of his confinement with the DOCS accumulated an extremely poor disciplinary record, now complains alleging that nine misbehavior reports authored by nine separate corrections officers at four corrections facilities over a two year period, seven of which resulted of findings of guilt following disciplinary hearings, were issued out retaliatory motivation. Having carefully considered the record now before the court, I conclude no reasonable factfinder could agree that those misbehavior reports were issued for retaliatory purposes. Plaintiff further claims that various inter-prison transfers which he experienced over time were retaliatory, in response to his having filed grievances and lawsuits. Once again, the record fails to contain evidence from which a reasonable factfinder could draw this conclusion. Finally plaintiff contends that he was subjected to cruel and unusual punishment by the denial of adequate opportunities for exercise. Having carefully reviewed the record, I conclude that no reasonable factfinder could determine that he was in fact subjected to cruel and unusual punishment.

For these reasons, and additionally because certain of his claims are procedurally barred based upon his failure to exhaust available administrative remedies, I recommend dismissal of plaintiff's complaint in its entirety. It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 80) be GRANTED, and that all plaintiff's claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 890658

Footnotes

1    On September 30, 2005, all of the Defendants except one filed their Answer to Plaintiff's Complaint. (Dkt. No. 58.) On November 28, 2005, Defendant Smith filed her answer to the Complaint. (Dkt. No. 59.)

2    On de novo review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3    *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), cert. denied, 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

4    *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; accord, Lee v. Alfonso, No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), aff'g, 97-CV-1741, 2004 U.S. Dist. 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

5    *Krug v. County of Rennselaer,* 04-CV-0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept. 18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant in not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); see also *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted]; see also Jessica Case, *"Pro Se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?"* 90 Ky. L.J. 701, 704, n. 24 (Spring 2001) ("The Second, Fourth, Seventh, Tenth, Eleventh, and D.C. Circuit Courts of Appeals mandate that notice of summary judgment requirements be given to *pro se* litigants.... The Ninth Circuit requires notice of summary judgment requirements for *pro se* prisoner litigants only.") [citations omitted].

6    *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ("[P]ro se status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant]

does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

7   Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

8   *See, e.g., Hassig v. N.Y.S. Dep't of Environmental Conservation,* 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04-1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd,* No. 04-1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04-1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at *2-3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2-3; *Singleton v. Caron,* 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1, n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

9   The Court notes that a detailed recitation of the claims and Plaintiff's procedural errors are provided in Magistrate Judge Peebles's Report-Recommendation. (Dkt. No. 85, at 8-14.) Accordingly, the Court will not repeat this thorough analysis.

10  *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment.") (citing *Ayers v. Stewart,* No. 96-2013, 1996 WL 346049, at *1 [2d Cir.1999] ).

11  *See also Sostre v. McGinnis,* 442 F.2d 178, 187-92 (2d Cir.1971), *rev'd on other grounds, Sostre v. Oswald,* 404 U.S. 1049 (1972).

12  In addition, in his Objections to the Report-Recommendation, Plaintiff appears to argue, for the first time, that the Court lacks jurisdiction over his claims. The Court rejects this argument for a number of reasons, including the fact that (1) such a jurisdictional challenge is not timely, and (2) such a jurisdictional challenge flies in the face of Plaintiff's Complaint, which alleged that the Court had "jurisdiction over each of Plaintiff's claims."

13  "Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases." *Chaney v. Koupash,* 04-CV-0136, 2008 WL 5423419, at *7 (N.D.N.Y. Dec. 30, 2008) (citing *Porter v. Nussle,* 534 U.S. 516, 524 (2002) [other citation omitted].). "While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that 'certain caveats apply.' " *Chaney,* 2008 WL 5423419, at *7 (citations omitted). "Exhaustion is generally achieved through the [Inmate Grievance Program]." *Id.* (citation omitted). "However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims." *Id.* "A court must consider whether (1) administrative remedies are not available to the prisoner; (2) defendants have waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Id.* (citations omitted).

14  "Administrative remedies are unavailable when there is no possibility of relief for the action complained of." *Chaney,* 2008 WL 5423419, at *7 (citations and internal quotations omitted). "The test to determine the availability of an administrative remedy is an objective one asking whether 'a similarly situated individual of ordinary firmness' would have deemed it accessible." *Id.* (citation omitted). "Courts have found unavailability where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Id.* (citations and internal quotations omitted).

15  *See, e.g., Carini v. Austin,* 06-CV-5652, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008) (noting that an inmate must point to "an affirmative act by prison officials that would have prevented him from pursuing administrative remedies, ... [because] his transfer to another facility is not a 'special circumstance' that excuses his failure to exhaust").

16  To the extent that Plaintiff argues that there existed a conflict of interest resulting from his disciplinary hearing officers knowing each other, or knowing the correctional officers having charged Plaintiff with disciplinary charges, it is true that "[p]risoners have a constitutional right to have a fair and impartial hearing officer preside over their disciplinary hearings."

*Chaney,* 2008 WL 5423419 at *7 (citing *Sira v. Morton,* 380 F.3d 57, 69 [2d Cir.2004] ). "However, the degree of impartiality required of prison officials does not rise to the level of that required of judges as it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citations and internal quotations omitted). "While the Supreme Court held 'that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ...,' the Second Circuit has held that the test is whether there was 'reliable evidence' of the inmate's guilt." *Id.* (citations omitted).

1    In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

2    Each of these claims and their factual underpinnings will be discussed in more detail further on in this report.

3    Plaintiff's claim against the CORC, as well as those asserted against the remaining defendants in their official capacities, were dismissed by order issued by Senior District Judge Lawrence E. Kahn, on September 29, 2006 (Dkt. No. 69), acting on a report and recommendation issued by me on August 28, 2006. Dkt. No. 67.

4    This matter was transferred from Judge Kahn to District Judge Glenn T. Suddaby on October 2, 2008. *See* Dkt. No. 84.

5    In their answers, defendants have included an affirmative defense alleging plaintiff's failure to satisfy his exhaustion obligation. *See* Dkt. Nos. 58, ¶ 16 and 60, ¶ 16.

6    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

7    In support of their motion, defendants have offered a version of plaintiff's complaint, which is exceedingly comprehensive, together with the extensive exhibits attached, all paginated for ease of reference. *See* Kerwin Decl. (Dkt. No. 80-8) Exh. A. In this report and recommendation I will adopt defendants' pagination when citing to those materials.

8    In his memorandum in opposition to defendants' motion, plaintiff alleges, for the first time, that certain prison officials, identified as defendants DeBejian and G. Molnar, interfered with his grievances out of retaliatory animus. *See* Plaintiff's Memorandum (Dkt. No. 82) at pp. 11-12. This conclusory statement draws no evidentiary support from the record, and is not viewed by the court as sufficient to invoke the limited exceptions by the Second Circuit in its group of decisions issued in 2004. *See, Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004); *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004); and *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004). I note, moreover, that whether the *Hemphill* test survives intact following the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378 (2006), has been a matter of some speculation. In one relatively recent decision a judge of another district within this Circuit concluded that at least the first two prongs of the *Hemphill* three part inquiry, requiring the court to assess whether administrative remedies were in fact "available" to prisoners and whether defendants should be estopped from raising the affirmative defense of non-exhaustion, retain continued vitality. *Amador v. Superintendent of Dep't of Correctional Services,* No. 03 Civ. 0650(KTD)(GWG), 2007 WL 4326747, at *6-7 (S.D.N.Y. Dec. 4, 2007). I note that another judge of this court has similarly concluded that

   it appears that these decisions have **not** been overruled ... In [his] concurring opinion, Justice Breyer specifically noted that two circuits, the **Second** Circuit and Third Circuit, have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts(,) ...,"

   further buttressing the conclusion that the Second Circuit's *Hemphill* test retains vitality. *Miller v. Covey,* No. 9:05-CV 649, 2007 WL 952054, at *3 (N.D.N.Y. Mar. 29, 2007) (*Emphasis in original* ).

9    While the grievance for which plaintiff claims he was retaliated against in this count was filed on April 12, 2001, according to the exhibit attached to plaintiff's complaint, Houston contends that it was filed earlier and that there was a delay on the part of the IGRC in passing the complaint through for filing. *See* Houston Aff. (Dkt. No. 82) ¶ 4. While plaintiff's actual grievance complaints are annexed as exhibits in connection with other claims of retaliation, plaintiff did not include a copy of his handwritten grievance in this instance. It should be noted, however, that the handwritten complaints filed in other instances and the resulting formal IGRC sheet all bear the same filing dates. *See, e.g.,* Complaint (Dkt. No. 1) at pp. 19-21, 24-25, 59-61 and 116-18.

| 8/15/01 | Elliott | Grievances filed on 8/9/01 and and 8/12/01 [10] | Guilty (all counts) |
|---------|---------|------------------------------------------------|----------------------|

10   While plaintiff alleges having filed grievances on August 9, 2001 and August 12, 2001 against defendants Elliott and DeBejain, the record contains only the August 12, 2001 grievance. *See* Complaint (Dkt. No. 1) at ¶ 15 and pp. 20-21. Additionally, although plaintiff claims that the resulting false misbehavior report was issued on August 15, 2001 by both defendants Elliot and DeBejain, the report contains only Elliot's signature. *Id.* at p. 21.

| 8/20/01 | Kelley | Filing of grievances (dates and content unspecified) | Guilty (two counts)/Not Guilty (one count) |
| 8/23/01 | Wurst | Filing of grievances and lawsuits against defendant Wurst's "buddies at Mohawk" (dates and specifics not specified) | Guilty of all charges |
| 11/26/02 | Morse | Plaintiff "verbally complaining to [Morse's] supervisor about his racist behavior" (neither dates nor specifics provided) | Acquitted on all counts |
| 3/3/03 | Touron | "[Plaintiff's] exercise of freedom of information" (neither dates nor specifics provided) | Guilty on all counts |
| 3/22/03 | Shaver | Grievance filed on 3/12/03 | Guilty (two counts), Not Guilty (one count). |
| 5/29/03 [11] | Hammill | Written complaint dated 5/29/03 to defendant Smith re: defendant Hammill [submitted by plaintiff] | Guilty (all counts) |

[11] Plaintiff contends that this misbehavior report was issued on May 30, 2003, but backdated by one day. *See* Complaint (Dkt. No. 1) ¶ 26.

| 6/9/03 | Pirie | Pursuit of grievance appeal resulting in CORC decision dated 6/4/03 | Guilty (all counts); hearing result subsequently reversed on appeal to defendant Donald Selsky, Director of SHU/ Inmate Disciplinary Program |

[12] No explanation is offered for the failure to include an affidavit for that defendant.

[13] It should be noted that this is not the first time the plaintiff has had occasion to raise the claim of retaliation associated with this inter-prison transfers. In another action also filed in 2003, in the Western District of New York, plaintiff's complaint included claims of retaliation based upon prison transfers; plaintiff's claims in that case were dismissed, on motion for summary judgment, by order issued by District Judge David G. Larimer. *Houston v. ZenZen,* No. 03-CV-6118 L, (N.D.N.Y. September 26, 2005). *See* Kerwin Decl. (Dkt. No. 80-8) Exh. M (Decision and Order). Significantly, among the defendants named in that action was defendant Knapp-David. *Id.* It therefore could well be that plaintiff's claims in this action alleging retaliatory inter-prison transfer are barred by claim preclusion, or at the very least issue preclusion, based upon Judge Larimer's determination and the resulting judgment. *See Hill v. Coca Cola Bottling Co.,* 786 F.2d 550, 552-53 (2d Cir.1986) and *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985).

| Date of Transfer | Transferee Facility |
| --- | --- |
| 5/7/01 | Mohawk Correctional Facility |
| 9/15/01 | Marcy Correctional Facility SHU |
| 11/21/01 | Downstate Correctional Facility SHU |
| 11/23/01 | Great Meadow Correctional Facility SHU |
| 11/27/01 | Downstate Correctional Facility SHU |
| 12/2/01 | Auburn Correctional Facility SHU |
| 12/5/01 | Five Points Correctional Facility |
| 7/11/02 | Cayuga Correctional Facility |
| 8/16/02 | Auburn Correctional Facility |
| 2/3/03 | Ogdensburg Correctional Facility |
| 6/13/03 | Riverview Correctional Facility |
| 6/17/03 | Gouverneur Correctional Facility |
| 8/15/03 | Elmira Correctional Facility |

[14] In her declaration, Knapp-David also explained that inmate transfers can be prompted by a number of factors, including required court appearances or the need for specialized medical treatment, additionally pointing out that on occasion when an inmate is moved between hubs, a transfer may include short term stays at various facilities along the way. Knapp-David Decl. (Dkt. No. 80-22) ¶ 9. Knapp-David further explained that this is the likely reason for certain transfers in rapid succession not necessarily reflected on plaintiff's inmate transfer history including, for example, the September 2001 transfer from Marcy to Great Meadow, with an intermediate stop at Downstate, and a return trip through Downstate with

a final destination of Five Points, with only the Marcy to Five Points transfer having been noted on the plaintiff's transfer history. *See* Knapp-David Decl. (Dkt. No. 80-22) ¶ 9 and Exh. B.

15    In a declaration given in support of defendants' motion, Attorney Stephen M. Kerwin, Esq. recounts his search for actions commenced by the plaintiff, revealing eleven civil cases commenced by Houston against DOCS employees, several of which include allegations of retaliation. *See* Kerwin Decl. (Dkt. No. 80-8) ¶¶ 5, 9-11.

---

**End of Document**                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,

v.

Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

NORMAN A. MORDUE, Chief Judge.

### INTRODUCTION

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims of
medical indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment
on plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that
the Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force claims
against defendant Reyell are subject to dismissal for lack
of personal involvement. (Dkt. No. 61). Plaintiff does not
object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. See *Brown v. Peters,* 1997 WL 599355, *2–3
(N.D.N.Y.),* af'd without op., 175 F.3d 1007 (2d Cir.1999);
*see also Batista v. Walker,* 1995 WL 453299, at *1
(S.D.N.Y.1995)* (when a party makes no objection to a
portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

### DISCUSSION

#### I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006)

(citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

> Q. —did Nurse Fitzgerald ask you any questions while he was examining you?
>
> A. I think he asked me how am I feeling, how did this happen?
>
> Q. And what did you say?
>
> A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.
>
> Q. What did you say?

> A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—
>
> Q. Which was—
>
> A. —and that I started this.
>
> Q. And is that the truth?
>
> A. No.
>
> Q. Why did you tell the nurse that?
>
> A. Because I was being forced to.
>
> Q. Forced to how?
>
> A. By the officers that [sic] was there.
>
> Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?
>
> A. Yes, ma'am.
>
> Q. Why did you do that?
>
> A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able

to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" . [3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloody [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing the LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

> **\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are

not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

Footnotes

1   Local Rule 7.1(a)(3) provides:
    Summary Judgment Motions
    Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
    The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

2   While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

3   Officer Rock is not a defendant herein.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5372872
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Aldo Contreras LIBERATI, Plaintiff,

v.

GRAVELLE, Sgt., Clinton County Jail, Defendant.

No. 9:12–CV–00795 (MAD/DEP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Aldo Contreras Liberati, Philipsburg, PA, pro se.

Lemire, Johnson Law Firm, Gregg T. Johnson, Esq, Mary
E. Kissane, Esq, of Counsel, Malta, NY, for Defendant.


**ORDER**

MAE A. D'AGOSTINO, District Judge.

 **\*1** On May 14, 2012, Plaintiff commenced this civil
rights action pursuant to 42 U.S.C. § 1983, alleging
that upon arrival at Clinton County Correctional
Facility, Defendant used excessive force against Plaintiff,
causing him injury. *See* Dkt. No. 1. On December 28,
2012, Defendant moved for summary judgment seeking
dismissal of Plaintiff's claim pursuant to Rule 56 of the
Federal Rules of Civil Procedure. *See* Dkt. No. 22–
7 at 5. Defendant argues that dismissal is appropriate
based on (1) plaintiff's failure to exhaust the available
administrative remedies at Clinton before commencing
suit; (2) the record evidence, from which no reasonable
factfinder could conclude that he used force that violated
Plaintiff's constitutional rights; and (3) his entitlement
to qualified immunity from suit. *See generally* Dkt. No.
22–7. Plaintiff failed to oppose Defendant's motion for
summary judgment. *See* Dkt. No. 31 at 6.

In a Report–Recommendation and Order dated August
9, 2013, Magistrate Judge Peebles recommended that the
Court grant Defendant's motion for summary judgment
and dismiss Plaintiff's complaint. *See* Dkt. No. 31 at
2. Specifically, although Magistrate Judge Peebles found
that questions of fact preclude granting the motion on

exhaustion grounds, he found that the motion should be
granted on the merits because no reasonable factfinder
could conclude that Defendant violated Plaintiff's Eighth
Amendment rights. *See* id. at 21. Neither party objected to
Magistrate Judge Peebles Report–Recommendation and
Order.

On February 5, 2012, Plaintiff was transferred to Clinton
Correctional Facility ("Clinton") located in Dannemora,
New York. *See* Dkt. No. 22–2 at 3. During the transfer,
the corrections officers escorting Plaintiff called Clinton
to notify them that Plaintiff was difficult and combative.
*See id.* Upon arrival, the staff at Clinton prepared Plaintiff
for housing by performing the routine intake and booking
procedures. See id. at 4. Part of the normal procedure was
to conduct a patdown search to detect any contraband
that was not detected by the "BOSS" chair. *See id.* at
3. During the pat-down, Plaintiff disobeyed orders on at
least two occasions when he refused to face and keep his
hands on the wall. See id. at 4.

When the Clinton officers realized that Plaintiff had a
second layer of pants underneath his jeans, they instructed
him to remove them in a private changeout room. See id.
at 4. After removal of the pants Plaintiff refused to remain
on the wall, so they attempted to physically restrain him.
See id. at 5. Upon hearing this commotion, Defendant
entered the changeout room to assist with the situation.
See id. He observed Plaintiff resisting the officers that were
trying to restrain him. See id. Defendant administered
"a single, one second, application of O.C. spray towards
other officers to continue to gain control over Plaintiff and
secure his hands." *Id* . After he administered the spray,
Defendant placed it back in his holster and retreated to
allow the other officers to gain control of Plaintiff. See
id. Although Defendant remained in the room, he used
no further force against him other than to place his feet
near the Plaintiff to prevent him from putting his hands
under his body. See id. at 5–6. When the Plaintiff was fully
secured, Defendant left the room. See id. at 6. Plaintiff
was then escorted to a holding cell to provide him an
opportunity to calm down, decontaminate his eyes with
eye wash and see medical staff at the facility. See id.

 **\*2** Plaintiff's verified complaint alleges that Defendant
punched him in the head twice and that he did not
file a grievance regarding these allegations because the
corrections officers at Clinton refused to provide him with
the necessary form. See id. at 2.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Morever, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. See *id.* at 295 (citing *Showers v. Eastmond,* No. 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidenced" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Upon review of Magistrate Judge Peebles' Report–Recommendation and Order, the Court finds that the report correctly determined that Defendant's motion for summary judgment should be granted. In support of the motion for summary judgment, Defendant argues that he did not violate Plaintiff's Eighth Amendment rights because there is no record evidence that he punched Plaintiff in the head or used excessive force. *See* Dkt. No. 22–7 at 8–11. To state a claim for excessive force, a plaintiff must show defendant's acts are "incompatible with 'the evolving standards of decency that mark the process of a maturing society,' or involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958); *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). Even though the Eighth Amendment does not mandate that prisons be comfortable, they must be sufficiently humane. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two componentsone subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The

subjective element is satisfied when plaintiff demonstrates that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the alleged conduct." *Wright,* 554 F.3d at 268 (internal quotation marks omitted). This inquiry looks at "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6 (quoting *Whitley v. Albers,* 475 U.S. 312, 320 (1986)).

The objective element examines the harm inflicted in relation to "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8). Malicious or sadistic harm caused by prison officials, notwithstanding the extent of injury, always violates the "contemporary standards of decency." *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9). The amount of force is examined in proportion to the need reasonably perceived by prison officials and what, if anything, did they do to limit such force. *See Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

In the present matter, no evidence in the record suggests that Defendant, Gravelle used force maliciously or sadistically against Plaintiff. The record reveals that action was initiated against Plaintiff in response to his repeated failures to obey orders to keep his hands on the wall during the pat-down search. Defendant administered a single O.C. spray to assist the corrections officers and then moved away from Plaintiff, using no more force or spray than was necessary to control Plaintiff. The undisputed material facts make clear that no reasonable factfinder could conclude that Defendant used malicious or sadistic force against Plaintiff because such actions were taken in response to Plaintiff's failure to obey orders and the need to restore order. Although Plaintiff's claim that Defendant punched him in the head would constitute malicious or sadistic force in violation of Plaintiff's Eighth Amendment rights, there is no evidence in the record to support such claim. Therefore, Plaintiff fails to state a claim that Defendant violated his Eighth Amendment rights.

**\*4** After careful review of Magistrate Judge Peebles' Report–Recommendation and Order, the parties' parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 9, 2013 Report–Recommendation and Order is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Aldo Conteras Liberati has commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of his rights under the United States Constitution. In his complaint, plaintiff alleges that, upon his arrival at the Clinton County Correctional Facility ("Clinton"), he suffered injuries arising from the use of excessive force by defendant Gravelle, a sergeant corrections officer stationed at Clinton at the times relevant to this action.

Currently pending before the court is defendant's motion for summary judgment on the merits, and based also on plaintiff's failure to exhaust the available administrative remedies and defendant's assertion that he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted, and plaintiff's complaint be dismissed.

### I. *BACKGROUND* [1]

On February 5, 2012, plaintiff was transported to Clinton, located in Dannemora, New York, by United States immigration officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 8. Prior to his arrival at Clinton, immigration officers called Clinton to notify staff that, during the transport,

plaintiff was difficult and combative. *Id.* Upon arriving at Clinton, facility staff began to prepare plaintiff for housing by subjecting him to routine intake and booking procedures. *Id.* at ¶ 10. This process included scanning plaintiff using a "BOSS" chair, which is designed to detect any metal contraband, as well as pat-searching him in a private room called the "changeout room" for any contraband not detected by the BOSS chair. [2] Id. at ¶¶ 3, 10.

During the pat-search, plaintiff was directed by Clinton corrections officers to face and keep his hands on the wall. Gravelle Decl. (Dkt. No. 22–2) at ¶ 11. On at least two occasions, however, plaintiff disobeyed this order, and turned toward the officer conducting the search. Gravelle Decl. Exh. A (traditionally filed) at 0:33, 1:05. At some point during the search, the officer performing the pat-down discovered that plaintiff was wearing a second layer of pants underneath his jeans. Gravelle Decl. (Dkt. No. 22–2) at ¶ 12. Plaintiff was then directed to move into a more private part of the changeout room and remove his jeans. *Id.* When plaintiff refused to remain on the wall after he removed his jeans, several Clinton corrections officers attempted to take physical control of the plaintiff to restrain him. *Id.;* Gravelle Decl. Exh. A (traditionally filed) at 1:11.

**\*5** Moments after the pat-search began, defendant Gravelle, whose office is located nearby the changeout room, heard the commotion arising from plaintiff's search, and went to assist the other officers. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:15. Upon entering the changeout room, defendant observed plaintiff resisting the officers attempting to restrain plaintiff. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13. Defendant immediately delivered one, single application of "O.C. spray" to regain control of plaintiff. [3] Gravelle Decl. (Dkt. No. 22–2) at ¶¶ 13, 14; Gravelle Decl. Exh. A (traditionally filed) at 1:17. Defendant then moved back away from Liberati and allowed the other corrections officers to secure plaintiff's hands. Gravelle Decl. (Dkt. No. 22–2) at ¶ 13; Gravelle Decl. Exh. A (traditionally filed) at 1:18. Although defendant remained in the changeout room until plaintiff was secured, he did not use any further force against him. Gravelle Exh. A (traditionally filed) at 1:18–2:16. After plaintiff was secured, Clinton corrections officers escorted him to a holding cell to provide him opportunity to clam down, following which his eyes were decontaminated with

eye wash and he was seen by medical staff at the facility. Gravelle Dec. (Dkt. No. 22–2) at ¶ 15.

In plaintiff's verified complaint, he alleges that defendant punched him twice in the head. Compl. (Dkt. No. 1) at 8. He also contends that he did not file a grievance regarding these allegations due to the refusal of corrections officers at Clinton to provide him with the necessary form. *Id.* at 2.

## II. *PROCEDURAL HISTORY:*

Plaintiff commenced this action on May 14, 2012, by the filing of a complaint, motion to stay deportation, and application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1–3. Plaintiff's complaint is comprised of eight claims, and names six defendants, including defendant Gravelle. *See generally* Compl. (Dkt. No. 1). On August 27, 2012, District Judge Mae A. D'Agostino issued a decision and order granting plaintiff's request to proceed IFP, denying his motion to stay deportation, and dismissing all claims with the exception of plaintiff's Eighth Amendment excessive force cause of action asserted solely against defendant Gravelle. Dkt. No. 9.

Now that discovery in this matter is closed, the remaining defendant, Sergeant Gravelle, has moved for the entry of summary judgment, dismissing plaintiff's remaining claim, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 22. Defendant argues that dismissal is appropriate based on (1) plaintiff's failure to exhaust the available administrative remedies at Clinton before commencing suit; (2) the record evidence, from which no reasonable factfinder could conclude that he used force that violated plaintiff's constitutional rights; and (3) his entitlement to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 22–7).

**\*6** Defendant's motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
The court's local rules require that a party seeking summary judgment must submit a statement of material

facts that it contends are undisputed by the record evidence. N.D.N.Y. L.R. 7.1(a)(3). The local rules also instruct the non-moving party to respond to the moving party's statement of material facts by specifically admitting or denying each of the facts listed in the moving party's statement. *Id.* The purpose underlying this rule is to assist the court in framing the issues and determining whether there exist any triable issues of fact that would preclude the entry of summary judgment. *Anderson v. Dolgencorp of N.Y.,* Nos. 09–CV0360, 09–CV–0363, 2011 WL 1770301, at *1 n. 2 (N.D.N.Y. May 9, 2011) (Sharpe, J.).[4] To meaningfully fulfill this purpose, it is essential for the court to have the benefit of both the moving party's statement and an opposition statement from the non-moving party.

In this instance, defendant Gravelle has complied with local rule 7.1(a)(3), providing a statement setting forth twenty-three facts as to which, he contends, there is no genuine triable issue. Def.'s L.R. 7.1(a)(3) Statement (Dkt. No. 22–6). Plaintiff, however, has failed to respond either to that statement, or to defendant's motion generally.[5] See *generally* Docket Sheet.

By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this provision in cases where a non-movant fails to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, C.J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a *pro se* litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, C.J.).

**\*7** Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's rule 7.1(a)(3) statement, Dkt. Nos. 22–1, 24–1, but has nonetheless failed to do so, I have construed defendant's facts contained therein as true to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005)* (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only

in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also* Anderson, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Exhaustion of Available Administrative Remedies*

**\*8** In his motion, defendant Gravelle argues that, because plaintiff did not file a grievance addressing the issues now raised in this action before commencing suit and pursue that grievance through the administrative grievance procedure available at Clinton, he is procedurally barred from pursuing this action. Def.'s Memo of Law (Dkt. No. 22–7) at 11–12.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

The requirement that inmates exhaust administrative remedies before filing a lawsuit, however, is not a jurisdictional requirement. *Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir.2003). Instead, failure to exhaust is an affirmative defense under the PLRA, and "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." [6] *Jones v. Bock,* 549 U.S. 199, 216 (2007). In the event a defendant establishes that the inmate-plaintiff failed to complete the administrative review process prior to commencing the action, the

plaintiff's complaint is subject to dismissal. *See Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [7]

There are grievance procedures in place and available to any Clinton inmate who desires to complain regarding prison conditions at the facility. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17; Johnson Decl. Exh. B (Dkt. No. 22–5). In this case plaintiff's complaint, which is signed under penalty of perjury, and thus has the same force and effect as an affidavit, [8] alleges that he requested a grievance form from Clinton corrections officers but they refused to provide one to him. Compl. (Dkt. No. 1) at 4, 8. In support of his motion, defendant Gravelle avers that plaintiff did not file a grievance regarding the events giving rise to this action while at Clinton. Gravelle Decl. (Dkt. No. 22–2) at ¶ 17.

**\*9** Although it is clear from the record that plaintiff failed to avail himself of the administrative remedies available to him, his failure to do so does not warrant dismissal of plaintiff's complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, although there is no record evidence to suggest that grievance procedures at Clinton were not fully available to plaintiff while he was at the facility, plaintiff does allege that corrections officers stationed at the facility refused to provide him with a grievance form. Under ordinary circumstances, this could justify a recommendation to the assigned district judge that she hold a hearing to develop plaintiff's allegation regarding special circumstances pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011). However, as is discussed more fully below, because I recommend that defendant's motion be granted based on a finding that no reasonable factfinder could conclude that defendant violated plaintiff's rights, a determination of whether plaintiff should be precluded from bringing this action based on a failure to exhaust administrative remedies is not necessary.

### D. *Plaintiff's Excessive Force Claim*

In support of defendant's motion, defendant Gravelle argues that there is no record evidence to support the allegation that he punched plaintiff, and that the record instead supports a finding that defendant's use of force against plaintiff did not violate his Eighth Amendment rights. Def.'s Memo. of Law (Dkt. No. 22–7) at 8–11.

Plaintiff's excessive force claim is grounded in the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.. Chapman,* 452 U.S. 337, 349 (1981)).

**\*10** A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and

the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright, 554 F.3d at 268* (internal quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), accord, *Blyden, 186 F.3d at 262.* The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins, 559 U.S. at 37; Hudson, 503 U.S. at 9.*

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted); *see also Griffin,* 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8); *see also Blyden,* 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991), *accord Hudson,* 503 U.S. at 8; *see also Wright,* 554 F.3d at 268. "But when

prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins,* 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson,* 503 U.S. at 7; *Whitley,* 475 U.S. at 321; *Romano,* 998 F.2d at 105.

**\*11** Finally, on a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003)) (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")).

In this case, although plaintiff's complaint alleges that defendant Gravelle punched him twice in the head, there is no record evidence to support his claim. Compl. (Dkt. No. 1) at 8. Instead, the record reveals that defendant used O.C. spray against plaintiff on one occasion during the course of an altercation with corrections officers, while those officers attempted to gain control over him. The video recording submitted in support of defendant's motion shows defendant coming into the changeout room after plaintiff was already on the ground with several officers trying to restrain him. Defendant quickly applied the O.C. spray to plaintiff's face, and then moved away from plaintiff and the other officers. According to defendant, corrections officers initiated the use of force against plaintiff as a result of his failure to obey orders to keep his hands on the wall during the pat-search. Defendant's use of force lasted a matter of seconds, and he sprayed him only to assist corrections officers in restraining him. In addition, although defendant states that plaintiff was seen by medical staff at Clinton

following the incident, nothing in the record, including plaintiff's complaint, indicates that plaintiff suffered a physical injury as a result of the incident. In light of all of this record evidence, I find that no reasonable factfinder could conclude that defendant used force against plaintiff maliciously or sadistically, or for any other purpose than restoring order. *See Kopy v. Howard,* No. 07–CV0417, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (Treece, M.J.), *report and recommendation adopted by* 2010 WL 3807166 (N.D .N.Y. Sept. 21, 2010) (Hurd, J.) (granting summary judgment where the record evidence demonstrated that the defendants used pepper spray on the plaintiff only once after plaintiff was repeatedly ordered to return to his cell and plaintiff suffered no injuries). Accordingly, I recommend that defendant's motion be granted. [9]

## IV. *SUMMARY AND RECOMMENDATION*

In defendant's motion, he challenges the legal sufficiency of plaintiff's excessive force claim. Because the record contains a dispute of material fact as to whether plaintiff's failure to exhaust available administrative remedies may be excused, defendant is not entitled to dismissal on that basis. However, after a careful review of the record evidence, including a video recording of defendant's use of force, I find that no reasonable factfinder could conclude that defendant violated plaintiff's Eighth Amendment rights.

**\*12** Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 22–7) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 86 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5372872

Footnotes

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2   A camera is installed in the changeout room. *Id.* at ¶ 10. In support of his motion, defendant submitted, as Exhibit A to his declaration, a copy of the recording from plaintiff's intake during the pat-search on February 5, 2012. Gravelle Decl. Exh. A (traditionally filed).

3   The term "O.C. spray" is not defined in defendant's motion papers. *See,* e.g., Gravelle Decl. (Dkt. No. 22–2); Def.'s L.R. 7 .1(a)(3) Statement (Dkt. No. 22–6).

4   Copies of all unreported decisions cited have been appended to this report for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

5   Plaintiff's response was due on January 22, 2013. Notice to Plaintiff (Dkt. No. 24). On July 24, 2013, the court received a letter from plaintiff requesting leave to file a response in opposition to the pending motion. Dkt. No. 29. Because plaintiff's request was over six-months late, and he was adequately put on notice previously of the consequences of failing to respond to defendant's motion, and in light of the unfair prejudice that defendant would incur as a result of such a delayed response, I denied that motion. Text Order Dated July 24, 2013.

6   In this case, defendant Gravelle raised failure to exhaust administrative remedies as a defense in his answer to plaintiff's complaint. Dkt. No. 14 at ¶ 14.

7   While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted)).

8   18 U.S.C. § 1746; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes[.]").

9   Because I recommend dismissal of plaintiff's complaint based on the merits, I have not considered defendant's qualified immunity argument.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7.[1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the

time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim in question was grievable, [11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

***4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court. [18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury. [19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law. [20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also

on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would]

have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.)[23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.)[24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.)[25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to

exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

### C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals- which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in

this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/ or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1235591

Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g* ., DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when

he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7   The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8   *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9   *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10  *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11  *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12  *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13  *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14  *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15    *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16    *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17    *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18    *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19    *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20    *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff's] grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff's] failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21 *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22 *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23 The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24 In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25 For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26 *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27 *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28 The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

2010 WL 3724883
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Prince PILGRIM, Plaintiff,
v.
Dale ARTUS, Superintendent, Clinton
Correctional Facility, Defendants.

Civ. No. 9:07–CV–1001 (GLS/RFT).
|
March 18, 2010.

**Attorneys and Law Firms**

Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for
the State of New York, Aaron M. Baldwin, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendant.

***REPORT–RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Prince Pilgrim has filed this civil
rights action, pursuant to 42 U.S.C. § 1983 and the
Religious Land Use and Institutionalized Persons Act
("RLUIPA"), 42 U.S.C. § 2000cc–1 *et seq.,* alleging
that Defendant Dale Artus, Superintendent of Clinton
Correctional Facility, violated his constitutional and
statutory rights to freely exercise his religious beliefs.
Dkt. No. 1, Compl. The crux of Plaintiff's religious
expression claim is that he was repeatedly punished
for exercising his sincerely held religious beliefs, which
require him to wear dreadlocks, because he is a member
of the Nation of Islam ("NOI") and Department of
Correctional Services' ("DOCS") policy allows only those
of the Rastafarian faith to wear dreadlocks. *See generally
id.*

In addition, Plaintiff alleges that Artus failed to protect
him from unconstitutional retaliation, his due process
rights were violated during the course of several
disciplinary hearings, and the penalties imposed as a

result of his disciplinary convictions constituted "cruel
and unusual punishment" in violation of the Eighth
Amendment. *Id.*

Presently before the Court for a Report–
Recommendation is Defendant's Motion for Summary
Judgment. Dkt. No. 36. Since the filing of Defendant's
Motion, the Court has granted Plaintiff four separate
extensions of time to file a response in opposition to
the Motion. *See* Dkt. No. 46, Order, dated Aug. 20,
2009, at p. 1 (cataloguing prior extensions). The final
extension granted Plaintiff until September 4, 2009, to file
a response, and warned Plaintiff that ***"failure to oppose
Defendant's Motion will result in this Court accepting
the facts set forth by Defendant as true."*** *Id.* at p. 3
(emphasis in original) (citing N.D.N.Y.L.R. 7.1(a)(3)).
Despite this Court's leniency and warnings, Plaintiff's
Response [1] was not received until September 10, 2009, six
days after the deadline passed. Dkt. No. 47, Pl.'s Resp. in
Opp'n to Def.'s Mot. Notwithstanding Plaintiff's failure
to meet the extended deadline, because he is proceeding
*pro se,* we will nonetheless consider his Response and the
Exhibits attached thereto in issuing a recommendation on
Defendant's Motion.

For the reasons that follow, we recommend that
Defendant's Motion be **granted** in part and **denied** in part.

**I. FACTS NOT IN DISPUTE**

The following facts were derived mainly from the
Defendant's Statement of Material Facts, submitted in
accordance with N.D.N.Y.L.R. 7.1, which were not,
in their entirety, specifically countered nor opposed by
Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall
deem admitted any facts set forth in the Statement of
Material Facts that the opposing party does not specifically
controvert."* (emphasis in original)). In any event, most, if
not all, of the material facts are not in dispute, but rather,
the issue is whether those facts give rise to constitutional
and statutory violations.

**\*2** Plaintiff was received into DOCS' custody on or about
November 4, 1992. Dkt. No. 36–2, Def.'s 7.1 Statement,
at ¶ 1. At all times relevant to the Complaint, and
continuing until the present, Defendant Dale Artus has
been the Superintendent of Clinton Correctional Facility
("Clinton"), where Plaintiff was confined from April 1,

2005 through February 5, 2009. *Id.* at ¶ 2. Plaintiff is currently incarcerated at Attica Correctional Facility. *Id.*

On November 18, 2006, Plaintiff was given a direct order by Corrections Officer ("C.O.") A. Appleby to remove his dreadlocks as per DOCS' policy, which allows only inmates of the Rastafarian faith to wear dreadlocks. *Id.* at ¶ 18; Dkt. No. 47–1, Prince Pilgrim Decl., dated Aug. 31, 2009 (hereinafter "Pl.'s Decl."), at ¶ 14. DOCS' hair policy is based on DOCS Directive # 4914, entitled "Inmate Grooming Standards," and relevant decisions from the Central Office Review Committee ("CORC"), which is the final appellate body for inmate grievances and whose decisions have the same effect as directives. Dkt. No. 36–6, Mark Leonard Decl., dated Apr. 30, 2009, at ¶ 59. DOCS Directive # 4914 allows inmates to wear long hair [2] provided they tie it back in a ponytail at all times, but does not specifically permit nor disallow dreadlocks. *Id.,* Ex. B, DOCS Directive # 4914(III)(B)(2)(a)-(d). However, relevant CORC decisions have made clear that "[o]nly inmates of the Rastafarian faith may have dreadlocks." *Id.,* Ex. C, CORC Decision, dated May 8, 2003.

On December 19, 2006, C.O. C. Strong observed Plaintiff, who was on his way to an NOI meeting, with his hair in dreadlocks that extended down to the middle of his back. *Id.* at ¶ 17; Pilgrim Decl. at ¶¶ 17–18. C.O. Strong issued Plaintiff a Misbehavior Report (hereinafter "First MR"), charging him with Refusal to Obey a Direct Order (Rule 106.10). Def.'s 7.1 Statement at ¶ 19. At a Tier II Hearing that concluded on December 27, 2006, Lieutenant ("Lt.") Boyle found Plaintiff guilty of the charge and assessed him a penalty of thirty (30) days keeplock,[3] with loss of commissary, package and phone privileges. *Id.* at ¶ 20. During that hearing, Boyle refused Plaintiff's request to call Defendant Superintendent Artus as a witness, reasoning that because Artus was not present nor otherwise involved in the incident, his testimony would not be germane to the charge at issue. *Id.* at ¶¶ 40–41. However, Plaintiff was allowed to call other witnesses including two C.O.'s and another inmate. *Id.* at ¶ 42. Plaintiff's appeal, dated December 27, 2006, was delegated by Defendant Artus to Captain J. Bell, who affirmed Boyle's decision. *Id.* at ¶ 21.

On February 20, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Second MR") by C.O. Appleby for again failing to cut his dreadlocks and thereby refusing to comply with both a direct order

and a prior hearing disposition. *Id.* at ¶¶ 22–23; Pl.'s Decl. at ¶ 21. A Tier II Hearing was conducted by Lt. Lucia, who found Plaintiff guilty of Refusal to Obey a Direct Order (Rule 106.10) and Noncompliance with a Hearing Disposition (Rule 181 .10), and assessed Plaintiff thirty (30) days keeplock, with corresponding loss of recreation, commissary, package and phone privileges, and an additional fifteen (15) days keeplock and loss of privileges invoked from a previous disciplinary hearing determination. Def.'s 7.1 Statement at ¶¶ 23–24; Pl.'s Decl. at ¶ 25. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision on March 5, 2007. Def.'s 7.1 Statement at ¶ 25; Pl.'s Decl. at ¶ 26. By letters dated March 14, 2007, and March 21, 2007, Plaintiff requested a discretionary review of the March 1, 2007 Tier II Hearing disposition, raising issues as to whether or not he should have been credited for time spent in pre-hearing confinement. Def.'s 7.1 Statement at ¶ 26. Artus delegated that petition to G. Haponik, First Deputy Superintendent, who denied the requested relief. *Id.* at ¶ 27.

**\*3** Also on February 20, 2007, Plaintiff filed a grievance with the Inmate Grievance Program ("IGP") at Clinton, alleging harassment and unlawful discrimination on the part of C.O. Appleby, and taking issue with DOCS' policy regarding dreadlocks. *Id.* at ¶¶ 43–44; Pl.'s Decl. at ¶ 22. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance on the grounds that there was a pending misbehavior report against Plaintiff, making the issue non-grievable. Def.'s 7.1 Statement at ¶ 45. Plaintiff's appeal to the Superintendent was referred to the IGP Supervisor, who agreed with the IGRC's determination and issued a memorandum to Plaintiff denying his appeal. *Id.* at ¶¶ 46–47.

On August 1, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Third MR") by C.O. J. Way for failure to comply with a prior direct order to cut his hair. *Id.* at ¶ 28. Along with Refusal to Obey a Direct Order (Rule 106.10), Plaintiff was charged with Harassment (Rule 107.11) for using obscene language during his confrontation with C.O. Way, and Inmate Grooming (Rule 110.33) for failure to tie back his long hair. *Id.* at ¶ 31. Lt. Miller conducted a Tier II Hearing on August 1, 2007, at which time Plaintiff was found guilty of refusing a direct order and having unfastened long hair, but not guilty of harassment. *Id.* at ¶ 32. Plaintiff was penalized with thirty (30) days keeplock and loss of

commissary, package, and phone privileges for the same amount of time. *Id.* at ¶ 33. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision. *Id.* at ¶ 34.

On September 12, 2007, C.O. Edwards issued Plaintiff a fourth Misbehavior Report (hereinafter "Fourth MR") concerning his dreadlocks. *Id.* at ¶¶ 35–36. The Fourth MR charged Plaintiff with Refusal to Obey a Direct Order (Rule 106.10) and making a False Statement (Rule 107.20), the latter charge owing to Plaintiff's alleged statement that he was a Rastafarian when, in fact, he was registered as an NOI member. *Id.* at ¶¶ 36–37; Pl.'s Decl. at ¶ 34. A Tier II Hearing was held on September 17, 2007, before Lt. Miller, who found Plaintiff guilty on both charges and sentenced him to thirty (30) days keeplock with concurrent loss of commissary, package, and phone privileges. Def.'s 7.1 Statement at ¶ 38.

On or about November 26, 2007, Plaintiff filed another grievance with the IGP, dated November 17, 2007, complaining about DOCS' policy regarding dreadlocks did not comply with DOCS Directive # 4914 and violated his First Amendment rights. *Id.* at ¶ 48. That grievance was consolidated with similar grievances filed by other inmates at Clinton who were given similar orders and/ or warnings regarding their hair. *Id.* at ¶ 49; Pl.'s Decl. at ¶ 36. After conducting an investigation, First Deputy Superintendent W.F. Hulihan issued a determination, dated December 19, 2007, stating that "DOCS policy is that registered Rastafarian religion inmates are the only inmates allowed to have dreadlock hairstyles .... This issue has been addressed in numerous CORC decisions .... Based on DOCS established policy and CORC decisions, no compelling evidence has been submitted to support a change in policy." Def.'s 7.1 Statement at ¶ 52. Plaintiff and the other grievants appealed Hulihan's determination to CORC, which upheld the decision. *Id.* at ¶ 53.

**\*4** Plaintiff wrote Defendant Artus many times during his incarceration at Clinton, the issue of his sanctions for wearing dreadlocks being the predominant topic of such correspondences. *Id.* at ¶ 54; Compl. at ¶ 4. On each occasion that he received a letter of complaint, request for an investigation, appeal, etc., from Plaintiff, Artus referred the matter to a deputy superintendent or other staff member for review, response, or other necessary action. Def.'s 7.1 Statement at ¶ 56.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary

judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.3d 18, 21 (2d Cir.1991).

### B. Personal Involvement

1. *Due Process, Retaliation, and Cruel and Unusual Punishment*

**\*5** Plaintiff alleges that Defendant Artus violated his First, Eighth, and Fourteenth Amendment rights by failing to overturn disciplinary sanctions, thereby subjecting him to punishments that were cruel and unusual, and by allowing others to retaliate against him. Defendant asserts he was not personally involved in any of those alleged constitutional violations.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal, —— U.S. ——,* 129 S.Ct. 1937, 1948 (2009).

Nonetheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff does not allege that Defendant Artus directly participated in any of the alleged harassment, retaliation, due process violations, nor disciplinary actions that were taken against him. Rather, Plaintiff hangs his hat on the second of the five aforementioned ways in which supervisory liability may attach: "failure to remedy a wrong after being informed through a report or appeal." *Id.* at 145. Plaintiff asserts that he sent several grievances, complaint letters, and appeals of his disciplinary convictions to Artus, who was thereby made aware of the allegedly unconstitutional policy regarding dreadlocks and the harassments and retaliatory misbehavior reports that were being filed against Plaintiff, but that Artus nonetheless failed to intervene on Plaintiff's behalf. The record establishes that Plaintiff appealed to Artus at least three of the four Tier II Hearing dispositions that are relevant to this lawsuit, and that he filed several grievances and complaint letters with Artus. [4] *See* Dkt. No. 36–5, Dale Artus Decl., dated Apr. 30, 2009, Exs. A–U, Docs. related to Pl.'s Misbehavior Reps. & Grievances.

**\*6** However, while personal involvement may be found where a supervisory official personally reviews and denies a grievance, the mere referral of an inmate's complaint by a supervisory official to the appropriate staff for investigation is not sufficient to establish personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009) (quoting *Harnett v. Barr,* 538 F.Supp.2d

511, 524–25 (N.D.N.Y.2008)); *cf. Charles v. New York State Dep't of Corr. Servs.*, 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) (noting that "courts in this circuit have held that when a supervisory official *receives and acts on* a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated" (emphasis in original) (citation omitted)). Moreover, "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks and citation omitted). Even "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Flemming v. Wurzberger*, 2006 WL 1285627, at *2 (W.D.N.Y. May 10, 2006) (internal quotation marks and citations omitted).

In this case, Artus asserts that he referred each and every one of Plaintiff's appeals and grievances to subordinate staff members for review, investigation, and appropriate action. Artus Decl. at ¶ 13. The documentary record confirms that contention. Artus referred Plaintiff's appeals of his convictions on the First, Second, and Third MRs to Captain Bell, who reviewed and affirmed the dispositions rendered at the corresponding Tier II Hearings. *Id.,* Exs. B–D, Interdep't Comm'ns, dated Jan. 3, 2006, Mar. 5, 2007, & Aug. 16, 2007. In addition, all of the grievances, complaints, and appeals of grievances mentioned in Plaintiff's Response to Defendant's Motion were forwarded by Artus to staff members in order to investigate, render a decision, and take appropriate actions. Artus Decl. at ¶ 13; Dkt. No. 47, Prince Pilgrim Aff., dated Aug. 31, 2009 (hereinafter "Pl.'s Aff.") at p. 5. Namely, Plaintiff's grievances dated November 9, 2006, November 21, 2006, November 28, 2006, February 20, 2007, July 1, 2007, August 1, 2007, and October 5, 2007,[5] were all responded to by Artus's subordinate staff members. Pl.'s Aff., Ex. F, Interdep't Mem., dated Nov. 13, 2006; Ex. H, Interdep't Mem., dated Nov. 13, 2006 (referring 11/9/06 grievance to Deputy Sup't for Sec. J. Tedford); Ex. I, Interdep't Mem., dated Nov. 29, 2006 (referring 11/21/06 grievance to Deputy Sup't of Programs L. Turner); Ex. J, Interdep't Mem., dated Nov. 29, 2006 (referring 11/28/06 grievance to Tedford); Ex. N, Interdep't Comm'n, dated Feb. 23, 2007 (forwarding 2/20/07 grievance to Deputy Sup't of Security Servs. S. Racette); Exs. Q–S, Interdep't Comm'ns, dated July 5,

Aug. 7 & Oct. 10, 2007 (referring grievances dated 7/1/07, 8/1/07, and 10/5/07 to IGP Supervisor T. Brousseau).

**\*7** Because Plaintiff has failed to rebut Defendant's documentary case that his involvement was limited to forwarding Plaintiff's disciplinary appeals, complaints, grievances, and appeals of grievances to other staff members, we recommend that all of Plaintiff's claims, with the exception of his RLUIPA and First Amendment religious expression claims,[6] be **dismissed** for lack of personal involvement. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (holding that the referral of appeals down the chain of command does not create personal involvement on the part of the referee); *see also Brown v. Goord*, 2007 WL 607396, at *10 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read and respond to ... complaints by prisoners" without becoming personally involved); *Cruz v. Edwards*, 1985 WL 467, at *4 (S.D.N.Y. Mar. 25, 1985) (finding defendant superintendent was not personally involved when he referred the appeal to the deputy superintendent).

Moreover, even if we were to look past Plaintiff's failure to demonstrate Artus's personal involvement, we would still find all of his constitutional claims (again with the notable exception of his First Amendment religious expression claim) to be without merit.

### a. *Due Process*

In his Complaint, Plaintiff appears to make a due process claim based on "prejudicial" hearings and other unspecified procedural violations that occurred during those Hearings. Compl. at ¶ 10; Pl.'s Aff. at ¶ 15; *see also* Pl.'s Decl. at ¶ 24 (stating that the proceedings were "hollow"). This claim is wholly conclusory. Plaintiff does not identify which of the four Tier II Disciplinary Hearings was conducted in a prejudicial manner, nor does he describe any of the alleged procedural violations that occurred. *See Bell. Atl. Corp. v. Twombly*, 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In short, Plaintiff has not stated a plausible due process claim.

Even if we were to look past the conclusory nature of Plaintiff's due process claim, we would still recommend

dismissal of such claim. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Here, Plaintiff alleges that he was sentenced to and served three separate thirty (30) day and one forty-five (45) day period of keeplock with reduced privileges, but alleges no additional aggravating circumstances present during that confinement. Courts in this Circuit have held that such periods of keeplock, absent additional egregious circumstances, are not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2–3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant), *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589–90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest). Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed.**

b. *Retaliation*

**\*8** Plaintiff claims that the disciplinary actions taken against him by DOCS staff members constituted

retribution for grievances he filed and that Artus failed to protect him from such reprisals. Compl. at ¶¶ 4 & 8; Pl.'s Aff. at ¶¶ 11 & 19.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138–39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)

(emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148–49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

**\*9** In this case, Plaintiff alleges that the disciplinary actions taken against him were done in retaliation for grievances he filed. Pl.'s Aff. at ¶ 19. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original). Thus, Plaintiff has met his burden of showing he was engaged in constitutionally protected conduct.

However, the record is clear that all of the disciplinary actions taken against Plaintiff were due to his failure to abide by orders directing his compliance with DOCS' hair policy. *See* Artus Decl ., Exs. B–E, Disciplinary Packets for MR's 1–4. Therefore, even assuming Plaintiff could show that such disciplinary actions were motivated by retaliatory animus (an assumption that finds no basis in the record), Plaintiff's retaliation claims would fail because it is undisputed that his dreadlocks violated DOCS' policy, and thus, the DOCS employees who disciplined Plaintiff can easily show that they would have taken the same disciplinary actions even in the absence of his protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). Although Plaintiff has challenged DOCS' hair policy in this lawsuit, there is no suggestion that at the time he was disciplined, that policy was not valid. Thus, because there is unrefuted evidence that Plaintiff

was disciplined pursuant to a valid DOCS' policy, his retaliation claims must fail.

### c. *Cruel and Unusual Punishment*

Although unclear, it appears that Plaintiff asserts an Eighth Amendment claim based on the conditions of his confinement while he served his disciplinary sanctions, which included serving three thirty (30) day and one forty-five (45) day periods in keeplock, loss of phone and commissary privileges, no regular visits, twenty-three (23) hour confinement, and only three showers a week. Compl. at ¶ 6.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). Here, Plaintiff does not allege that he was denied the "minimal civilized measure of life's necessities," rather, he states that he was placed on keeplock and denied various privileges for three thirty (30) day and one forty-five (45) day periods. [7] These conditions are not so severe as to violate the Eighth Amendment's ban on cruel and unusual punishment. *See Parker v. Peek–Co,* 2009 WL 211371, at \*4 (N.D.N.Y. Jan. 27, 2009) ("It is well established ... that placement in keeplock confinement under the conditions normally associated with that status does not violate an inmate's Eighth Amendment rights.") (citation omitted); *see also Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (citing cases). Therefore, it is recommended that this claim be **dismissed** as a matter of law.

### C. RLUIPA and First Amendment Claims

#### 1. *Merits of Plaintiff's Claims*

**\*10** RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are

therefore dependent on the government's permission and accommodation of exercise of their religion." [8] *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the prison regulations constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means.* As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v.. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests. 482 U.S. 78, 89 (1987).

The first issue is whether Plaintiff's freedom of religious expression has been substantially burdened. Plaintiff is a registered NOI member. The NOI does not require him to wear dreadlocks, however, Plaintiff asserts that he wears dreadlocks pursuant to his own personal faith and interpretations of the Qu'ran and Bible. Pl.'s Decl. at ¶ 43. As Plaintiff explains, his

> refusal to cut his hair is rooted in the spiritual understanding that he is *"one"* with the Original Man, Blackman, who is Allah, as Plaintiff is a Blackman thus claiming the Holy Qu'ran and Bible as his blueprint of his lifestyle and hair:
>
> A. Holy Qu'ran provision, surah (Chapter) 2, verse 196: "And accomplish the pilgrimage and the visit for ALLAH. But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches its destination."

> B. Holy Bible, Numbers, Chapter 6, verse 5, commonly referred to as the Nazarite Vow 8[:] "All the days of the vow of his Naziriteship no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow."

*Id.* at ¶ 43 (emphasis in original).

Defendant contends that because Plaintiff's desire to wear dreadlocks is "merely a personal choice and is not based upon NOI tenant or dogma," DOCS' policy does not substantially burden his sincerely held religious beliefs. Dkt. No. 36, Def.'s Mem. of Law at p. 31; *see also* Leonard Decl. at ¶ 65. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Thus, the question of whether Plaintiff's personal religious beliefs are founded in any particular established religion is inapposite. However, RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson,* 544 U.S. at 725 n. 13. On that subject, the record shows that Plaintiff has been growing dreadlocks for religious reasons since approximately 1993. Dkt. No. 36–3, Pl.'s Dep. at p. 12. In addition, Plaintiff's continued refusal to cut his hair despite the successive punishments he received arguably supports his professed sincerity. Simply put, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs.

**\*11** RLUIPA does not define "substantial burden," however, the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 717–718 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck* ). In this case, there can be little doubt that the DOCS' policy in question substantially burdens Plaintiff's religious exercise by forcing him to choose between cutting his hair and being subjected to disciplinary punishment. In *Amaker v. Goord,* 2007 WL

4560596 (W.D.N.Y. Mar. 9, 2007), the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, addressed a motion for a preliminary injunction on facts nearly identical to those established here, and concluded that "forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliations with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice." 2007 WL 4560596, at *6; [9] see also Singh v. Goord, 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (noting that "demonstrating a substantial burden is not an onerous task for the plaintiff").

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc–2(b). On the first point, Defendant has asserted an interest in maintaining prison security, which he alleges could be undermined if more prisoners are allowed to wear dreadlocks, which can be used to conceal weapons. Def.'s Mem. of Law at pp. 32–33; Dkt. No. 36–8, Lucien J. LeClaire, Jr., Decl., dated Apr. 30, 2009, at ¶¶ 7–21; Leonard Decl. at ¶¶ 48–57 & 68. Without question, DOCS' interest in safety and security is a compelling governmental interest. See Cutter v. Wilkinson, 544 U.S. at 725 n. 13.

But, in order to defeat Plaintiff's RLUIPA claim, Defendant must also show that DOCS' policy is the least restrictive means of furthering its compelling interest in security. We believe there are questions of material fact on that issue. Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Leonard Decl. at ¶ 63. Also, Directive # 4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a "Afro-natural" style. Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(a),(d). Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners. Plaintiff asserts that the least restrictive means of ensuring security is already provided in DOCS Directive # 4914(III) (B)(2) (e), which states that

*12 [a]n inmate may be subjected to a hair search when there is reason to believe that contraband may be discovered by such a search. An inmate may be subjected to such search at any time that a pat frisk, strip search, or strip frisk is being conducted. Consistent with Directive # 4910, during a pat frisk, an inmate will be required to run fingers through [his] hair. During a strip search, an inmate may be subjected to an inspection of his or her hair. During a strip frisk, an inmate will run his or her hands through the hair.

Id.

DOCS Deputy Commissioner for Correctional Facility Security Lucien J. LeClaire, Jr., responds to that argument in his Declaration, asserting that "[l]arge, long dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein." LeClaire Decl. at ¶ 18. LeClaire further argues that if an inmate need only declare a personally held religious belief in growing dreadlocks in order to be given permission to do so, DOCS will have no ability to restrict the number of inmates wearing dreadlocks. Id. at ¶ 19. The Court does not overlook the weight of these arguments nor the deference courts must accord prison officials when analyzing their policies. However, we question the assumption that permitting dreadlocks to be worn by inmates whose sincerely held religious beliefs require them would open the proverbial floodgates. Under DOCS' current policy, any nefariously motivated inmate need only register himself as a Rastafarian in order to be given permission to wear dreadlocks, and there is no evidence presented to the Court that such policy has resulted in a substantial increase in the Rastafarian/ dreadlock-wearing inmate population. Leonard Decl. at ¶ 63; see also Artus Decl., Ex. D, Misbehavior Rep., dated Aug. 1, 2007 (stating "[i]nmate Pilgrim was given a direct order on July 1st 2007 to cut his dreadlocks or become a registered Rastafarian") & Leonard Decl., Ex. C, CORC Decision, dated Feb. 9, 2005 (ruling that

"staff have correctly directed the grievant to remove his dreadlocks, or change his religious designation"). Moreover, because DOCS has deemed its current policy adequate to protect its safety interests with respect to all of the other permitted hairstyles as well as for Rastafarian inmates with dreadlocks, a material question of fact exists as to why that policy would not also suffice for inmates in Plaintiff's position. *See Amaker v. Goord et al., 2007 WL 4560595.*

Even under a First Amendment analysis, questions of fact remain. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith, 850 F.2d 917, 926 (2d Cir.1988)* (citations omitted).

**\*13** The first two prongs have been met in this case. As discussed above, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs, nor any suggestion that Plaintiff is personally motivated by fraud or is otherwise attempting to deceive DOCS officials. And, on the second prong, Plaintiff has shown that DOC S' policy substantially burdens his religious beliefs. *See Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir.2006).* [10] As to the third prong, the Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley, 482 U.S. at 89.* Courts look to the following four factors in determining the reasonableness of a prison regulation: 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id. at 89–91* (citations omitted).

DOCS has a compelling and legitimate penological interest in maintaining prison security. The policy in question, which seeks to limit the number of prisoners who are allowed to wear dreadlocks, which can be used to hide small weapons, is rationally related to that interest. The other remaining three factors, however, weigh against

Defendant. On the second *Turner* factor, the Court is not aware of any other means of exercising this particular religious belief other than physically growing dreadlocks. As to the third factor, as previously discussed, questions of fact exist as to what effect the accommodation of Plaintiff's beliefs would have on the entire prison system, especially considering the fact that DOCS' current policy allows any inmate who self-identifies as Rastafarian to wear dreadlocks. For the same reasons, we believe a question of fact exists as to whether there are ready alternatives to DOCS' current policy, including the procedures already applied to those whom DOCS currently allows to wear dreadlocks and other long hair styles. Overall, there are material questions of fact as to the reasonableness of DOCS' policy Plaintiff has challenged. *See Benjamin v. Coughlin, 905 F.2d 571, 576–77 (2d Cir.), cert. denied, 498 U.S. 951 (1990)* (affirming district court's finding that DOCS' policy requiring Rastafarian inmates to cut their dreadlocks upon arrival into DOCS' custody was not reasonably related to the asserted penological interests when defendants did not demonstrate that the religious accommodation sought by prisoners would have "more than a de minimis effect on valid penological interests"); *see also Francis v. Keane, 888 F.Supp. 568, 577 (S.D.N.Y.1995)* (denying summary judgment where two Rastafarian C.O.'s challenged DOCS' grooming regulation prohibiting dreadlocks for officers); *Amaker v. Goord, 2007 WL 4560595.*

## 2. *Personal Involvement*

**\*14** Although neither party addresses the issue in their respective submissions to the Court, there is a question as to whether Plaintiff has sufficiently alleged personal involvement with respect to his RLUIPA claim. Neither the Supreme Court nor the Second Circuit have directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims. [11] *See Joseph v. Fischer, 2009 WL 3321011, at \*18 (S.D.N.Y. Oct. 8, 2009)* (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith, 2009 WL 3199520, at \*9 (N.D.N.Y. Sept. 30, 2009)* (dismissing RLUIPA claim for want of personal involvement on

the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at *2 (S.D.Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* 2009 WL 890521, at *3 (S.D.Ohio Mar. 31, 2009); *Alderson v. Burnett,* 2008 WL 4185945, at *3 (W.D.Mich. Sept. 8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc–1(a), and defines "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of the State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law," 42 U.S.C. § 2000cc–5(4)(A). Thus, RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.

In this case, the uncontroverted record shows that Artus took no actions relevant to Plaintiff's claims beyond referring Plaintiff's complaints, grievances, and appeals to his subordinates. Artus Decl. at ¶ 13. Moreover, the record does not show, and it is not alleged, that Artus was the creator of the DOCS' policy Plaintiff is challenging. *Id.* at ¶ 8 (noting that the policy is based on DOCS Directive # 4914 and relevant CORC determinations, which have the effect of Directives). Plaintiff has not sued DOCS, nor any DOCS employee responsible for creating and/or enforcing the challenged policy.

However, considering Plaintiff's *pro se* status, the lack of finality in this Circuit on the issue of personal involvement in RLUIPA claims, and judicial economy, the Court recommends that DOCS and DOCS Commissioner Brian Fischer be substituted as proper Defendants to this action solely as to Plaintiff's RLUIPA and First Amendment free exercise claims. [12] *See Zuk v. Gonzalez,* 2007 WL 2163186, at *2 (N.D.N.Y. July 26, 2007) (adding a proper defendant, *sua sponte,* in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* FED. R. CIV. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker,* 2006 WL 5893295, at *7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a

defendant in a FTCA claim brought by a *pro se* plaintiff); *Ciancio v. Gorski,* 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999) (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").

### 3. *Monetary Damages under RLUIPA*

**\*15** Defendant argues that Plaintiff is barred from seeking monetary damages for the alleged RLUIPA violation. Def.'s Mem. of Law at p. 29. RLUIPA allows for "appropriate relief against a government," 42 U.S.C. § 2000cc–2(a), but does not specify what types of relief it makes available. The Second Circuit has not yet ruled on the issue, and there appears to be a divide amongst the other circuit courts that have addressed it. *See Bock v. Gold,* 2008 WL 345890, at *5–7 (D.Vt. Feb. 7, 2008) & *Pugh v. Goord,* 571 F.Supp.2d 477, 506–08 (S.D.N.Y.2008) (both noting the split among circuit and district courts).

However, the district courts in this Circuit have held that monetary damages are not available under RLUIPA against state defendants in either their official or individual capacities. [13] Looking to the Eleventh Amendment's protection of the states' sovereign immunity, courts have held that because RLUIPA does not make an unequivocal waiver of sovereign immunity with respect to monetary damages against state defendants in their official capacities, such relief is not available. *See Pugh v. Goord,* 571 F.Supp.2d at 509 (" 'To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.' "(quoting *Lane v. Pena,* 518 U.S. 187, 192 (1996)); *see also Bock v. Gold,* 2008 WL 345890, at *6; *El Badrawi v. Dept. of Homeland Sec.,* 579 F.Supp.2d 249, 258–63 (D.Conn.2008). In addition, courts in this Circuit have held that to allow claims against defendants in their individual capacities would raise serious constitutional questions about whether RLUIPA exceeds Congress's powers under the Spending Clause (Article 1, Section 9, Clause 1) of the Constitution. [14] *See Pugh v. Goord,* 571 F.Supp.2d at 506–07; *Vega v. Lantz,* 2009 WL 3157586, at *4 (D.Conn. Sept. 25, 2009) (holding that RLUIPA does not allow damages against defendants in their individual capacities and citing cases). Essentially, courts have found that because Congress enacted RLUIPA pursuant to the

Spending Clause, not its power to enforce the provisions of the Fourteenth Amendment under Section 5 of the same, there is no constitutional basis for Congress to enforce RLUIPA as to individual defendants, who are not parties to the "contract" between the federal government and the states pursuant to which, as a normal practice, the former provides funding to the latter in exchange for compliance with certain conditions. *See Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 328 (5th Cir.2009) (holding that "individual RLUIPA defendants are not parties to the contract in their individual capacities") (cited in *Vega v. Lantz,* 2009 WL 3157586, at *4); *see also Pugh v. Goord,* 571 F.Supp.2d at 506–07 (citing *Smith v. Allen,* 502 F.3d 1255, 1275 (11th Cir.2007) for the same proposition). Because interpreting RLUIPA to allow suits against individuals would call into question the constitutionality of the statute itself, courts have applied the canon of constitutional avoidance [15] in concluding that RLUIPA does not permit such causes of action. *See Bock v. Gold,* 2008 WL 345890, at *6.

**\*16** Based on the above reasoning, we agree with the other district courts in this Circuit that RLUIPA does not allow monetary damages against individual defendants in their individual or official capacities. *See Pugh v. Goord,* 571 F.Supp.2d at 507 (citing cases); *see also Sweeper v. Taylor,* 2009 WL 815911, at *9 (N.D.N .Y. Mar. 27, 2009) (holding that no monetary damages are available under RLUIPA). Therefore, we recommend that Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA be **dismissed.** However, because Plaintiff has requested both declaratory and injunctive relief, our finding that RLUIPA does not allow monetary damages does not totally moot his claims.

### D. Qualified Immunity

Defendant asserts the affirmative defense of qualified immunity. Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did

not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citation omitted).

Should the district court adopt this Court's recommendations, Plaintiff's RLUIPA and First Amendment religious expression claims against DOCS and Commissioner Fischer are all that will remain in this case. Qualified immunity does not apply to suits against individuals in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). We have already held that, with respect to Plaintiff's RLUIPA claim, monetary damages are not available against defendants in their individual or official capacities. As such, Plaintiff's RLUIPA claims will be limited to injunctive and declaratory relief against DOCS employees in their official capacities. Therefore, qualified immunity has no bearing on Plaintiff's RLUIPA claim. *See, e.g., Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir.1995) ( "[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities ... and it protects only against claims for damages, not against claims for equitable relief."); *see also Rodriguez v. Phillips,* 66 F.3d 470, 481 (2d Cir.1995) (noting that qualified immunity does not apply to claims for injunctive and declaratory relief against a defendant in his official capacity).

**\*17** Plaintiff's claim for damages under the First Amendment, however, is subject to a qualified immunity analysis. On that issue, we find that it is not clearly established law that DOCS' hair policy, which allows only Rastafarians to wear dreadlocks, violates the Free Exercise Clause of the First Amendment. Although the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, *Benjamin v. Coughlin,* 905 F.2d at 576–77, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protection. *See Redd v. Wright,* 597 F.3d 532, 2010 WL 774304, at *4 (2d Cir.2010) (citing cases for the proposition that constitutional rights should be defined with "reasonable specificity"

for qualified immunity purposes and granting qualified immunity because a DOCS policy had not been held unconstitutional at the time it was enforced against the plaintiff). As such, under preexisting law a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was unlawful. *See Dean v. Blumenthal,* 577 F.3d 60, 68 (2d Cir.2009) (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)).

Because we find that DOCS' policy did not violate clearly established law, qualified immunity would apply to all those who participated in its creation and enforcement. As such, should the District Court adopt our recommendation that Commissioner Fischer be substituted as a Defendant, Plaintiff's only potential relief against Fischer in his individual capacity could be non-monetary. *See Rodriguez v. Phillips,* 66 F.3d at 481. Likewise, the Eleventh Amendment's protection of the States' sovereign immunity would preclude any monetary damages Plaintiff would seek against Fischer in his official capacity. *See Farid v. Smith,* 850 F.2d at 921.

As such, should the District Court adopt our recommendations, DOCS and Commissioner Fischer will be substituted as Defendants and Plaintiff will be limited to non-monetary relief against those Defendants under both RLUIPA and § 1983.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED in part** and **DENIED in part** in accordance with the above Report–Recommendation; and it is further

**RECOMMENDED,** that DOCS and Commissioner Brian Fischer be substituted as Defendants pursuant to FED. R. CIV. P. 21; and it is further

**RECOMMENDED,** that Defendant Artus be **dismissed** from this action; and it is further

**RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants *sua sponte* by the Court, that the Clerk of the Court shall add the "New York State Department of Correctional Services" and "Commissioner Brian Fischer" as Defendants to the Docket of this action; and it is further

**\*18 RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants, that the Clerk shall issue Summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the substituted Defendants; and it is further

**RECOMMENDED,** that should DOCS and Fischer be substituted as Defendants, that those substituted Defendants shall file a response to Plaintiff's Complaint as provided for in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED,** that should DOCS and Fischer be substituted as Defendants, that upon the filing of their response to the Complaint, the Clerk shall notify Chambers so that a status conference may be scheduled; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3724883

Footnotes

1  Plaintiff's Response consists of (1) an Affidavit, dated August 31, 2009, which is in sum and substance a concise memorandum of law, and (2) a Declaration, dated August 31, 2009, which is in sum and substance a statement of material facts, with attached Exhibits. *See* Dkt. No. 47.

2  DOCS Directive # 4914 defines "long" as "below shoulder length." Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B) (2) (b).

3  Generally speaking, inmates placed on keeplock are restricted to their cells for twenty-three (23) hours a day, given one hour for exercise, and are denied participation in normal prison activities that occur outside of their cells. *Parker v. Peek– Co,* 2009 WL 211231, at *4 n. 6 (N.D.N.Y. Jan. 27, 2009) (citing cases).

4  Defendant contends that Plaintiff did not appeal the disposition rendered at the fourth Disciplinary Hearing held on September 17, 2007. As opposed to his appeals on the first three Tier II Disciplinary Hearing dispositions, there is no record evidence of any appeal taken as to the fourth. *See generally,* Dkt. No. 36–5, Dale Artus Decl., dated Apr. 30, 2009, Ex. E, Fourth MR Docs. Plaintiff has not presented any evidence in opposition to Defendant's claim that he did not exhaust the administrative remedies available to him with respect to the fourth hearing. *See also* Compl. at ¶ 1 (stating that Plaintiff filed *"three* appeals to Tier II Disciplinary Hearings to Superintendent Dale Artus" (emphasis added)).

5  Plaintiff also mentions complaints/grievances filed on October 22, 2006, and August 30, 2007. Pl.'s Aff. at p. 5. The only correspondences on the record with those corresponding dates are a letter Plaintiff wrote to Assistant Deputy Superintendent S. Garman on October 22, 2006, regarding his self-nomination for Inmate Liaison Committee Representative, and a letter to IGP Supervisor T. Brousseau dated August 30, 2007, in which Plaintiff enclosed two previously filed grievances that allegedly had not been acknowledged at that point. Pl.'s Decl., Ex. E & H, Lts. dated Oct. 22, 2006, & Aug. 30, 2007. Neither of these letters was sent to Artus, nor did they implicate Plaintiff's issues regarding his dreadlocks.

6  We discuss the personal involvement issues related to Plaintiff's RLUIPA and First Amendment religious expression claims below in Part II.C.2.

7  Plaintiff also alleges, in conclusory fashion, that he was denied access to the law library during his periods in keeplock confinement. Compl. at ¶ 6. To the extent Plaintiff attempts to raise an access to the courts claim under the First Amendment, any such claim would fail for want of personal involvement and because Plaintiff has not alleged any injury resulting from his alleged denial of access to the law library. *See Lewis v. Casey,* 518 U.S. 343, 353 (1996).

8  RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores,* 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under Section 5 of the Fourteenth Amendment. "RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord,* 2007 WL 4560597, at *5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

9  The district court adopted Judge Schroeder's recommendation that the preliminary injunction be granted because the prisoners had shown a likelihood of success on the merits of their claim that DOCS' policy precluding NOI members from wearing dreadlocks violated RLUIPA. *Amaker v. Goord et al.,* 2007 WL 4560595 (W.D.N.Y. Dec. 18, 2007).

10  In *Salahuddin,* the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been "substantially burdened." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 n. 5 (2d Cir.2006). *See also Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (noting that the Second Circuit has twice declined to answer the question). To the extent that heightened standard applies to all free exercise claims, Plaintiff has met it by showing that DOCS' policy substantially burdens his religious beliefs.

11  The Court's research uncovered no ruling that a plaintiff need *not* show personal involvement in order to bring a valid RLUIPA claim.

12  Defendant asserts that Plaintiff's claims are moot because he has been transferred from Clinton Correctional Facility, where Artus is the Superintendent, to Southport Correctional Facility. Def.'s Mem. of Law at p. 38 (quoting *Salahuddin v. Goord* for the proposition that "an inmate's transfer from a prison facility generally renders moot any claims for declaratory judgment and injunctive relief against the officials of that facility."). However, because we recommend that DOCS and Commissioner Fischer be added to the case as Defendants, this mootness argument is without merit.

13  Research has not revealed any district court in this Circuit that has concluded otherwise.

14  Both the Eleventh and the Fifth Circuits have explicitly held that Congress enacted RLUIPA pursuant to its power under the Spending Clause, not the Commerce Clause. *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 329 n. 34 (5th Cir.2009); *Smith v. Allen,* 502 F.3d 1255, 1274 n. 9 (11th Cir.2007). We agree with those courts that because "there

is no evidence concerning the effect of the substantial burden" on interstate commerce, RLUIPA must necessarily be Spending Clause legislation. *See Sossamon v. Lone Star State of Texas,* 560 F.3d at 329 n. 34.

15 "The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted." *Bock v. Gold,* 2008 WL 345890, at *6.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---